# EXHIBIT A

CONVERGYS vs. IGATE CORPORATION, et al.
William P. Koopmans
February 12, 2004

PAGE 1

```
          UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF OHIO
                WESTERN DIVISION
CONVERGYS INFORMATION      :
MANAGEMENT GROUP, INC.,    :
AND CHUBB CUSTOM           :
INSURANCE COMPANY,         :
     Plaintiffs            :
        -v-                :   Case No. CV-01-618
                           :     (Judge Beckwith)
IGATE CORPORATION, et al., :
     Defendants            :
                       - 0 -
```

The deposition of WILLIAM P. KOOPMANS, taken before Melea E. Chaney, Court Reporter and Notary Public in and for the State of Ohio, at the law offices of Ulmer & Berne, 600 Vine Street, Suite 2800, Cincinnati, Ohio, on the 12th day of February, 2004, beginning at the hour of 9:23 a.m. and ending at the hour of 6:09 p.m. of the same date.
                       - 0 -
                 RIVERSIDE REPORTING
               Certified Court Reporters
                     P.O. Box 949
                Covington, Kentucky  41012
                   KY(859)291-6110
                   OH(513)574-7017



Case 1:01-cv-00618-TSH    Document 48-2    Filed 04/01/2004    Page 3 of 8

CONVERGYS vs. IGATE CORPORATION, et al.
William P. Koopmans
February 12, 2004

PAGE 6

and then I'm going to ask your counsel to indicate on the record which of the particular paragraphs of the notice you're being presented as the designee of plaintiff, Convergys Information Management, Group, Inc.

MR. SHANK: For the record Mr. Koopmans is being designated on the following topics in the notice of deposition: Topic number one, topic number two, I, topic number four, topic number five, six, seven, eight, nine, 11, 12, 13, 14, 16 and 20. Let's go off the record for one second.

(OFF THE RECORD)

MR. SHANK: I believe I finished with topic number 20. And a couple of other things to note for the record, Kevin. First of all, there may be additional witnesses that can speak to the same topics that Mr. Koopmans is being designated on as well, including Darin Brown. So the fact that Mr. Koopmans is being designated on these topics does not preclude Convergys from having other witnesses who will also testify to the same topics.

And secondly, in a letter that I wrote to you and sent to you on February the 10th of

PAGE 7

2004, we addressed a couple of objections to topics two, three, four, five, seven, 11, 12 and 17. And I don't think I need to say any more about those objections at this point, but just note that letter and hopefully to the extent we have any issues that arise with those objections, we can resolve those either on the record or off the record.

MR. LUCAS: I acknowledge receipt of the letter you mentioned. I believe you also had certain objections in that letter to topics six and seven. Since you and I have not yet had a chance to go through those matters, and I didn't know until just now what the subject matters Mr. Koopmans was being designated on, perhaps you and I can talk about that on a break and I'll just move forward.

I will attempt, however, to the extent that I can, to defer questioning Mr. Koopmans on those areas that you are not designating him on or ones where you've made an objection even if he's going to be a designee on those subject matters.

So I'll try to get the ones where we have no objections pending and he's going to be

PAGE 8

produced on out of the way and then try to do clean-up after you and I have had a chance to talk. I think that makes sense.

MR. SHANK: I appreciate that.

MR. LUCAS: Do I correctly understand, though, that Mr. Koopmans is not being presented as a designee at all at this deposition on behalf of Chubb Custom Insurance Company?

MR. SHANK: That is correct.

MR. LUCAS: And Mr. Koopmans is also being produced just in his individual capacity for deposition; is that correct?

MR. SHANK: In his individual capacity for deposition and then also in his capacity on the topics that we've noted on behalf of Convergys.

MR. LUCAS: And I take it for tomorrow's deposition of Mr. Brown you will tell me at that time, perhaps you can tell me later today, which topics Mr. Brown is being offered as a designee on.

MR. SHANK: I can tell you anytime that you want to talk about that.

MR. LUCAS: Very good.

