# EXHIBIT B

Case 1:01-cv-00618-TSH     Document 48-3     Filed 04/01/2004     Page 1 of 15

CONVERGYS INFORMATION MGMT. GROUP, INC., et al. vs. IGATE CORP., et al.
DARIN BROWN
2/13/04

SHEET 1   PAGE 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

CONVERGYS INFORMATION          :
MANAGEMENT GROUP, INC. and     :
CHUBB CUSTOM INSURANCE         :
COMPANY,                       :
    Plaintiffs             :
    -v-                    : Case No. CV-01-618
                               : (Judge Beckwith/Magistrate
                               : Judge Sherman)
IGATE CORPORATION, et al.,     :
    Defendants             :

- 0 -

The deposition of DARIN BROWN, taken before Susan K. Lee, CVR-CM, Court Reporter and Notary Public in and for the State of Ohio, at the law offices of Ulmer & Berne LLP, 600 Vine Street, Suite 2800, Cincinnati, Ohio, on the 13th day of February, 2004, beginning at the hour of 9:15 a.m. and ending at 5:12 p.m. of the same date.

- 0 -

RIVERSIDE REPORTING
Certified Court Reporters
P.O. Box 949
Covington, Kentucky  41012
KY(859)291-6110   OH(513)574-7017

**COPY**

Case 1:01-cv-00618-TSH   Document 48-3   Filed 04/01/2004   Page 3 of 15

CONVERGYS INFORMATION MGMT. GROUP, INC., et al. vs. IGATE CORP., et al.
DARIN BROWN
2/13/04

SHEET 14 PAGE 50

50
1  A  That is correct.
2  Q  And that's something that Convergys
3  realized within minutes of the actual event; is that
4  correct?
5      MR. SHANK: Objection to foundation.
6      THE WITNESS: Convergys realized that
7      the database had become corrupt within a few
8      minutes, a matter of minutes of when the
9      corruption occurred.
10 BY MR. LUCAS:
11 Q  And Convergys knew what SSP database
12 files had been corrupted?
13 A  At what time?
14 Q  Within minutes of it happening.
15     MR. SHANK: Objection to form and
16     foundation.
17     THE WITNESS: I don't think that's
18     accurate.
19 BY MR. LUCAS:
20 Q  Would you look at -- I'll Mr. Shank to
21 show you Exhibit Number 9. Take a moment just to look
22 at the document and I'll give you a chance to look at
23 any particular section you want in detail.
24     But subsequent or after the September
25 17th database corruption there was what was called

PAGE 51

51
1  within Convergys a postmortem analysis, was there not?
2  A  Yes.
3      MR. SHANK: Object to foundation.
4  BY MR. LUCAS:
5  Q  And that postmortem analysis included,
6  among other things, a determination of what the root
7  cause was for the database corruption; is that correct?
8      MR. SHANK: Object to foundation.
9      THE WITNESS: That is correct.
10 BY MR. LUCAS:
11 Q  And that root base cause was then
12 communicated by Convergys to its customer, Sprint,
13 correct?
14     MR. SHANK: Object to foundation.
15     THE WITNESS: That is correct.
16 BY MR. LUCAS:
17 Q  And as part of those efforts, Convergys
18 also decided upon certain what it called irrevocable
19 corrective actions; is that correct?
20     MR. SHANK: Object to foundation.
21     THE WITNESS: Specific to this
22     incident?
23     MR. LUCAS: Yes.
24     THE WITNESS: I -- I believe that to be
25     true.

PAGE 52

52
1  BY MR. LUCAS:
2  Q  And you were part of those efforts,
3  were you not?
4  A  Part of the efforts to determine the
5  irrevocable corrective actions?
6  Q  And the root causes of the September
7  17th, 1999 database corruption incident.
8  A  Yes.
9  Q  And you were part of the discussions
10 within Convergys, you reviewed drafts, discussed those
11 drafts with Mr. Koopmans and others before the
12 postmortem analysis was completed and delivered to
13 Sprint; is that correct?
14     MR. SHANK: Objection to form and
15     foundation.
16     THE WITNESS: From a technical
17     perspective I reviewed documents associated
18     with the root cause of this incident.
19 BY MR. LUCAS:
20 Q  And you also attended meetings, did you
21 not, and reviewed drafts of the postmortem documents in
22 question; isn't that correct?
23     MR. SHANK: Object to form.
24     THE WITNESS: I clearly reviewed
25     materials associated, again, with the root

PAGE 53

53
1      cause of this incident.
2  BY MR. LUCAS:
3  Q  Let me show you -- while you have
4  Exhibit Number 9 in front of you, let me also place in
5  front of you Exhibit Number 17. Take a look at that,
6  please. Have you seen this document before, Exhibit
7  Number 17?
8  A  Yes.
9  Q  Mr. Koopmans identified this in
10 substance as being the final version of the root cause
11 irrevocable corrective action document that Convergys
12 prepared as a result of its investigation of the
13 September 17, 1999 database corruption incident. Do
14 you agree with that?
15     MR. SHANK: Objection to form.
16     THE WITNESS: I was not responsible for
17     -- as far as communications with Sprint, the
18     client, with relation to this, so I can't speak
19     to that.
20 BY MR. LUCAS:
21 Q  You did see this document, however, and
22 comment on it as it was being prepared by Convergys?
23     MR. SHANK: Object to form and
24     foundation. I think he's already answered that
25     question.