PAGE 9

BY MR. LUCAS:
Q    Mr. Koopmans, would you provide your residence address, please?
A    10806 Palestine, P-A-L-E-S-T-I-N-E, Drive, Union, Kentucky 41091.
Q    Could you briefly describe for me your educational background after high school?
A    After high school I went to the University of Illinois. I got a bachelor's degree in mechanical engineering. I went into the graduate program and completed all the course work. I did not get my degree because I didn't finish my thesis.
Q    And the graduate program was also mechanical engineering?
A    Yes, it was.
Q    What year did you obtain your -- I take it a BS --
A    Yes.
Q    -- in mechanical --
A    1984.
Q    And in what year or years were you involved in the graduate program?
A    Well, '84 through '86, May of '86.
Q    Have you had any other formal education after high school other than what you just described?

Case 1:01-cv-00618-TSH   Document 48-2   Filed 04/01/2004   Page 4 of 8

CONVERGYS vs. IGATE CORPORATION, et al.
William P. Koopmans
February 12, 2004

PAGE 10

```
 1        A    No.
 2        Q    Have you taken part and participated in
 3   various what I'll call continuing education programs or
 4   certification programs in the IT field?
 5        A    Yes.
 6        Q    Can you describe for me briefly what
 7   those are?
 8        A    I would probably have to answer
 9   precisely.  I'd have to go back through history and
10   notes.
11        Q    Let me ask you then a general question
12   so you feel comfortable and you can answer.
13        A    Okay.
14        Q    Is there any particular area within the
15   IT field where you've taken some additional courses or
16   certification in this area?  For example, a systems
17   administration on the one hand versus database
18   administration on another versus different areas.
19   Would that be an easier question to answer?
20        A    Yes.
21        Q    Could you answer that then?
22        A    I've taken a number of classes dealing
23   with Oracle database administration or their tool set
24   that they provide.  And I've taken a number of courses,
25   seminars, on software development processes, quality
```

PAGE 11

```
 1   processes within software development.  What I can't do
 2   is -- at this point is tell you precisely which courses
 3   I took, what their names were and what dates.
 4        Q    Let's take those two areas, though.  In
 5   the area of the database administration dealing with
 6   Oracle, approximately when were you involved in that
 7   particular study?
 8        A    Probably my first classes with Oracle
 9   were in the late 1980s.
10        Q    And could you tell me, did they take
11   place in one particular approximate time frame or were
12   they taken from time to time?
13        A    They were taken from time to time.
14        Q    When was the most recent Oracle course
15   of this sort that you took?
16        A    I can only speculate on that answer.
17        Q    Well, I don't want you to do that, but
18   I would like to get an idea.  We're here to talk about
19   events that took place in September of 1999.  Do you
20   recall approximately, just in approximate terms, how
21   much time before September of 1999 you had your last
22   Oracle course?
23        A    It would have likely been in the first
24   half of the 1990s.
25        Q    So whatever courses that you would have
```

PAGE 12

```
 1   taken or attending of programs for Oracle database
 2   administration would have been somewhere between the
 3   late 1980s up to early 1990s through 1995 or
 4   thereabouts?
 5        A    That is correct.
 6        Q    Did these lead to any particular
 7   certifications?
 8        A    No.
 9        Q    How many days of study or weeks of
10   study were involved?
11        A    Probably on the order of 15 to 20.
12        Q    Days?
13        A    Yes.
14        Q    With respect to the subject matter that
15   we're going to talk about in your deposition, and that
16   being the events really of September the 16th through
17   September the 21st or thereabouts of 1999, with respect
18   to the activities that you understand that Mr. Rao was
19   engaged in, were any of your courses with Oracle
20   devoted to that subject matter?
21        A    Yes.  One of the first classes I took
22   was basic Oracle database administration and an Oracle
23   DBA 101, so it provides the -- kind of the simplest
24   foundation for the tasks that Ragesh performed.
25        Q    That would have been one of the courses
```