CONVERGYS INFORMATION MGMT. GROUP, INC., et al. vs. IGATE CORP., et al.
DARIN BROWN
2/13/04

SHEET 15  PAGE 54

**Page 54**

1           THE WITNESS: I don't remember
2      specifically reviewing this exact document,
3      but, again, I was involved in the root cause
4      analysis for this incident.
5  BY MR. LUCAS:
6      Q    Let me show you what will be marked as
7  Exhibit Number 27. It's a two-page document with
8  Convergys document production numbers 708 and 709.
9           Mr. Brown, this document, as it
10 appeared in what was called the Koopmans file in the
11 Convergys legal department, was discussed with Mr.
12 Koopmans yesterday. He described that this relates to
13 the review finalization by Convergys of its postmortem
14 analysis and written summary and then the presenting of
15 that at a meeting with Sprint.
16          And I just want to call your attention
17 to the middle section, to see if this refreshes your
18 recollection, on the first page of this document.
19          The meeting with Sprint, as indicated
20 in the e-mail on the bottom, was to take place with
21 Convergys and Sprint on Thursday, September the 30th.
22 And then if you look at the middle e-mail of the
23 September 28th, there was going to be a review session
24 of that document by a variety of Convergys
25 representatives, and you're listed as a recipient of

**Page 55**

1  Mr. Koopmans' memo scheduling the internal review
2  meeting for the day prior to the meeting with Sprint.
3           Does that refresh your recollection
4  that you, in fact, met in internal meetings with
5  Convergys to discuss the very written postmortem
6  documents that Convergys then presented to Sprint?
7       MR. SHANK: Objection to form.
8       THE WITNESS: As I answered before, I
9       clearly was involved in reviewing the material
10      that this document covers. I don't have
11      specific recollection of reviewing this
12      document and I don't have specific recollection
13      of attending this meeting.
14 BY MR. LUCAS:
15      Q    So you could have been there, but you
16 just don't recall?
17      A    I -- I don't recall, that's correct.
18      Q    Would you turn now back to Exhibit 9?
19 Remember, we were looking at 9 and 17 together. Number
20 9 relates to the postmortem document as it existed on
21 September the 28th and the cover memo refers to the
22 same internal review meeting and then the presentation
23 of the document to Sprint on Thursday, September the
24 30th. Do you recall seeing this document before? This
25 document meaning Exhibit 9.

**Page 56**

1       A    Yes.
2       Q    The second through the seventh pages of
3  this document, numbered 693 through 698, is a
4  chronology of various events having to do with the
5  database corruption; is that correct?
6       A    Yes.
7       Q    Okay. And did you work with Mr.
8  Koopmans in developing or gathering the information to
9  develop this chronology of events?
10      A    I provided input to this document.
11      Q    Would you turn to page 694? And I'm
12 showing this to see if this refreshes your recollection
13 to the questions I had asked you earlier about the time
14 frame involved.
15          This document reflects, does it not,
16 that -- in the top entry on September the 17th
17 beginning at 10:33 that various tablespaces were
18 created with data files that overwrote the SSP data
19 files that you were referring to earlier in your
20 testimony; is that correct?
21      A    Yes.
22      Q    And that's indicated as taking place
23 sometime beginning at about 10:33. Do you see that?
24      A    Yes.
25      Q    At 10:35, two entries down, two minutes

**Page 57**

1  later, the errors were appearing in the SSP alert log;
2  is that correct?
3       A    Yes.
4       Q    And that's the SSP alert log that
5  Convergys does not contend was edited or manipulated in
6  any manner by Mr. Rao, correct?
7       MR. SHANK: Objection. Go ahead, Mr.
8       Brown.
9       THE WITNESS: That is -- can you
10      rephrase the question, please?
11 BY MR. LUCAS:
12      Q    Convergys within minutes from -- at
13 least from the SSP alert files was aware of the
14 database corruption, correction?
15      MR. SHANK: Objection to the extent
16      it's already been asked and answered.
17      THE WITNESS: That is correct.
18 BY MR. LUCAS:
19      Q    Like within two minutes?
20      MR. SHANK: Objection.
21      THE WITNESS: I don't know how many
22      minutes but within minutes.
23      MR. LUCAS: Okay.
24 BY MR. LUCAS:
25      Q    And Convergys knew within minutes

Case 1:01-cv-00618-TSH   Document 48-3   Filed 04/01/2004   Page 5 of 15

CONVERGYS INFORMATION MGMT. GROUP, INC., et al. vs. IGATE CORP., et al.
DARIN BROWN
2/13/04

SHEET 16 PAGE 58

**Page 58**

1 exactly which files had been corrupted, correct?
2         MR. SHANK: Objection to the extent
3     it's already been asked and answered.
4         THE WITNESS: I believe the answer to
5     that is no.
6 BY MR. LUCAS:
7     Q    When did Convergys first know what SSP
8 database files had been corrupted?
9     A    I don't recall the exact time.
10     Q    It was before Convergys took the system
11 offline, wasn't it?
12     A    Convergys didn't take the system
13 offline.
14     Q    Before Convergys took the affected
15 tablespaces offline, correct?
16     A    Convergys knew of some files that had
17 been corrupted within minutes of the corruption, but
18 that doesn't mean Convergys knew the extent of that
19 corruption.
20     Q    How many table files were corrupted?
21     A    If I recall correctly, it was 17 data
22 files.
23     Q    And that all took place sometime
24 between 10:33 or 10:30 in approximate terms and before
25 11:00, correct?

**Page 59**

1     A    I believe that's correct, yes.
2     Q    Okay. And all of those affected data
3 files, all 17 or the totality of the affected data
4 files, were taken offline before 11:00, correct?
5         MR. SHANK: Objection to the extent
6     it's already been asked and answered.
7         THE WITNESS: When you say taken
8     offline, are you referring to somebody
9     specifically taking that action?
10 BY MR. LUCAS:
11     Q    Why don't you look at the next entry on
12 the page we're looking at, the very page we're looking
13 at. September 17th at 11:00, the affected tablespaces
14 taken offline, in Convergys' final postmortem document.
15 Do you see that?
16     A    Yes.
17     Q    Okay. So is that a correct statement?
18         MR. SHANK: Object to foundation.
19         THE WITNESS: I have no reason to
20     believe that's not correct.
21 BY MR. LUCAS:
22     Q    If Mr. Koopmans testified as to when
23 Convergys learned -- how long it took for Convergys to
24 learn what data files had been corrupted, he would know
25 the answer to that question, would he not?