PAGE 13

```
 1   you had taken back in the late 1980s?
 2        A    That is correct.
 3        Q    Was there anything of a more
 4   specialized nature as opposed to like TBA 101 type of
 5   study?
 6        A    No.
 7        Q    Now, the second general area that you
 8   described, I think you said courses on software
 9   development quality processes --
10        A    Correct.
11        Q    -- would you just briefly describe for
12   me what you mean by that?  What was the general nature
13   of that particular area?
14        A    Different methodologies for software
15   development and how to build quality into your
16   software, how to ensure quality.
17        Q    Did that area of study have anything to
18   do with procedures or processes that should be followed
19   in a software development or a developmental database
20   administration type of work?
21        A    Yes.  There were a few that -- there
22   were portions of courses that dealt with development of
23   SQL and database access and database design methods.
24        Q    Are there any certifications you
25   received in this area?
```

CONVERGYS vs. IGATE CORPORATION, et al.
William P. Koopmans
February 12, 2004

PAGE 14

1   A   No.
2   Q   Was that any particular company like
3   Oracle that provided these courses or a particular
4   institution that provided these particular areas of
5   study?
6   A   Other than taking some courses directly
7   from Oracle, I can't recall the vendors.
8   Q   And are these courses that you just
9   mentioned, are they included in the approximate 20 days
10  of study you had mentioned earlier or are these in
11  addition to that?
12  A   Those -- these are in addition to that.
13  Q   And approximately how many additional
14  days or weeks were involved in this particular area?
15  A   Over the course of the last 17 years, I
16  don't know that I can give -- in general we take five
17  to ten days of training a year. I -- I can't even
18  begin to speculate if it's 60 or 100.
19  Q   In the period prior to the events of
20  September of 1999, were there any particular areas that
21  you had courses or areas that you had studied that you
22  believe were particularly related to the events that
23  took place, what you believe to be Mr. Rao's activities
24  during that September 16th to the 21st time frame?
25  A   I'm sorry. Can you repeat that

PAGE 15

1   question?
2   Q   Yes. In the period prior to September
3   of 1999, were there any particular courses of the type
4   you're discussing here, whose subject matter was, in
5   your mind, related to what you believe was the nature
6   of Mr. Rao's activities during this period of mid-
7   September of 1999?
8   A   Yes.
9   Q   Can you tell me what that was?
10  A   Specifically not so much as the day-to-
11  day database administration, but in the processes that
12  you follow to ensure quality. Things like reviews of
13  scripts, second set of eyes.
14  Q   And what is the process to be followed
15  in your mind that you're referring to in your example
16  about the review of scripts, second set of eyes?
17  Describe to me what that means.
18  A   That means that you don't rely on an
19  individual's work to ensure quality. You rely on the
20  experience and knowledge of multiple members to make
21  sure your solution is precise and accurate and will --
22  and will yield the intended result.
23  Q   And is that with respect to everything
24  a DBA does or is that with respect to scripts prepared
25  by the DBA?

PAGE 16

1   A   It is -- it relates to everything
2   developed, so including virtually all scripts. It is
3   not 100 percent inclusive of day-to-day activities,
4   commands that are performed, but does include some of
5   the more complex.
6   Q   With respect to whatever courses that
7   we've been discussing, would these matters be reflected
8   in your personnel file, if you know, at Convergys?
9   A   I occasionally reference training I've
10  completed in my self-appraisal, but it would not be 100
11  percent inclusive because many years I have not
12  completed a self-appraisal.
13  Q   Let me ask you -- well, it will be a
14  leading question, but maybe it will expedite matters.
15  In looking at some of the personnel records that have
16  been produced in this case, and they don't include
17  anything having to do with you, but it looks like
18  there's a process in Convergys where there's a midyear
19  review and as part of that the employee provides a
20  self-appraisal of his or her own accomplishments and
21  achievements. And then there's a review and a report
22  by a supervisor. And then there's also a year-end
23  appraisal. Is that essentially the process that's been
24  followed during this time period, say, from the mid-
25  '90s up through 1999?