**Page 60**

1         MR. SHANK: Object to the form of the
2     question.
3         THE WITNESS: I can't speak to what Mr.
4     Koopmans would know.
5 BY MR. LUCAS:
6     Q    Well, who was more involved in these
7 matters between 10:30 a.m. and 11:00 a.m. on September
8 17th of 1999?
9         MR. SHANK: Him or Mr. Koopmans, is
10     that the question?
11         MR. LUCAS: Yes.
12         THE WITNESS: I believe we were both
13     equally involved.
14 BY MR. LUCAS:
15     Q    Were you responsible for the usage
16 split project that was going on?
17     A    I was not.
18     Q    Okay. Was Mr. Koopmans responsible for
19 the usage split project that was going on?
20         MR. SHANK: Object to form.
21         THE WITNESS: If you can define
22     responsible for me.
23 BY MR. LUCAS:
24     Q    The people to whom -- the people that
25 reported to him were actually doing it, correct?

**Page 61**

1     A    That is correct.
2     Q    Okay. You weren't supervising at the
3 time those people, were you?
4     A    That is correct.
5     Q    You had no supervisory or management
6 position with respect to the usage split project that
7 was going on on September 17th, correct?
8     A    That is correct.
9     Q    Do you have any reason to believe that
10 Mr. Koopmans did not know when Convergys first learned
11 of which data files had been corrupted?
12         MR. SHANK: Objection to form, lack of
13     foundation.
14         THE WITNESS: I -- I wouldn't have any
15     reason to disbelieve Mr. Koopmans.
16 BY MR. LUCAS:
17     Q    And this document that we're looking
18 at, you do recall that Convergys put together its
19 postmortem after conferring with everyone, including
20 yourself, who was involved and then finalized the
21 document and gave it to Sprint, correct?
22         MR. SHANK: Objection to form.
23         THE WITNESS: I -- I was conferred with
24     in the production of this document.
25 BY MR. LUCAS:

CONVERGYS INFORMATION MGMT. GROUP, INC., et al. vs. IGATE CORP., et al.
DARIN BROWN
2/13/04

SHEET 37  PAGE 142

**142**

1  A    That's correct.
2  Q    And your understanding is Convergys is
3  not contending that Mr. Rao did it, correct?
4       MR. SHANK: Objection. He's already
5       said that.
6       THE WITNESS: Yeah, that's my
7       understanding.
8       MR. LUCAS: Okay. I want to go through
9       this one at a time to get your answers.
10 BY MR. LUCAS:
11 Q    You talked about alert log. So if
12 that's then not what's being used in support of the
13 assertion that Mr. Rao may have edited or modified his
14 shell history or keystroke log, then what other
15 documents, if any, do you believe support that
16 contention?
17 A    You're saying other than Exhibit 19,
18 right?
19 Q    Right.
20 A    I don't know of any.
21 Q    Do the shell histories or keystroke
22 logs relating to Mr. Rao as they exist with respect to
23 the time frame of September of 1999, do they themselves
24 reflect anything that you believe supports a contention
25 or assertion that Mr. Rao edited or modified or amended

PAGE 143

**143**

1  his keystroke logs or shell histories?
2       MR. SHANK: Object to form.
3       THE WITNESS: Can you -- which things
4       are you asking that point to that?
5  BY MR. LUCAS:
6  Q    The history -- shell histories
7  themselves or keystroke logs themselves that have been
8  produced by Convergys, namely Exhibit 13 and Exhibit 7
9  which we looked at earlier today, do either of those
10 documents reflect, in your opinion, any entry or
11 activity by Mr. Rao which resulted in an editing or
12 amendment of the keystroke logs or shell histories?
13      MR. SHANK: The question is directed at
14      Exhibit 7 and Exhibit 13, correct? So the
15      question is: Do either of those two documents
16      reflect anything that would indicate that Rao
17      edited his keystroke histories?
18      MR. LUCAS: That is correct.
19      THE WITNESS: Not that I know of. I
20      mean, this is a 143-page document so -- but not
21      -- but not that --
22      MR. LUCAS: Well, take your time.
23      Apparently you're a designee of the company.
24      MR. SHANK: Well, he's one of them and
25      Bill Koopmans is another one so -- and you did

PAGE 144

**144**

1  ask most all of these questions to Bill
2  Koopmans as well.
3       MR. LUCAS: That's right. You don't
4       get to choose which witness you want as a
5       designee, but that's another matter after the
6       fact.
7  BY MR. LUCAS:
8  Q    So if the SSP alert logs are not what
9  you're relying on as other documents supporting the
10 contention that Mr. Rao allegedly edited or modified
11 his keystroke logs or shell histories and if the
12 Exhibit 7 and 13 which are keystroke logs or shell
13 histories for Mr. Rao himself that have been produced
14 by Convergys do not reflect any such editing or
15 amendment in your view, then what other document or
16 documents, if any, in your view, support an assertion
17 that Mr. Rao edited or amended his keystroke history?
18      MR. SHANK: Objection to form.
19      MR. LUCAS: I'm sorry. His keystroke
20      logs or shell histories.
21      MR. SHANK: Objection to form. This
22      witness has definitely testified that Exhibit
23      19, his e-mail, is one such document.
24      MR. LUCAS: That's fine, Mr. Shank, and
25      we're trying to get to all such documents.