PAGE 17

1   MR. SHANK: Objection to form. Go
2   ahead.
3   THE WITNESS: Yes. In general the
4   policy in Convergys has been an informal mid-
5   year review and more formal year-end review.
6   BY MR. LUCAS:
7   Q   Now, Convergys during the time period
8   of your employment has used the services in what I'll
9   call the IT area, including the database administration
10  area, of both employees as well as individuals who are
11  not employees; is that correct?
12  A   That is correct.
13  Q   The latter category of individuals, are
14  they generally referred to as consultants?
15  A   The accepted Convergys terminology for
16  99-plus percent of those individuals is contractors.
17  Q   Is there any procedure --
18  A   May I clarify my answer?
19  Q   Please do.
20  A   The -- the term that we use in the
21  working level is contractors. I don't have any idea
22  how HR, our executives or our legal department refers
23  to them.
24  Q   That's fine. I just want to know a
25  term that I can use that you will know what I'm talking

CONVERGYS vs. IGATE CORPORATION, et al.
William P. Koopmans
February 12, 2004

PAGE 150

```
 1    said he hasn't.
 2            MR. LUCAS:  The witness appears to be
 3    thinking.  I don't want to cut him off.
 4            MR. SHANK:  Well, I mean, you're close
 5    --
 6            THE WITNESS:  But I did physically
 7    deliver them to Mr. Booher.
 8            MR. SHANK:  You're close to the
 9    privilege line, counsel, so that's why I want
10    to be careful.
11            MR. LUCAS:  Well, there's no privilege
12    here and that's what this whole thing is -- I
13    mean, that's what this whole line of
14    questioning is to get at.  There is no
15    privilege that's applicable here.
16            MR. SHANK:  I --
17    BY MR. LUCAS:
18        Q   You didn't deliver them to Mr. Booher
19    for a minimum of three and a half months and maybe as
20    long as 40 months, correct?
21            MR. SHANK:  Again, I'm going to object
22    to the statement that there's no privilege
23    there and that's part of the question that's
24    asked, so I'm going to object to the question
25    as well.  What's the question?  He's already
```

PAGE 151

```
 1    said he did not deliver them physically to Mr.
 2    Booher for a minimum of three and a half
 3    months.  He's said that already.
 4    BY MR. LUCAS:
 5        Q   Did you read them to Mr. Booher during
 6    the week of 9/20 to 9/23?
 7        A   No.
 8        Q   I mean, you made them and you threw
 9    them in the file so you could look at them at a later
10    point in time; is that correct?
11            MR. SHANK:  Objection.  Objection to
12    form.
13            THE WITNESS:  I --
14            MR. SHANK:  He cannot answer the
15    question why they were made, Kevin.  For him to
16    answer the question why they were made would
17    violate the privilege.
18            MR. LUCAS:  Well, if he can't answer
19    that question, there can't even be an assertion
20    of privilege.  Not only an inadequate assertion
21    of privilege, there can't even be an assertion
22    of the privilege.
23    BY MR. LUCAS:
24        Q   At the time you prepared these notes,
25    were you personally contemplating Convergys filing a
```

PAGE 152

```
 1    claim against Mr. Rao or Mr. Rao's employer?
 2        A   That is not my role.
 3        Q   So you weren't; is that correct?
 4            MR. SHANK:  You can answer that.
 5            THE WITNESS:  Yes.
 6    BY MR. LUCAS:
 7        Q   Did you ever tell Mr. Rao or Mr. Rao's
 8    employer at the time that you or Convergys was
 9    contemplating filing some sort of a claim against one
10    or both of them?
11        A   I can't recall precisely, but I can't
12    imagine I would ever do that.
13        Q   You cannot imagine it; is that what you
14    said?
15        A   That is correct.
16        Q   Did anyone else that you know of within
17    Convergys, such as Mr. Darin Brown, Mr. Ravi Kura, Mr.
18    Neil Hulin, anyone else that was involved, did anyone
19    else prepare notes at the time concerning the events?
20        A   I do not know.
21        Q   Dd Mr. Booher suggest to you or direct
22    to you that you prepare notes of your recollection of
23    the factual events that had taken place?
24            MR. SHANK:  Don't answer that question.
25    That is a privileged question.
```