PAGE 145

**145**

1       MR. SHANK: Well, I think the question
2       is improper, Kevin. Your question was if any.
3       He's already identified for you at least one
4       document that he had indicated.
5       MR. LUCAS: You heard the question.
6  BY MR. LUCAS:
7  Q    Other than Exhibit 19 --
8       MR. SHANK: No, that wasn't the
9       question then. Go ahead.
10      MR. LUCAS: Do you want me to put that
11      into every question when the witness has
12      already said it three times and we're trying to
13      get to the other documents that he's supposedly
14      referring to? I'll do it. Let me -- let me
15      start over.
16 BY MR. LUCAS:
17 Q    Other than Exhibit 19 and in light of
18 your testimony concerning the alert SSP logs and the
19 shell histories and keystroke logs themselves not
20 supporting a contention and your belief that Mr. Rao
21 may have edited or amended his keystroke logs or shell
22 histories, is there any other document in addition to
23 Exhibit 19 that you think supports such a contention?
24 A    I don't believe that I stated in my
25 testimony that the alert logs do not support the

CONVERGYS INFORMATION MGMT. GROUP, INC., et al. vs. IGATE CORP., et al.
DARIN BROWN
2/13/04

SHEET 61   PAGE 238

**238**

1   Do you recall what the procedure was at
2 that point in time in terms of in the normal course the
3 ongoing preserving of, I think he called them, shell
4 histories or keystroke logs?
5   A   In September of 1999 I don't recall.
6 What I believe would be the case is that at the time we
7 preserved 1000 lines. Our current standard is 5000, so
8 it's been modified over the course of time.
9   Q   And do you know why the standard was
10 increased in this regard?
11   A   It may have been related to this
12 incident, but I don't know that.
13   Q   Did you have to do anything in terms of
14 implementing that change or is that a change that was
15 implemented by others?
16   A   I implemented that change.
17   Q   What did you have to do or what did
18 Convergys have to do to change the amount of lines that
19 were being preserved on an ongoing basis?
20   A   That's just a setting in the -- I can't
21 recall if it's in -- it's either in the dot profile,
22 which is a file in Unix that runs automatically when
23 you log in, or in the dot KSHRC file.
24   Q   Is it something that can be readily
25 implemented or is it a lengthy process?

PAGE 239

**239**

1   A   No. It's a one-line change.
2   Q   Mr. Koopmans talked about certain
3 technical assistance reports relating to dealings with
4 Oracle during this time frame of late September, mid to
5 late September of 1999. Were you involved in dealing
6 with Oracle in these matters?
7   A   I was.
8   Q   Can you just describe to me briefly
9 what your involvement was?
10   A   When you say these matters, can you be
11 more specific?
12   Q   Well, I take it there were -- there
13 were restoration/recovery events that took place with
14 respect to the database that had been corrupted; is
15 that correct?
16   A   That's correct.
17   Q   Okay. And as part of that effort you
18 would have had various dealings, you personally, with
19 Oracle?
20   A   I don't believe that specific to the
21 recovery effort I was dealing with Oracle.
22   Q   Well, were you dealing with Oracle in
23 some other manner relating to the database corruption
24 or the recovery/restoration efforts?
25   A   I believe it was Mr. Hulin who opened

PAGE 240

**240**

1 the TAR, which is technical assistance request, with
2 Oracle related to the recovery of the database. To the
3 best of my knowledge, I did not open any technical
4 assistance requests related to the recovery of the
5 database.
6   Q   Let me just ask you so I have an idea:
7 What was -- in general terms what was your involvement
8 or responsibility in connection with the
9 recovery/restoration efforts?
10   A   I was essentially one of the DBAs on
11 the team that was trying to figure out the best
12 mechanism to get the database restored in the shortest
13 possible amount of time.
14   Q   How long did it take to get the
15 database restored, an approximate time frame?
16   A   As I recall, the application was not
17 able to be brought up until sometime Saturday morning,
18 so I believe it was about 24 hours before we could
19 restore service to our customer.
20   Q   After service was restored to the
21 customer, did you continue on in providing recovery and
22 restoration services or work related to the September
23 17 database corruption and/or archive log damage?
24   A   In terms of restoring the lost data as
25 a result of the way the database was restored, is that

PAGE 241

**241**

1 -- the lost data recovery?
2   Q   Yes.
3   A   I was peripherally involved as directed
4 by others, but I was not responsible for that effort.
5   Q   We don't have -- maybe Mr. Shank has
6 it. We don't have the document here that was marked as
7 an exhibit relating to the postmortem or I'll call it
8 the time line, but it's Exhibit Number 9 beginning on
9 page 692. If you could just take a look at pages 693
10 through 698. Were you involved in the preparation of
11 these particular pages?
12       MR. SHANK:  Objection to the extent
13   it's already been asked and answered.
14       THE WITNESS:  I provided Mr. Koopmans
15   input and he -- he consolidated the
16   information.
17 BY MR. LUCAS:
18   Q   I take it Mr. Koopmans was overall
19 responsible or they reported to him; is that correct?
20   A   Yes, that is correct.
21   Q   And we talked about this a little bit
22 today and I don't want to re-cover the ground, but Mr.
23 Koopmans would have been in charge of this
24 restoration/recovery effort, not yourself; is that
25 correct?