PAGE 153

```
 1            MR. LUCAS:  So you're invoking the
 2    privilege and instructing him not to answer
 3    that, correct?
 4            MR. SHANK:  Correct.
 5    BY MR. LUCAS:
 6        Q   After you prepared the notes, so, I
 7    mean, like in this third week of September when you
 8    were preparing these notes at that time, what steps did
 9    you take or did anyone else at Convergys under your
10    direction or control take to preserve documents at
11    Convergys relating to Mr. Rao's activities?
12        A   I guess none other than to retain
13    everything that was existing.
14        Q   Well, let's talk about that.  What did
15    you retain?  You retained what was in your folder; is
16    that correct?
17        A   Correct.
18        Q   Did you retain anything else?
19        A   Yes.
20        Q   What else did you retain having to do
21    with this incident?
22        A   Electronic correspondence.
23        Q   And you've turned that over to
24    Convergys' counsel in this lawsuit, correct?
25        A   Yes.
```

Case 1:01-cv-00618-TSH   Document 48-2   Filed 04/01/2004   Page 7 of 8

CONVERGYS vs. IGATE CORPORATION, et al.
William P. Koopmans
February 12, 2004

PAGE 210

1  A   That's what I intended to type in as a
2  -- a note that this excerpt of the SSP alert log is --
3  represents normal activity on the SSP database.
4  Q   Then let's go up to your -- I guess
5  down it would be, there's an entry, it's a little bit
6  difficult to see, for the September 17th at 10:48 a.m.,
7  "? ?"
8  A   Mm-hmm.
9  Q   It seems like it says "On SSP"?
10 A   Mm-hmm.
11 Q   That's your handwriting again?
12 A   Correct.
13 Q   What is that intended to reflect?
14 A   I'm just embellishing. The -- this
15 document was our time line of what happened, explaining
16 what happened. So this was a draft and I'm -- I think
17 there's several of these where I continued to refine
18 and take notes and dig down. So --
19 Q   Let me -- I'm sorry.
20 A   So this was -- I was being precise.
21 "Additional corrupted data files observed on SSP as
22 opposed to SSUP."
23 Q   And then the next entry for the okay
24 that's down there, what's that supposed reflect?
25 A   That -- that is a complete list of the

PAGE 211

1  data files that were corrupted.
2  Q   And then the entry down where it says
3  "Last data file that restored at 16:46".
4  A   Yes.
5  Q   What does that refer to?
6  A   The -- the last of the 17 data files
7  that were corrupted was restored at 16:46 on 9/17.
8  Q   So that would be like 4:46 in the
9  afternoon?
10 A   Correct.
11 Q   And then, if you would, go to the next
12 page which is marked number 13. It says "Called Oracle
13 and discussed..." -- is that options?
14 A   Mm-hmm.
15 Q   Is that your handwriting?
16 A   Yes.
17 Q   And did you call Oracle and discuss
18 that or was that done by somebody else?
19 A   Well, it -- it was the -- a team of us
20 that were working this problem.
21 Q   Would you turn now to page 15?
22 A   Okay.
23 Q   There is a reference to, at the bottom,
24 it says "9/17 10:45 operations received" and then dash,
25 dash, dash; what does that mean?

PAGE 212

1  A   I can't be sure. If we look at the
2  final version, it might provide a little clarity.
3  These were just my notes and embellishing. Probably a
4  step where operations --
5  Q   That's fine. Down below "Contacted
6  Oracle support." That's the same type of reference you
7  had before. Is it intended to mean the same thing?
8  A   Yes.
9  Q   Then there's a reference to Darin, Neil
10 and George. I take it that's Darin Brown, Neil Hulin
11 and George Robson?
12 A   That is correct.
13 Q   What is the significance of their names
14 being entered there?
15 A   I probably want to -- wanted to
16 reference -- oh, that's what it is. At -- at a point
17 in time we split our investigation, one set of folks
18 contacted Oracle support, another set of folks kind of
19 went off on a fact-finding investigative exercise.
20 Q   Let me ask you: In looking at these,
21 the event in terms of the corruption of the database as
22 you were talking about --
23 A   Mm-hmm.
24 Q   -- first starts to appear, if I read
25 this page correctly, number 15, at approximately 10:35