CONVERGYS INFORMATION MGMT. GROUP, INC., et al. vs. IGATE CORP., et al.
DARIN BROWN
2/13/04

SHEET 64 PAGE 250

### PAGE 250

```
 1    is that correct?
 2              MR. SHANK:  Objection to the form of
 3         the question.
 4              THE WITNESS:  No, I don't think that's
 5         correct.
 6    BY MR. LUCAS:
 7         Q    The lost data that we're talking about,
 8    was it on the archive logs that were damaged or
 9    otherwise made unavailable as a result of Mr. Walters'
10    actions?
11              MR. SHANK:  Objection to the form of
12         the question.
13              THE WITNESS:  The -- the lost data
14         could have been reproduced, if that
15         reproduction was necessary, had all the archive
16         logs been present.
17    BY MR. LUCAS:
18         Q    And those archive logs that were not
19    present were the ones that were not present because of
20    the activities or the actions that Mr. Walters had
21    taken in the early morning hours of September 17th of
22    1999, correct?
23              MR. SHANK:  Objection to the form of
24         the question.
25              THE WITNESS:  And would not have been
```

### PAGE 251

```
 1         needed, had it not been for --
 2              MR. LUCAS:  That's a different
 3         question.  I know you want to answer that
 4         question.
 5    BY MR. LUCAS:
 6         Q    But as a factual matter, the lost data
 7    that you're talking about is the lost data that could
 8    have been created from the archive logs that were not
 9    available or not present because of Mr. Walters'
10    conduct, correct?
11              MR. SHANK:  Objection to the form of
12         the question.
13              THE WITNESS:  I believe that is
14         correct.
15              MR. LUCAS:  This is probably a good
16         time then to break.
                        - 0 -
              (AND FURTHER THE DEPONENT SAITH NAUGHT)
                        - 0 -

                    _____
                        Darin Brown
```

### PAGE 252

```
                C-E-R-T-I-F-I-C-A-T-I-O-N
STATE OF OHIO,
COUNTY OF HAMILTON, To-wit;
              I, Susan K. Lee, CVR-CM, Court Reporter
and Notary Public in and for the State of Ohio, do
hereby certify;
              That on the 13th day of February, 2004,
there appeared before me pursuant to Notice and
agreement of counsel, DARIN BROWN, as a witness in the
previously entitled cause;
              That the said witness was sworn by me
and examined to tell the truth, the whole truth, and
nothing but the truth in said cause;
              That the deposition was taken by me via
Stenomask and electronic recording and the foregoing
251 pages contain a true, full and correct
transcription of all the testimony of said witness;
              That the deposition was submitted to
counsel for the witness for reading and signature;
              That I am not related to or in any way
associated with any of the parties to said cause of
action, or their counsel, and that I am not interested
in the event thereof.
              IN WITNESS WHEREOF, I have hereunto set
my hand this 19th day of February, 2004.

                        _____
                        Susan K. Lee, CVR-CM
                        My commission expires:
                        August 30, 2004
```

VOLUME II
IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

CONVERGYS INFORMATION            :
MANAGEMENT GROUP, INC.,
and CHUBB CUSTOM INSURANCE       :
COMPANY,
                                 :
         Plaintiffs,
                                 :
         -v-                         CASE NO.: CV-01-618
                                 :     (Judge Beckwith)
IGATE CORPORATION, et al.,
                                 :
         Defendants.

\* \* \* \* \* \* \* \* \*

The continuation of the deposition of DARIN BROWN, taken before Debra A. Sprague, Certified Court Reporter and Notary Public in and for the State of Ohio, at the offices of Ulmer and Berne, LLP, 600 Vine Street, Suite 2800, Cincinnati, Ohio, on the 19th day of February, 2004, beginning at the hour of 1:37 p.m., and ending at the hour of 3:03 p.m.

\* \* \* \* \* \* \* \* \*

RIVERSIDE REPORTING
Certified Court Reporters
P.O. Box 949
Covington, Kentucky 41012-0949
KY: 859-291-6110/OH: 513-574-7017

Page 10

1     MR. LUCAS: Please.
2     MR. SHANK: -- confirm that. Just
3     for the record, I'm putting in front of the
4     witness what's been Bates marked CVG1107
5     through 1121.
6  BY MR. LUCAS:
7     Q   Mr. Brown, would you be kind enough to
8  take a look at that document and let me know if that's the
9  document that you're referring to?
10    A   It is.
11    Q   I'm going to ask the court reporter to
12 mark -- We'll do it at the end of the deposition. -- a
13 copy of that, so we can give Mr. Shank his document back,
14 but a copy of that document, CVG1107 to 1127, as Exhibit
15 fifty -- Defendants' Exhibit 51. Can I see that just for
16 a moment, please?
17    A   (Hands document to Mr. Lucas)
18    Q   Mr. Brown, were you involved in any manner
19 in the initial preparation of this document or of the --
20 of its contents, whether it's the plan itself or the
21 instructions?
22    A   No.
23    Q   Do you know whether it was revised in any
24 manner or modified between its date, which is dated
25 September 7, 1999, and September the 19th of 1999?

Page 11

1     A   I don't know if it was or not.
2     Q   Did you attend any meetings prior to
3  September 17, 1999, where the subject matter of the
4  implementation of the usage split project was discussed?
5     A   I don't believe I did.
6     Q   Mr. Brown, I didn't have an opportunity in
7  the first session of your deposition to ask you about some
8  of your background information in terms of education,
9  experience, and employment, so I'd like to do that now.
10 And again, we're jumping around from different matters to
11 kind of cover some matters that weren't covered the first
12 time. So if that becomes confusing, let me know.
13         Can you briefly describe for me your post-
14 high school educational background?
15    A   I have a bachelor's degree in computer
16 science from the University of Cincinnati.
17    Q   Is that a BS?
18    A   Yes.
19    Q   And what year did you get that?
20    A   1990.
21    Q   And did you continue on for any graduate
22 training at that time or graduate degree training?
23    A   I did not.
24    Q   Since your graduation with your degree,
25 your undergraduate bachelor of science degree, have you