PAGE 213

1  a.m. on September 17th; is that correct?
2  A   Well, that's the first impact to
3  customer. The events that caused the corruption are at
4  the top of the page at 10:33.
5  Q   Okay. So at 10:33 things happened.
6  Within two minutes you're indicating that the errors
7  were appearing in the SSP alert log, correct?
8  A   Right.
9  Q   And then ten minutes after that you
10 have split Convergys' operations twofold: one will be
11 the recovery efforts in working with Oracle support; is
12 that correct?
13          MR. SHANK: Objection to form.
14          THE WITNESS: It's really our
15     investigation and figuring out what the heck
16     was going on at the time, why we were seeing
17     the stuff we were seeing. We created two
18     teams: one that worked with Oracle support,
19     one that dug into the logs and the application
20     logs and the operating system logs to try to
21     figure out what was going on.
22 BY MR. LUCAS:
23 Q   Okay. We'll come back in the final --
24 in the final version I think this will clear it up.
25 Let me ask you generally: At the time did the effort

CONVERGYS vs. IGATE CORPORATION, et al.
William P. Koopmans
February 12, 2004

PAGE 318

```
 1    as well?
 2        A      I don't recall.
 3        Q      Do you recall whether he accused anyone
 4    of doing that?
 5        A      I don't recall.
 6        Q      Is there anything else that took place
 7    on September the 17th in any dealings you had with Mr.
 8    Rao concerning the database corruption or his
 9    activities on the 16th and 17th that you haven't
10    testified to today?
11        A      No, other than, like I said before, he
12    played no role.  He stayed to himself.  We believe we
13    know why he did that.  And then he left at a reasonable
14    time when the rest of the team stayed and worked
15    essentially all evening and many through the night.
16        Q      Did you talk to him at all or did Mr.
17    Brown or anyone else from Convergys talk to Mr. Rao
18    over the weekend, that Saturday, Sunday, the 18th,
19    19th?
20        A      Not -- I -- I do not believe so.  He
21    did not -- everybody else worked through the weekend
22    with the exception of Ragesh.
23              MR. LUCAS:  Okay.  Why don't we adjourn
24        for right now and then we'll pick up tomorrow
25        with Mr. Brown and then we'll finish off with
```

PAGE 319

```
 1        Mr. Koopmans next week, as we previously
 2        discussed.  Thank you for your time.
                           - 0 -
         (AND FURTHER THE DEPONENT SAITH NAUGHT)
                           - 0 -
                    _____
                       William P. Koopmans
```

PAGE 320

                                                          320
                    C-E-R-T-I-F-I-C-A-T-I-O-N
STATE OF OHIO,
COUNTY OF WARREN, To-wit;
            I, Melea E. Chaney, Court Reporter and
Notary Public in and for the State of Ohio, do hereby
certify;
            That on the 12th day of February, 2003,
there appeared before me pursuant to Notice and
agreement of counsel, WILLIAM P. KOOPMANS, as a witness
in the previously entitled cause;
            That the said witness was sworn by me
and examined to tell the truth, the whole truth, and
nothing but the truth in said cause;
            That the deposition was taken by me via
Stenomask and electronic recording and the foregoing
319 pages contain a true, full and correct
transcription of all the testimony of said witness;
            That the deposition was submitted to
counsel for the witness for reading and signature;
            That I am not related to or in any way
associated with any of the parties to said cause of
action, or their counsel, and that I am not interested
in the event thereof.
            IN WITNESS WHEREOF, I have hereunto set
my hand this 19th day of February, 2004.

                          _____
                          Melea E. Chaney
                          My commission expires:
                          July 3, 2006

RIVERSIDE REPORTING
KY(859)291-6110   OH(513)574-7017