Page 12

1  had any other formal education in terms of programs,
2  leading to some sort of certification or degree?
3     A   I have had formal education from Oracle
4  Corporation on a variety of subjects.
5     Q   From any source other than Oracle?
6     A   I had some formal training from Cincinnati
7  Bell Information Systems training department.
8     Q   That's the company or corporate
9  predecessor of the Convergys Plaintiff in this case; is
10 that correct?
11    A   That's correct. I also had some formal
12 training from Information Technology Development
13 Corporation, and it used to be in Sharonville. I think
14 they've since gone out of business.
15    Q   Any other that you can remember?
16    A   Not that I recall, no.
17    Q   In your undergraduate degree, was there an
18 area of specialization or focus within computer sciences
19 generally?
20    A   No.
21    Q   The formal training you had from the last
22 company you mentioned, I think Information Technology
23 Development Corporation, approximately when was that?
24    A   That was in the early '90s.
25    Q   Can you tell me just briefly or in general

Page 13

1  terms what the nature of the training was?
2     A   If I recall correctly, that was a --
3  probably a Unix shell scripting course or some type of
4  Unix course.
5     Q   Can I just ask you what that means, Unix
6  shell scripting?
7     A   A shell script is the program language
8  designed to operate on the Unix operating system.
9     Q   You said you also had some formal training
10 to the predecessor to the Plaintiff, Convergys. When was
11 that approximately?
12    A   That would have been in the -- sometime in
13 the 1989 to 1991 time frame; I'm not sure exactly when.
14    Q   Can you tell me generally what that
15 training consisted of?
16    A   I believe that was a C programming course.
17    Q   And then you also mentioned training,
18 formal training from the Oracle Corporation. When
19 approximately did that take place?
20    A   I don't recall. I've been to several
21 classes with Oracle.
22    Q   Do you recall, and again, just
23 approximate, how many classes you've been to and what the
24 duration or the typical duration was of those classes?
25    A   Probably a total of maybe five or six

Page 14

1  courses over the last 12 years.
2       Q    And how long would each course, on
3  average, last?
4       A    In general the courses are either three
5  days or five days. So probably somewhere in the three to
6  five days.
7       Q    As a result of any of those classes, did
8  you receive any certification or certificate from Oracle?
9       A    I did at one point have Oracle's
10 certification as a database administrator.
11      Q    And when was that?
12      A    It was on version 7.3 of the database. I
13 believe that certification expired in the year 2000 maybe,
14 or thereabouts.
15      Q    Do you recall when you first, moving back
16 in time, when you first received that certification?
17      A    I believe that was in the 1997 or 1998
18 time frame.
19      Q    Could you briefly then describe for me
20 what your employment history has been since your
21 graduation from college?
22      A    Well, I've worked at a variety of
23 companies.
24      Q    Maybe it'd be easier --
25      A    I'm not sure how detailed you want me to

Page 15

1  be.
2       Q    -- if I started -- Well, let me ask you
3  first, then maybe we can decide how detailed. When did
4  you first do work at Oracle, whether -- I'm sorry -- at
5  Convergys, whether as -- Let me rephrase that. When did
6  you first do work at Convergys or any of its corporate
7  predecessors, whether as a contractor or as an employee?
8       A    In 1989, I believe.
9       Q    Okay. And I take it you were working for
10 whom at the time?
11      A    Cincinnati Bell Information Systems.
12      Q    Were you an employee or contractor?
13      A    I was an employee.
14      Q    And for how long did you remain employed
15 at that time by Cincinnati Bell Information Systems?
16      A    About two and a half years.
17      Q    And what was your general job duties or
18 title?
19      A    I was a programmer.
20      Q    What was your next employment position?
21      A    It would have been at CARS Information
22 Systems.
23      Q    That's what, somewhere around 1991 or
24 1992?
25      A    Yes.

Page 16

1       Q    Until approximately when?
2       A    I was there about a year.
3       Q    What did you do? What were your job
4  duties at that point?
5       A    I want to caveat this with I've had a lot
6  of positions over the course of the last 12 years, so
7  these dates and -- it might not be exact.
8       Q    That's fine. I just want a general --
9  just a general sense. We understand.
10      A    It -- I was again doing C programming with
11 CARS Information Systems, and that was in conjunction with
12 the Informix database.
13      Q    What was your next employment position?
14      A    I left CARS Information Systems and went
15 to work for a company called PCS Technologies.
16      Q    How long did you stay there?
17      A    I was also there about a year, as I
18 recall.
19      Q    So this probably takes us up somewhere, in
20 approximate terms, about 1994, or thereabouts? Does that
21 sound about right?
22      A    Somewhere in the '93 to '94 time frame.
23      Q    And what was your duties, your job title
24 there?
25      A    I was a programmer there as well.

Page 17

1       Q    C program?
2       A    It was C programming. There may have been
3  some other languages also. And that was with the Oracle
4  database.
5       Q    And what was your next position?
6       A    I left there and went to work for Oracle
7  Corporation.
8       Q    That would be somewhere around 1994,
9  thereabouts, starting. And how long did you remain there?
10      A    I believe that was a little bit less than
11 three years.
12      Q    What was your job duty or titles at that
13 point?
14      A    I was a consultant.
15      Q    So you were not an employee of Oracle or
16 you were an employee but in the capacity of consultant?
17      A    The latter, correct.
18      Q    What type of job duties or functions did
19 you have in that capacity?
20      A    I did a variety of different assignments,
21 some as a programmer, some as a database administrator.
22      Q    Okay. That would take us probably
23 somewhere around 1996, '97, in general terms; is that
24 about right?
25      A    Somewhere in there, yeah.

Page 18

1  Q  Okay. What was your next position?
2  A  I left Oracle to do consulting work on my
3  own.
4  Q  When you worked for Oracle, where were you
5  located geographically?
6  A  I was located in Cincinnati, Ohio.
7  Q  What were the circumstances of your
8  leaving?
9  A  Excessive travel.
10  Q  So you would go to customer sites and that
11  type of thing --
12  A  Yeah.
13  Q  -- frequently, would that be it?
14  A  Yes.
15  Q  That takes us now, you wanted to go out, I
16  think you said, and I guess work on your own --
17  A  Correct.
18  Q  -- as a consultant. And you did that then
19  probably starting somewhere around '96, '97?
20  A  That's about right.
21  Q  And how long did you remain in that type
22  of capacity?
23  A  I was working essentially as an
24  independent consultant, although potentially through
25  different companies as a subcontractor for different

Page 19

1  companies up until I joined Convergys as a contractor.
2  Q  And you joined Convergys as a contractor
3  when, if you recall?
4  A  In 1999.
5  Q  Do you recall when in 1999 it was, in
6  relation to the events of September 17th?
7  A  Oh, before September 17th. I --
8  Q  A month before? Three weeks before?
9  A  I think it was in the month of August.
10  Q  When you were in your consultant,
11  independent consultant position, what was the nature of
12  the work, generally, that you were doing?
13  A  Mostly database administration.
14  Q  Do you have a background in Unix, like
15  systems administration?
16  A  I do not.
17  Q  When you joined or when you began working
18  for Convergys in August of 1999, you said you were a
19  contractor?
20  A  That's correct.
21  Q  Did you remain a contractor or did at some
22  point you become a Convergys employee?
23  A  I am now a Convergys employee.
24  Q  Okay. And when did you become an
25  employee?

Page 20

1  A  June of 2002.
2  Q  When you were serving as a contract --
3  Well, let's start with the August 1999, or thereabouts,
4  time frame. The initial position or function you served
5  at Convergys was what?
6  A  Production database administrator.
7  Q  Was it on the Sprint P2K only or was it a
8  more extensive assignment then?
9  A  At that time it was just Sprint.
10  Q  Did there come a point in time when your
11  duties changed?
12  A  To include more than just Sprint; is that
13  the question, or --
14  Q  Or change in some other capa -- What I
15  want to know is whether your duties remained essentially
16  the same or if they changed when that change would be.
17  Certainly it could be an expansion of the duties, it could
18  be beyond the Sprint application. Whatever any signi --
19  what you viewed as a significant change in your duties and
20  responsibilities.
21  A  At some point in 2002, there were some
22  organizational changes within the company that resulted in
23  our team supporting more clients than just Sprint.
24  Q  Has that continued up to the present date?
25  A  Yes, it has.

Page 21

1  Q  Am I correct in understanding that from
2  the time you first started working for Convergys as a
3  contractor in August of 1999 up to the present time,
4  you've been a production DBA?
5  A  Yes, that's true.
6  Q  Do you have, for example, right now an
7  official -- is there an official job title that goes with
8  your position, or is it more of an assignment to a group
9  or an area?
10  A  I have an official job title.
11  Q  Can you tell me what that is, please?
12  A  It's senior database consultant.
13  Q  When you first joined on as a contractor
14  for Convergys in August of 1999, although you were not an
15  employee, did you have a designation, kind of the
16  equivalent of a title, at that point in time?
17  A  Not that I'm aware of, other than what
18  I've testified to earlier, which is production DBA.
19  Q  Okay. When you joined Convergys in August
20  of 1999, or thereabouts, was Mr. Neil Hulin then working
21  for Convergys either as an employee or a contractor?
22  A  He was.
23  Q  Do you know how long he had been there
24  prior to your joining?
25  A  I believe he had started within a couple

Page 58

1  recall, you hadn't even looked or reviewed this document
2  in September of 1999, correct?
3          A   Right, as far as I can recall, that's
4  true.
5          Q   So now I'm asking you in the capacity --
6  And I'm not asking you to disclose communications with
7  Convergys counsel. But as a Convergys designee in this
8  case or one of two designees on various subject matters,
9  are there entries on Exhibit 7 which Convergys believes
10 are significant for purposes of the determination of the
11 cause or likely cause of the September 17 production data
12 corruption, or any alleged coverup activities by Mr. Rao
13 with respect to those matters?
14              MR. SHANK:  If you can answer the
15          question, Mr. Brown, without disclosing
16          communications you've had with Convergys
17          counsel, then you can answer; if not, then
18          please don't answer that question.
19              THE WITNESS:  Can I confer with you
20          on this issue to --
21              MR. SHANK:  Yeah.
22              THE WITNESS:  -- clarify what's
23          considered privileged?
24              MR. LUCAS:  Would you like to step
25          out, or you want me to step out?  Whatever --

Page 59

1               MR. SHANK:  We'll step out.
2               (OFF THE RECORD)
3               MR. SHANK:  Can we have her -- either
4          have that read back or can you restate it?
5               MR. LUCAS:  I'll try and restate it.
6  BY MR. LUCAS:
7          Q   Mr. Brown, is there any entries or
8  omission of entries, I guess, in Exhibit Number 7 which
9  Convergys believes are significant for purposes of
10 determining the cause or possible cause or causes of the
11 September 17th, 1999 production database corruption, or of
12 any alleged coverup type activities by Mr. Rao with
13 respect to those events?
14              MR. SHANK:  Mr. Brown, as the
15          question's worded, you can tell Mr. Lucas your
16          beliefs, but you cannot tell Mr. Lucas, and
17          I'm instructing you not to tell him any
18          communications that you've had with Convergys
19          counsel as to what they've said to you or what
20          you've said to them.
21              So you can tell Mr. Lucas your
22          beliefs, but do not disclose any communications
23          you've had with Convergys counsel or Convergys
24          counsel has had with you. Do you understand
25          the instruction?

Page 60

1               THE WITNESS:  Yes.  This might take a
2          few minutes.
3               MR. LUCAS:  That's all right.  Let's
4          go off the record.
5               (OFF THE RECORD)
6               MR. SHANK:  After conferring with the
7          witness again, I'm going to modify the
8          instruction a bit.  Mr. Brown testified in his
9          previous deposition that the topic of this
10         particular exhibit was referenced either
11         directly or indirectly in his e-mail to Bill
12         Koopmans dated September 20th.  I'm sorry,
13         September 21st.
14              He can answer the question to the
15         extent the question is directed at those
16         communications.  Any other beliefs that Mr.
17         Brown may or may not have that are responsive
18         to the question that you've asked Kevin, would
19         implicate the attorney work product privilege
20         and also the attorney/client privilege.  So I'm
21         not going to let him testify as to any other
22         beliefs that he has responsive to your
23         question, other than as they relate to his e-
24         mail and his communications with Mr. Hulin.
25              MR. LUCAS:  Mr. Hulin or Mr. Koopmans

Page 61

1  or both?
2               MR. SHANK:  Mr. Hul -- Well, Mr.
3          Hulin and Mr. Koopmans at the time -- around
4          the time of the outage.
5               MR. LUCAS:  Okay.  Well, I mean, I
6          don't think that's an appropriate objection,
7          but there's nothing I can do about that.
8  BY MR. LUCAS:
9          Q   So, Mr. Brown, in light of your
10 understanding of what your counsel just stated, can you
11 answer my question?
12         A   The only significant difference that I
13 know of between the two files, outside of instructions by
14 counsel, is the fact that Mr. Hulin had looked at the
15 history file at that time, did not find certain commands
16 that existed on September 17th; namely, the removal of
17 the alert log file.  And, therefore, the presumption was
18 made that those commands were likely removed from the
19 file.
20         Q   Okay.  So there's nothing you could point
21 out to me in Exhibit 7, which would be a line item or a
22 command in response to my question?
23              MR. SHANK:  There's nothing that's
24          non-privileged, Kevin.
25              MR. LUCAS:  I'm not trying to -- I

Page 62

1    mean, subject to the objection that's been made
2    --
3        THE WITNESS: Correct, there's
4    nothing.
5    BY MR. LUCAS:
6        Q   -- there's nothing you could point to, to
7    indicate that because you're telling me what it is is an
8    omission; is that correct?
9        A   As -- Correct.
10       Q   Now, you attended Mr. Rao's deposition
11   yesterday; is that correct?
12       A   Yes, that's correct.
13       Q   And I'm not going to try to characterize
14   his testimony. We can get his transcript when the time
15   comes. But as a general matter, Mr. Rao was asked certain
16   questions in your presence as to whether he could or would
17   speculate or venture some thoughts on what might have been
18   the cause of the production database corruption on
19   September 17th, 1999. Do you recall that testimony,
20   generally?
21       A   I do.
22       Q   Okay. And do you recall that Mr. Rao
23   indicated a view that the import function that he
24   testified to or import command that he testified to as
25   having issued on September 17th, might have caused the

Page 63

1    data -- database -- I'm sorry -- the production database
2    corruption? Do you recall that testimony generally?
3        A   Yes.
4        Q   Had you considered, you personally, prior
5    to September 21, 1999, the question or issue as to what
6    effect, if any, the import command or function in question
7    had or may have had on the production database corruption
8    in question?
9        A   I don't believe I had.
10       Q   Had anyone within Convergys made such a
11   consideration prior to September 21 of 1999?
12           MR. SHANK: If you know, Mr. Brown.
13           THE WITNESS: I don't recall anybody
14   telling me that.
15   BY MR. LUCAS:
16       Q   So you don't recall, for example, Mr.
17   Koopmans or Mr. Hulin addressing that issue or having
18   indicated that they considered such an issue back in
19   September of 1999, correct?
20       A   I don't recall.
21       Q   Prior to yesterday, had you ever
22   considered what effect or possible effect the import
23   command or import function may have had in connection with
24   the production database corruption of September 17th,
25   1999?

Page 64

1        MR. SHANK: Carve out -- I'm going to
2    instruct the same wit -- the witness the same
3    way I did before. If to answer Mr. Lucas'
4    question you have to disclose privileged
5    communications, don't answer the question. So
6    I think Kevin will agree to carve out
7    privileged communications from your question.
8    Is that correct, Kevin?
9        MR. LUCAS: I can't change the
10   instruction. I'm not sure -- As a general
11   matter, yes. But I don't know what constitutes
12   those discussions here. But that's the
13   instruction that's on the table. So follow
14   your counsel's instruction and answer the
15   question as best your able.
16       THE WITNESS: I -- Then I can't
17   answer the question.
18       MR. LUCAS: In light of the
19   instructions in the last five minutes, there's
20   nothing else. I mean, I would have additional
21   questions if the witness could provide other
22   testimony, but for the instructions, he's not.
23   So that'll be the end of my questioning of Mr.
24   Brown. Thank you for your time.
25       MR. SHANK: We'll reserve signature,

Page 65

1    for the record.
2            * * * * * * * * * *
3            (WHEREUPON, THE DEPOSITION OF DARIN BROWN
4    WAS CONCLUDED AT 1:37 P.M.)
5            * * * * * * * * * *

Page 66

CERTIFICATION

STATE OF OHIO,

COUNTY OF HAMILTON, TO-WIT:

I, Debra A. Sprague, Court Reporter and Notary Public in and for the State of Ohio, do hereby certify:

That on the 19th day of February, 2004, there appeared before me pursuant to notice and agreement of counsel, DARIN BROWN, as a witness in the previously entitled cause;

That the said witness was sworn by me and examined to tell the truth, the whole truth, and nothing but the truth in said cause;

That the deposition was taken by me via stenomask and electronic recording and the foregoing 65 pages contain a true, full and correct transcription of all the testimony of said witness;

That the said deposition having been transcribed, was delivered to counsel, for the witness for reading and signature;

That I am not related to or in any way associated with any of the parties to said cause of action, or their counsel and that I am not interested in the event thereof.

IN WITNESS WHEREOF, I have hereunto set my hand this 21st day of February, 2004.

Debra A. Sprague, CVR
My Commission Expires:
August 12, 2006