UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| CONVERGYS INFORMATION MANAGEMENT GROUP, INC., et al., | : : : | Civil Action No. C-1-03-252 |
| | : | Magistrate Hogan |
| Plaintiffs, | : : | BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION *IN* |
| v. | : : | *LIMINE* TO EXCLUDE EVIDENCE RELATING TO |
| IGATE CAPITAL ORPORATION, et al., | : : : | CHANGES MADE AFTER THE DATABASE OUTAGE AT ISSUE |
| Defendants. | : : | |

**BRIEF IN OPPOSITION TO PLAINTIFFS'
MOTION *IN LIMINE* TO EXCLUDE EVIDENCE RELATING
TO CHANGES MADE AFTER THE DATABASE OUTAGE AT ISSUE**

Defendants, by their undersigned counsel, hereby file this Brief in Opposition to Plaintiffs' Motion *In Limine* To Exclude Evidence Relating To Changes Made After The Database Outage At Issue.

**I.      BACKGROUND**

Plaintiffs contend that on September 17, 1999 an error was made by an employee of Defendant Mastech Systems Corporation ("Mastech"), who was providing computer database administration services to Convergys Information Management Group, Inc. ("Convergys") allegedly pursuant to a written contract between the parties, which caused the overwriting or corruption of certain data in a database file (the "Data Corruption") maintained by Convergys for one of its customers.  Defendants maintain that no adequate proof exists that any act of the Mastech employee actually caused the Data Corruption and deny such alleged conduct was the legal or factual cause of Convergys' claimed resulting damages.  Moreover, the evidence is undisputed that, prior to the Data Corruption, a Convergys employee inadvertently corrupted an

archive or "backup" file (the "Archive Corruption") containing various of the data subsequently affected by the Data Corruption. Defendants contend and will present expert or other evidence at trial that the legal and proximate cause of the bulk of Plaintiffs' claimed damages is the Archive Corruption caused by Convergys itself since its corruption of the archive files prevented a standard automated recovery of the data later affected by the Data Corruption.

Plaintiffs Motion *In Limine* attempts to bar as evidence certain changes (unspecified in the Motion *In Limine*) made by Convergys after September 17, 1999 to its procedures or equipment for maintaining backup or archive copies of the database. Defendants intend to demonstrate at trial that such archiving procedures and equipment were available to (and were feasible for use by) Convergys and could and should have been in place at the time of the September 17, 1999 Archive Corruption with the result that a substantial portion of Convergys' alleged damages would not have been incurred. Plaintiffs rely in support of their Motion *In Limine* solely on Federal Rule of Evidence 407, which prohibits the use for certain purposes not applicable in the present circumstances of evidence of subsequent remedial measures, subject to various exceptions. For the reasons set forth below, Rule 407 does not bar admission of evidence relating to changes in archiving procedures and equipment made by Convergys after September 17, 1999.

## II.    ARGUMENT

### A.    Federal Rule of Evidence 407 Simply Is Inapplicable To A Breach Of Contract Action.

Federal Rule of Evidence 407 provides:

> When, after an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove <u>negligence</u>, <u>culpable conduct</u>, a defect in a product, a defect in a product's design, or a need for a

warning or instruction. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment. (emphasis added).

Rule 407 essentially is intended to encourage defendants to make safety changes protecting the public by preventing a plaintiff seeking damages on tort or strict liability causes of action from offering evidence of the defendant's subsequent remedial changes to its product or conduct as evidence that defendant's original product design or conduct was negligent. None of those fundamental circumstances underlying the applicability of Rule 407 exists in the present case. Indeed, Plaintiffs' Motion *In Limine* attempts to contort and distort Rule 407 to make it applicable in unintended and inappropriate circumstances. Here, for example, Plaintiffs' claims are in breach of contract only, not in tort, and the evidence in dispute is to be offered by Defendants for causation and feasibility purposes and not to prove negligent or culpable conduct. Also, the alleged remedial conduct relates to the internal conduct of Plaintiffs, not of Defendants, and Defendants are not asserting any claims or seeking an award of any damages against Plaintiffs. The intended confines for application of Rule 407 simply do not fit the present circumstances.

As stated above, the rationale of Rule 407 is to prevent subsequent remedial measures from being utilized by the party prosecuting the claims to show fault on the part of a defendant. *See* Fed. R. Evid. 407 Advisory Committee's Notes (1972 Proposed Rules) ("In effect [Rule 407] rejects the suggested inference that fault is admitted."). As such, exclusion under Rule 407 is appropriate "only when the evidence of subsequent remedial measures is offered as proof of negligence or culpable conduct." *See* Fed. R. Evid. 407 Advisory

Committee's Notes (1972 Proposed Rules); *Hall v. American Steamship Company*, 688 F.2d 1062, 1066 (6th Cir. 1982).[1]

Because Rule 407 focuses only on fault in the form of negligence or culpable conduct, evidence in an action based on contract is not subject to exclusion under Rule 407. *See Mowbray v. Waste Management Holdings, Inc.*, 45 F. Supp. 2d 132, 141 (D. Mass. 1999); *All The Chips, Inc. v. Oki America, Inc.*, No. 88-C-8373, 1990 WL 36860 (N.D. Ill. 1990). This is because a breach of contract claim looks only to a breach and requires no showing of any sort of fault, thereby negating the rationale and operation of Rule 407. *See Mowbray*, 45 F. Supp. 2d at 141 ("Breach of contract requires no showing of any sort of fault, thus, apparently negating the operation of Rule 407"); *Giampapa v. American Family Mut. Ins. Co.*, 64 P. 3d 230, 250 (Col. 2003) ("Contract [law] looks to the fact of breach and does not weigh the culpability of the breacher in granting relief.").

In this case, Convergys' claims against Defendants with respect to the Data Corruption are based in contract alone. Further, Defendants are not asserting any claims or damages against Plaintiffs and evidence of Plaintiffs' subsequent conduct goes to the issues of the causation of Plaintiffs' alleged damages and the feasibility as of September 17, 1999 of Plaintiffs' archiving procedures and equipment in question. Thus, Rule 407, and the public policy underlying it, is inapplicable.

---

[1]  Although Rule 407 was amended in 1997 to include "a defect in a product, a defect in a product's design or a need for a warning or instruction," such change was made merely to make Rule 407 applicable to products liability suits as well as negligence suits. *See Garcia v. Fleetwood Enterprises, Inc.*, 200, F. Supp. 2d 1302, 1303 (D. N.M. 2002) ("In 1997, Federal 407 was amended specifically to include products liability cases, in addition to actions in negligence."). Therefore, such changes in no way affect the above analysis.

**B.    Federal Rule of Evidence 407 is Inapplicable Where a Defendant
Offers Subsequent Remedial Measures Evidence Against a Plaintiff.**

Even if the Motion *In Limine* were to be analyzed for argument's sake as if Plaintiffs' claims were in negligence and not in contract, Rule 407 still would not bar Defendants offering of such evidence against Plaintiffs based on the underlying policy considerations of the Rule. The rationale behind Rule 407 is to encourage parties to implement socially desirable remedial measures without making it more likely to have a suit instituted against the party because of the remedial measure. S*ee Murillo v. Sandvik*, No. 98 C 372, 2001 WL 1191167 (N.D. Ill. Oct. 4, 2001) ("[T]he policy behind [Rule 407] is to encourage safety improvements by preventing their being used as evidence to show that the defendant should have made the improvements earlier."). Therefore, Rule 407 applies only where a plaintiff seeks to introduce subsequent remedial measures against a defendant, and is inapplicable where a defendant seeks to introduce such measures against a plaintiff. S*ee Murillo*, 2001 WL 1191167 at *3 ("The policy behind the Rule would most likely not be thwarted by allowing a defendant to offer evidence of a safety campaign to support its defense against a negligence claim."); *Hall*, 688 F.2d at 1067 ("By excluding [subsequent remedial measures] defendants are encouraged to make such improvements . . . it makes no difference to the defendant on what theory the evidence is admitted; an inclination to make subsequent improvements will be similarly repressed.") (emphasis added); *Rimqus v. Quest Colorado Ski Corp.*, 706 F.2d 1060, 1066 (10th Cir. 1983) ("Rule 407 prohibits the admission of evidence of subsequent repairs when that evidence is introduced for the purpose of proving negligence of the defendant.") (emphasis added); *Scurlock Marine, Inc. v. W.W. Patterson Co.*, No. 95-528, 1997 W.L. 573405 (E.D. La. 1997) ("Rule 407 prohibits the admission of evidence of subsequent repairs when that evidence is introduced for the purpose of proving negligence of the defendant.") (emphasis added).

Defendants have not asserted any claims or damages against Plaintiffs and the alleged remedial measures relate to archiving practices and equipment of Plaintiffs, not of Defendants. Therefore, the policy considerations of Rule 407 are not applicable in the present case and Rule 407 does not bar the admission of the evidence in question.

**C.    The Remedial Measures Are Admissible to Impeach Plaintiffs' Allegations that Defendants are Solely Responsible For the Data Corruption.**

Even if Plaintiffs' claims were analyzed as negligence claims and came within the policy considerations of Rule 407 (which they do not), Plaintiffs' subsequent remedial measures would still be admissible because they come within the impeachment exception to the Rule. Plaintiffs allege that Defendants are the sole legal cause of any and all of the damages flowing from the Data Corruption. Defendants, on the other hand, contend that Plaintiffs, by the prior Archive Corruption caused by their own employee, are the legal and proximate cause of some or all the claimed damages.

On its face, Rule 407 does not apply to subsequent remedial measures introduced for the purpose of impeachment. Here, the subsequent archiving measures taken by Plaintiffs with respect to their own archiving practices and equipment are admissible to impeach Plaintiffs' allegation that Defendants supposedly were the legal cause of their alleged damages. *See* Rimqus, 706 F.2d at 1066 ("Where [the subsequent remedial measures] relates to alleged contributory negligence of plaintiff, it should not be considered prejudicial"); *Scurlock Marine, Inc.*, 1997 WL 573405 at *2 ("Evidence of subsequent remedial measures is not considered prejudicial where it relates to the alleged contributory negligence of plaintiff and where the trial court is careful to point out to the jury that the evidence is not to bear on the general negligence of the defendant."). As such, the subsequent remedial measures are admissible for purposes of impeaching Plaintiffs' theory of causation and damages.

**D.      Investigative Reports and Memoranda Related to the
Necessity of the Subsequent Measures are Admissible.**

Regardless of whether or not Rule 407 were deemed applicable in the present

circumstances, any and all investigative reports and post-mortem analyses created by Plaintiffs

discussing the necessity of the subsequent measures should be admissible.  Such internal reports

by Convergys clearly exist and have been authenticated by Convergys' 30(b)(6) deposition

designees in this action.  See e.g., Defendants' Deposition Exhibit 17, attached hereto.  This is

because such investigative reports and analyses, even if discussing the necessity of such changes,

are not a "remedial measure" in and of themselves excludable under Rule 407.  *See Rocky*

*Mountain Helicopters, Inc. v. Bell Helicopters Textron*, 805 F.2d 907, 918 (10th Cir. 1986) ("It

would strain the spirit of the remedial measure prohibition in Rule 407 to extend its shield to

evidence contained in post-event tests or reports."); *Prentiss & Carlisle Co. v. Koehring-*

*Waterous Division of Timberjack, Inc.*, 972 F.2d 6, 10 (1st Cir. 1992) ("The Rule prohibits

evidence of subsequent measures, not evidence of a party's analysis of its product.").   Thus,

Plaintiffs' Motion *In Limine* should be denied also to the extent it seeks to preclude as evidence

investigative reports and post-mortem analyses by Plaintiffs relating to the Archive Corruption,

the Data Corruption, or Plaintiffs' alleged damages.

**III.     CONCLUSION**

For all the reasons set forth above, Defendants respectfully request that the

Motion *In Limine* To Exclude Evidence Relating To Changes Made After The Database Outage

At Issue filed by Plaintiffs be denied in its entirety.

Respectfully submitted,


    /s/ Jacqueline Schuster Hobbs
Donald J. Mooney, Jr. (0014202)
Jacqueline Schuster Hobbs (0068236)
ULMER & BERNE LLP
600 Vine Street, Suite 2800
Cincinnati, Ohio 45202
(513) 698-5000
(513) 698-5001 (Fax)

OF COUNSEL:

Kevin P. Lucas, Esq.
Pa. I.D. No. 25596
Michael D. Hennen, Esq.
Pa. I.D. No. 85597
MANION McDONOUGH & LUCAS, P.C.
Firm I.D. No. 786
600 Grant Street, Suite 1414
Pittsburgh, Pennsylvania  15219
(412) 232-0200

Attorneys for Defendants

## CERTIFICATE OF SERVICE

        The undersigned certifies that a copy of the foregoing was filed electronically with the Court and served electronically upon Grant S. Cowan, Esq., and Robert Shank, Esq., Frost Brown Todd LLC, Attorneys for Plaintiffs, 2200 PNC Center, 201 East Fifth Street, Cincinnati, Ohio  45202, this 1st day of April, 2004.


                /s/ Jacqueline Schuster Hobbs

CONFIDENTIAL

CVG 000716

## RCA/ICA Identification
### Sept 17-18 Database Outage

| RCA/ICA # | Root Cause | Invincible Corrective Action |
|---|---|---|
| 1 | **Root Cause**<br>The technical root cause of the problem was that the script created to add the 6 tablespaces (17 datafiles) to the database used a "Create tablespace <tablespace_name> datafile  REUSE ..." The datafile specifications contained an error in that they pointed to incorrectly named datafiles associated with the customer database FRODB/ACCT_DATA_1. Unluckily, the FRODB/Oracle datafiles /app/ACCT_DATA_1, processed for the usage database's creation, is in the same location as the customer datafiles. The error caused the customer /app/ datafiles to be overwritten with new headers, thus corrupting the datafiles within the app database, and making the datafiles unavailable to the database. | 1) DBA is no longer within Conveys due to the individual's disregard and non-conformance to established processes, procedures and plans.<br>2) Explore internally, and with Sprint PCS, if proven methods exist to tighten access control within the usage of production DBAs.<br>3) With the Database High Availability initiative, pursue solutions that also provide protection against physical and logical corruption (in addition to hardware failure), like a standby database that is maintained through near realtime (or time delayed) application of archivelogs.<br>4) If Sprint PCS moves forward with the creation of a lub-scale staging environment, this would provide an opportunity to test scripts and move them to production without change. |
| 2 | This was a typographical error or oversight by the analyst that created the script. However, standard processes which dictate creation of all production scripts were not followed. They had been followed for the previous day's steps of creating the usage database (setup). For whatever reasons, the DBA elected not to follow the procedure. He created the script and proceeded to run it in production.<br><br>This activity was also not scheduled to occur until Friday evening after successful completion of the SROP and lrackscup tasks on the usage database. We do not know why the DBA did not follow the schedule - which left plenty of time for desktop review of the scripts to create the tablespaces and datafiles.<br><br>The usage split procedure/package had been tested successfully in the Y2K, UAT and Pre-Prod (Staging) environments. Ninety-five percent of the procedures are packaged and have remained the same through all stages of testing. The datafile creation script however must specify actual directory paths and datafile names. The production system has an order of magnitude more datafiles than these other environments. | 1) Work with Oracle to improve their responsiveness and level of support.<br>2) Assume nothing. Train Administration personnel to be able to follow-up with Oracle Support to confirm receipt of deliverables, or technical analysis can remain focused on the problem. |
| 3 | Interaction with Oracle was not particularly effective or efficient in the first couple hours of this outage. Problems included:<br><br>1) It took too long to get a support analyst who specialized in database corruptions and recoveries and had Veritas LVM experience. Ultimately, the analyst who was assigned was very good and got right person for the job. It just took too long to get him engaged.<br>2) When FTPing necessary files to Oracle Support, the analyst stated he had a process that checked for the existence of the file every 60 seconds. As a result, the Conveys Duty Manager elected - once he had verified the files had been successfully FTPed to the specified Oracle location - to roll follow-up with a call to the Oracle Support Analyst to confirm receipt. The analyst called 30 minutes or so later to file when he might be receiving the files. | 1) (Near realtime) copy of archivelogs to another media (preferably tape)<br>2) Create an archivelog filesystem with space for 3 days of archivelogs so they do not need to be touched (210GB now, 400 GB in March)<br>3) Test recovery strategy with every database<br>4) Investigate using Oracle 8i archiving duplexing feature in the future when 8i is implemented |
| 4 | At 3:17 AM on Friday, Sept. 17, the on-call DBA was paged by Operations with an alert that the 4f filesystem (which holds the archivelogs) was 95% full. In the minutes it took the DBA to get into the system, the filesystem was 100% full. As a result, he had to manually move files out of the archiving directory, instead of using the normal script, which requires some available space.<br><br>The following excerpt from the analyst's history file shows the commands he typed. The first command created the problem, overwriting archivelog ssp_arch_10204.dbf with ssp_arch_10108.dbf. This error was caused by the DBAs attempt to copy the targeted filename from this directory listing by highlighting and copying the filename with his mouse. The result was that upon pasting what he thought was the source filename after the 'mv' command he had already typed, the really pasted in the source, destination and carriage return which executed the command). He did not catch that the command had executed, and went on with his moves.<br>mv ssp_arch_10204.dbf ssp_arch_10204.dbf<br>mv ssp_arch_10108.dbf   ssp_arch_10204.dbf<br>mv ssp_arch_10108.dbf  more_space<br>mv ssp_arch_10190.dbf  more_space<br>mv ssp_arch_10190.dbf more_space | 1) Have added an entry to the "Operations Crisis Checklist" to place REEL weekly maintenance on hold if a crisis is in progress and backups or restores might be necessary.<br>1) Acquire speakerphones for the offices of all Production DBAs and System Administrators. |
| 5 | REEL weekly maintenance activity delayed the restore of the archivelog. | |
| | General communication difficulty with Sprint. We called into the Sprint PCS Silikan Bridge Line from an office where our investigation started. However, shortly after the problem began, most of the activity moved to a different set of workstations that did not have a speakerphone. This shifted Sprint PCS ability to participate in realtime discussions/analyses. | |

Westlaw.

1990 WL 36860
**(Cite as: 1990 WL 36860 (N.D.Ill.))**
< KeyCite History >

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.

ALL THE CHIPS, INC., Plaintiff,
v.
OKI AMERICA, INC., Defendant.

No. 88 C 8373.

March 16, 1990.

*MEMORANDUM OPINION*

KOCORAS, District Judge.

*1 This matter is before the court on Defendant OKI America, Incorporated's motion requesting this court to reconsider its order of December 27, 1989, denying OKI's motion for summary judgment on Count II of Plaintiff All The Chips, Incorporated's ("ATC's") complaint. For the following reasons, the motion is denied.

*BACKGROUND*

On December 27, 1989, this court issued a substantial memorandum opinion denying OKI's motion for summary judgment on Count II of ATC's complaint, a claim for breach of contract under the Uniform Commercial Code ("UCC"). In it, we rejected OKI's arguments that the undisputed facts showed (1) that there was no contract as a matter of law because there was no meeting of the minds and (2) that there was no writing sufficient to satisfy the UCC's statute of frauds as a matter of law. We based these conclusions on the finding that there were genuine disputes over facts which were material to both of these defenses. OKI now claims our decision was grounded on gross misconceptions and asks that we reconsider. We, however, decline to do so.

*DISCUSSION*

OKI lists what it views as the decision's errors in four separate sections of its supporting memorandum. We find each of these purported errors, however, to be either misplaced or irrelevant.

First and foremost, OKI criticizes our assumption that there was a contract formed by OKI's silence in September, 1987. OKI claims that it has never admitted that there was a contract formed by the parties' dealings in September of 1987 and thus we were wrong to assume that such a contract existed for purposes of analyzing its motion for summary judgment on the contract asserted in Count II. OKI concludes that since the September contract was the linchpin of our decision, the result reached in that decision cannot stand.

OKI is quite correct that the September contract was critical to the denial of its motion. In particular, we used the existence of the September contract and the fact that the offer there was also accepted by silence as a prior course of dealing which could give contractual meaning to OKI's silence in the case of the January contract. In addition, we noted that the prior course of dealing demonstrated by the September contract (1) strengthened the implied ratification argument with respect to the conduct prong of that doctrine and (2) obviated the need to show OKI's written intention to be bound under the UCC statute of frauds.

OKI, however, is grossly mistaken that our treatment of the September contract as valid was legal error. OKI does not and did not contest that if there was a September contract, it was a contract which was never expressly accepted or ratified by OKI headquarters. Thus, if there was such a contract, it arose in a similar manner to the second alleged contract, that is, by silence. OKI, however, did not move for summary judgment on ATC's Count I, which asserts breach of the September contract. And because OKI did not move for summary judgment on the earlier contract, it had to be deemed valid for purposes of the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



1990 WL 36860                                                    **Page  2**
**(Cite as: 1990 WL 36860, \*1 (N.D.Ill.))**

motion for summary judgment on Count II's contract.    The reason for this assumption is obvious: as long as the first contract remains a legal possibility as a matter of law, to discount its validity would greatly prejudice ATC.    If this court rejects silence as acceptance as a matter of law simply because the prior course of dealing has not yet been established as a matter of law, what happens at trial if ATC succeeds in proving the September contract?    OKI's suggested approach would leave ATC with an established prior course of dealing but without a second count to apply it to.

**\*2** At bottom, OKI's argument completely misconstrues the burden it had to meet on its motion for summary judgment.    The silence-by-acceptance theory is one way to get a valid contract for the sale of goods under the UCC on these facts.    In order to show, then, that there was no second contract *as a matter of law*, OKI bore the burden of proving that silence by acceptance was inapposite *as a matter of law*.    And in order to accomplish this, OKI had to show that there was no prior course of dealing to be applied to the second contract.    Thus, OKI's failure to demonstrate that there was no first contract as a matter of law was fatal to its no-contract argument on Count II.    OKI's attempt to shift this burden to ATC is utterly wrongheaded and completely inconsistent with the legal standard under Rule 56 of the Federal Rules of Civil Procedure.

On the other hand, we also reject ATC's argument that our December 27th ruling *establishes* the September contract as a matter of law.    Although we stated at one point in the opinion that OKI "admitted" there was a September contract, implicit in the statement is the understanding that OKI did not contest the existence of the September contract *for purposes of the motion*.    As discussed above, it was simply the fact that there was a possibility of a September contract which made it fodder for ATC's attempt to defeat the motion and not any legal conclusion that the September contract had been established as a matter of law.    To accomplish this important objective, ATC must file its own motion for summary judgment on Count I, where of

course it rather than OKI will bear the burden of proof imposed by Rule 56.

OKI's second allegation of error is that the court mistakenly concluded that there was a factual dispute over whether OKI knew that Sumnarski was behaving as if he had authority to enter into contracts on its behalf and what sort of contract he had purportedly entered.    What OKI knew is important to any implied ratification argument because one element of that doctrine is that the ratifier--in this case, OKI--must be on notice that an agent has gone beyond his legitimate authority in contracting with a third party on behalf of the ratifier.    OKI argues that it was undisputed on the motion that McClarity, OKI's regional manager, had explained to Sumnarski that OKI might have trouble filling any new orders.    From this, OKI concludes as follows, and we quote: "OKI's knowledge then was that Sumnarski knew that it would be difficult or impossible to fill the January orders, and presumably so advised ATC.    That was what McClarity told Sumnarski, and there is nothing in the record to the contrary."

Aside from the above quotation's lack of clarity (although it certainly did not lack Mc--Clarity), it misconstrues completely whose knowledge is at issue. What Sumnarski and ATC knew may be relevant to the reasonable reliance requirement of implied ratification but their knowledge has nothing to do with the knowledge requirement, which focuses on the principal, i.e., OKI.

**\*3** When the focus is properly placed on OKI, we reaffirm that there is sufficient evidence from which to conclude that OKI knew of Sumnarski's "acceptance" of ATC's January offers.    Although we engaged in this analysis once before, we will do so again in abbreviated form.

OKI, of course, cannot really know anything in a cognitive sense.    Whatever knowledge or notice it has necessarily comes from its agents by imputation. In this case, the relevant agent was McClarity.      Thus, if McClarity had reason to know that Sumnarski had led ATC

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



1990 WL 36860
**(Cite as: 1990 WL 36860, \*3 (N.D.Ill.))**

to believe that Sumnarski had agreed to a January contract on behalf of OKI, then it becomes OKI's knowledge as well by operation of agency law as long as McClarity was acting within the scope of his agency when he learned it.

As presented in this court's earlier decision, the evidence presented by ATC is quite sufficient to create a genuine issue of fact over McClarity's knowledge.    There are repeated references in the depositions to Sumnarski's description of his role as synonymous with OKI itself and the fact that many of these statements were allegedly made in front of McClarity.    In addition, there is testimony that McClarity himself helped create the impression that Sumnarski was authorized to deal on behalf of OKI by telling ATC that Sumnarski was the person to deal with at OKI.    This evidence is relevant to the issue of whether McClarity should have known of a potential exercise of authority by Sumnarski beyond his authority.    When this evidence is coupled with statements by ATC's agents that McClarity was present on occasions after the alleged   January   oral   agreement   where Sumnarski referred to the various orders which had been sent to OKI headquarters as "in queue" and also discussed future delivery as if a deal had indeed been made, it becomes evident that there is a reasonable inference that McClarity knew or should have known that Sumnarski had contracted with ATC on behalf of OKI beyond the scope of his authority in January of 1987.    Since it also reasonable under agency law to impute McClarity's knowledge to OKI on these facts, OKI's claim that the undisputed facts show no knowledge on OKI's part as a matter of law must again be rejected.

OKI's third claim of error is that, in our opinion, we "disregarded undisputed evidence that ATC was well aware of the delivery difficulties and that ATC was timely advised that their [sic] January orders could not be filled."    From this OKI apparently concludes that any reliance ATC placed on OKI's subsequent silence was unreasonable as a matter of law.

OKI is again mistaken.    In the first place, the fact that ATC was on notice of even severe problems with the timeliness of delivery does not necessarily negate reasonable reliance on OKI's silence with respect to the existence of a contract.    As this court clearly indicated in its first opinion, ATC's orders were met with silence the first time and there appeared to be a September contract, so why not the second time?   Of course OKI has an argument on the facts with respect to reasonableness, but that will be a matter for the trier of fact. Secondly, just how severe the delivery problems were made to seem to ATC is not undisputed.      For example, Giammarusco stated in his deposition that although Sumnarski had told him there might be some problems with delivery being late, he also indicated that delivery could be right on schedule and up to volume.      Under this version of ATC's information, the belief that there nonetheless was an underlying contract would be much more reasonable.    The point is that there is a dispute.

\*4 Before moving on to OKI's last argument, we also take the opportunity to note that even if OKI's second and third claims of error were both correct, it would still lose this motion. OKI's knowledge and the reasonableness of ATC's reliance are necessary elements of the implied ratification doctrine but they have nothing whatever to do with this court's *alternative* theory of contract: acceptance by silence pursuant to a prior course of dealing. Knowledge and reasonable reliance also have nothing to do with satisfying the writing requirement of the UCC's statute of frauds. With this we come to OKI's last, as well as its most interesting, claim of error.

OKI, apparently in all seriousness, takes the incredible    position    that    our    "opinion improperly ascribes great importance to a policy enacted months after the events in question."      By this OKI refers to our quotation of OKI's "new marketing policy" of April 1987, which required contract disclaimer language on all new customer purchase orders. OKI   now   argues   that   the   policy   is inadmissible under Rule 407 of the Federal Rules of Evidence, and thus was improperly

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



1990 WL 36860
**(Cite as: 1990 WL 36860, \*4 (N.D.Ill.))**

Page  4

"considered" in this court's analysis.

OKI's position is absurd.  First, the argument makes it clear that OKI did not read our memorandum opinion very closely. Although we quoted the marketing policy in an introductory section of the opinion chronologically discussing the events and litigation procedure leading up to OKI's motion for summary judgment and clearly labelled that section as a "*BACKGROUND,*" we never referred to the policy again in analyzing the merit of OKI's motion and, in fact, the policy was never referred to other than in the quotation.  How this single reference leads to the court's ascribing the policy great importance defies reasonable comprehension.

Second, it is by no means clear that the policy would be inadmissible under Rule 407.  That provision states that, as a matter of policy, "evidence of [subsequent remedial] measures is not admissible to prove negligence or culpable conduct...."  Breach of contract, however, requires no showing of any sort of fault, thus apparently negating the operation of Rule 407.  *See, e.g., R.W. Murray v. Shatterproof Glass,* 758 F.2d 266, 274 (8th Cir.1985) ( Rule 407 not applicable in contract action for breach of warranty because plaintiff need not show negligence of culpability).

Third, notwithstanding OKI's "concern" to keep the record "uncluttered," the marketing policy was legitimately articulated in ATC's statement of material facts.  If OKI desired either to contest the existence of such a policy or to argue that it should not have been considered in the motion, it was responsible for so arguing.  The fact that it did not would, of itself, be sufficient to reject OKI's Rule 407 argument out of hand on this motion for reconsideration. *E.g., Ray E. Friedman & Co. v. Jenkins,* 824 F.2d 657, 660 (8th Cir.1987).

For the foregoing reasons, the defendant's request that this court reconsider its memorandum ruling of December 27, 1989, denying its motion for partial summary judgment, is denied.

1990 WL 36860, 1990 WL 36860 (N.D.Ill.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.

Not Reported in F.Supp.2d
Prod.Liab.Rep. (CCH) P 16,172
**(Cite as: 2001 WL 1191167 (N.D.Ill.))**
< KeyCite History >

United States District Court, N.D. Illinois,
Eastern Division.

Rafael MURILLO, Plaintiff,
v.
SANDVIK PROCESS SYSTEMS, INC.,
Defendant.

No. 98 C 372.

Oct. 4, 2001.

MEMORANDUM OPINION AND ORDER

MORAN, Senior J.

*1 Plaintiff Raphael Murillo filed a product liability suit against defendant Sandvik Process Systems, Inc., for injuries sustained on January 22, 1996, when plaintiff's left arm was pulled into a machine designed and manufactured by Sandvik. Plaintiff seeks recovery from Sandvik under a negligence theory. After the accident, plaintiff's employer, Witco Chemical Corporation ("Witco"), made safety improvements to plaintiff's work area, including installing safety equipment supplied by Sandvik in 1993 as part of a safety campaign. Although the equipment was in Witco's possession for about two years before plaintiff's injury, Witco did not install the equipment until after the January 1996 incident.

Plaintiff has now filed a motion *in limine* requesting the court to bar presentation of evidence relating to Sandvik's safety campaign and the failure of Witco to install retrofitting safety equipment until after plaintiff's accident. For the reasons set forth below, motion is denied.

### DISCUSSION
*Relevance to Negligence Defense*

Plaintiff's first ground for barring the evidence of Sandvik's safety campaign and Witco's failure to install Sandvik's safety equipment is that the evidence is not relevant to a defense of the negligence claim against Sandvik. Both parties recognize that in a negligence action, unlike a strict liability action, a defendant's conduct is examined to determine if the defendant breached a duty owed to the plaintiff. In this motion plaintiff is not contesting that Sandvik's conduct be presented to the jury, instead, he is asking that the conduct presented be limited to the time period before Sandvik sold the machine involved in this action to Witco.

Plaintiff argues that the requirements of what a plaintiff must offer to establish a product liability cause of action sounding in negligence should also serve as a limitation for what a defendant can offer in defending the action. Plaintiff presents Illinois caselaw, which states that "[g]enerally, the relevant time period in a cause of action alleging the negligent manufacture of a product is the time of sale or manufacture." *Carrizales v. Rheem Manufacturing Co., Inc.,* 226 Ill.App.3d 20, 41, 589 N.E.2d 569, 583, 168 Ill.Dec. 169, 183 (1st Dist.1991). We follow this statement insofar as it goes, but the courts in *Carrizales,* and the additional supporting cases presented, were determining what evidence a plaintiff could present in establishing liability, and usually were working within the confines of the subsequent remedial measures evidentiary rule hereafter discussed. The cases presented that do discuss a defense to a negligent design or manufacture action only state possible ways to defend, not limitations on available defenses.

Neither party has offered precedent stating definitively that a defendant may or may not present evidence of conduct taken after a product has been put into the stream of commerce and before a cause of action involving that product arose. We believe the test comes down to one of relevance. Will this evidence help the jury to determine whether or not Sandvik breached a duty or whether the alleged breach was the proximate cause of

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Not Reported in F.Supp.2d
(Cite as: 2001 WL 1191167, *1 (N.D.Ill.))

**Page    2**

plaintiff's injury? We believe it will.

*2 Plaintiff also argues that a manufacturer has a non-delegable duty to produce a reasonably safe product. However well-founded, this argument seems misplaced since the issue presented by this motion is what conduct of the defendant may be examined in determining if the alleged duty has been met. Defendant's evidence will not be excluded under this ground.

### Adequacy of Pleadings

Plaintiff next argues that even if the disputed evidence is relevant to a Sandvik's defense, Sandvik should be kept from presenting it under Rule 8(c) of the Federal Rules of Civil Procedure, which requires that a party plead affirmative defenses. If an affirmative defense is not plead, then that defense is waived. *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 235 (7th Cir.1991). This rule may not be strictly applied if through discovery a plaintiff is put on notice of the defenses to be used at trial. *Fort Howard Paper Co. v. Standard Havens, Inc.*, 901 F.2d 1373, 1378 (7th Cir.1990). In answering plaintiff's allegation of negligence, Sandvik states that it complied with any duties it may have had in manufacturing and designing the machine in this case. It also denies that "any condition of the product proximately caused or resulted in Plaintiff's alleged injuries,..." (Ans., ¶ 23).

Plaintiff argues that under Rule 8(c) this general denial by Sandvik constitutes a waiver of certain defenses, making the evidence offered to support those defenses irrelevant. Plaintiff asserts that Sandvik cannot now argue that it was originally negligent and then corrected the deficiencies, or that Witco's failure to install the safety equipment provided by Sandvik was a superceding cause of plaintiff's injuries. Rule 8(c) provides a list of specific defenses that must be affirmatively raised that do not include lack of proximate cause or superceding cause. It does however cover "any other matter constituting an avoidance or affirmative defense."

Sandvik's defense to the claim of negligence does not appear to be an affirmative defense, such as assumption of risk or contributory negligence, and is likely outside the scope of Rule 8(c). In any event, we find that the plaintiff has had sufficient notice of Sandvik's proposed defense. The evidence of Sandvik's safety campaign and Witco's failure to install equipment are not barred by Rule 8(c).

### Subsequent Remedial Measures

Plaintiff also asks that the contested evidence be excluded under Rule 407 of the Federal Rules of Evidence, which provides that evidence of measures taken after an event, that would have made the event less likely to occur, should not be admitted to prove negligence or culpable conduct. Rule 407 is usually invoked by a defendant seeking to exclude evidence of repair or change in design that is being offered by a plaintiff to show a defendant's implied confession of fault in the repairs not having been taken earlier. *Kaczmarek v. Allied Chemical Corp.*, 836 F.2d 1055, 1060 (7th Cir.1987). Illinois follows a corresponding rule, allowing evidence of subsequent remedial measures against a defendant only in limited circumstances. *Herzog v. Lexington Township*, 167 Ill.2d 288, 300-01, 212 Ill.Dec. 581, 587, 657 N.E.2d 926, 932 (1995).

*3 Sandvik is the party seeking to present evidence of remedial measures. While not unheard of, a plaintiff seeking to bar evidence of subsequent remedial measures is unusual since the policy behind Rule 407 is "to encourage safety improvements by preventing their being used as evidence to show that the defendant should have made the improvements earlier." *Traylor v. Husqvarna Motor*, 988 F.2d 729, 733 (7th Cir.1993). The policy behind the rule would most likely not be thwarted by allowing a defendant to offer evidence of a safety campaign to support its defense against a negligence claim. If anything, allowing Sandvik to use the evidence in its defense would provide incentive to manufacturers to make needed safety changes and educate prior buyers in ways to make a potentially harmful machine

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



**Page  3**

safer after the machine has left the manufacturers' control.

The court also recognizes that Sandvik's safety campaign was undertaken before the "event" in this case. While a court might determine the event in a product liability case to be the moment when a defendant placed a product into the stream of commerce, the event in an accident case such as this one should be the accident. *Traylor,* 988 F.2d at 733; *Raymond v. Raymond Corp.,* 938 F.2d 1518, 1523 (1st Cir.1991). Considering the timing of the remedial measures and the intended use of the evidence by the defendant, we find that the evidence falls outside of the scope of Rule 407.

*Availability of Superceding Cause Defense*

Plaintiff's final ground for barring the evidence is that a superceding cause defense is not recognized by Illinois law in this situation and, as a result, the evidence offered to support that defense is irrelevant. In a case for negligence under Illinois law, a plaintiff must show by a preponderance of the evidence that the defendant caused the plaintiff's injury or harm. *Smith v. Eli Lilly,* 137 Ill.2d 222, 232,148 Ill.Dec. 22,26, 560 N.E.2d 324, 328 (1990). A defendant can avoid liability if "the negligence charged does nothing more than furnish a condition by which the injury is made possible and that condition causes an injury by the subsequent, independent act of a third person ... the subsequent act is an intervening efficient cause which breaks the causal connection between the original wrong and the injury, and itself becomes the proximate or immediate cause." *Merlo v. Public Service Co. of Northern Illinois,* 381 Ill. 300, 316, 45 N.E.2d 665, 675 (1942). Illinois law also provides that an intervening act will not break the chain of proximate cause if that act was probable or foreseeable. *Neering v. Ill. Cent. R. Co.,* 383 Ill.366, 381, 50 N.E.2d 497, 504 (1943).

Plaintiff argues that there was no independent act in this case that could rise to the level of a superceding cause. Sandvik does not appear to be arguing that it is a third

party's act that cuts off the proximate cause chain, but rather a third party's failure to act. Sandvik is proposing that Witco was negligent in failing to install equipment and that this negligence was the sole proximate cause of plaintiff's injury and cut off any liability Sandvik may have had. Plaintiff responds that even if Witco was negligent in not installing the safety equipment, this negligence would be so foreseeable that as a matter of law it could not be considered a separate superceding cause.

**\*4** Plaintiff's arguments have some force on this issue of causation since this appears to be a situation where the machine involved in the accident was operating in the way it was originally designed and manufactured to operate. Cause is almost always a question for the jury, however, including determining whether an alleged tort was a superceding, intervening cause. *Wehmeier v. UNR Industries, Inc.,* 213 Ill.App.3d 6, 32, 572 N.E.2d 320, 338, 157 Ill.Dec. 251, 269 (4th Dist.1991). Even if Sandvik's alleged negligence is found to be a cause in fact of plaintiff's injury, Sandvik should have the opportunity to argue to the jury that it was not the proximate legal cause of the injury. After the presentation of the evidence the court can reconsider the question of whether as a matter of law there was no intervening force that could rise to the level of a superceding cause. The evidence will not be excluded under this ground.

### CONCLUSION

For the reasons above, plaintiff's motion *in limine* to exclude evidence of subsequent remedial measures and Sandvik's post-manufacture safety campaign is denied.

2001 WL 1191167 (N.D.Ill.), Prod.Liab.Rep. (CCH) P 16,172

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Westlaw.

1997 WL 573405                                          **Page 1**
**(Cite as: 1997 WL 573405 (E.D.La.))**
< KeyCite Yellow Flag >

Only the Westlaw citation is currently
available.

United States District Court, E.D. Louisiana.

SCURLOCK MARINE, INC.
v.
W. W. PATTERSON COMPANY

No. CIV.A. 95-528.

Sept. 12, 1997.

CLEMENT, District J.

*1 Before the Court is defendant W.W.
Patterson's ("Patterson") Motion in Limine to
exclude evidence of defendant's subsequent
remedial measures. For the following reasons,
the defendant's motion is DENIED, and
evidence of defendant's subsequent remedial
measures will be allowed for the limited
purposes described below.

### BACKGROUND

This case stems from an accident which
occurred on February 13, 1994. The plaintiff
in the matter entitled "Charles D. Gautreaux
v. Scurlock Marine, Inc., Civil Action No. 94-
879" sued his employer, Scurlock Marine, Inc.
("Scurlock") asserting a Jones Act claim as
well as a claim for unseaworthiness under
general maritime law for injuries he sustained
when a winch handle struck him in the eye.

A trial on this case was held on December 14-
15, 1994. The jury found: 1) the vessel was
seaworthy; 2) Scurlock was negligent under
the Jones Act for not properly training Mr.
Gautreaux in the use of the winch; and 3) Mr.
Gautreaux was 5% contributorily negligent
while Scurlock was 95% negligent. (Tr.
Transcript, p. 343.) Although a panel of the
Fifth Circuit initially affirmed the trial court's
judgment, *see Gautreaux v. Scurlock Marine, Inc.,*
84 F.3d 776(5th Cir. 1996), the Circuit en banc
concluded that the Fifth Circuit Pattern Jury
Instructions on comparative negligence were

wrong, vacated the judgment as to
comparative fault, and remanded the case
back to the district court to determine the
comparative fault based upon an "ordinary
prudence" standard. *Gautreaux v. Scurlock
Marine, Inc.,* 107 F.3d 331, 334, 339(5th Cir.
1997). The parties subsequently settled the
case.

On February 13, 1995, Scurlock filed the
present suit against Patterson seeking
contribution or indemnity from Patterson. The
complaint alleges that Patterson is in the
business of manufacturing and distributing
electric towing winches and manufactured the
towing winch that caused Mr. Gautreaux's
injuries. Scurlock asserts that Patterson is
liable for Gautreaux's injuries under products
liability law because of "defects or deficiencies
in [Patterson's] towing winch, or... defects in
design or inadequate warnings or
instructions." (Plaintiff's Complaint,
paragraph 12).

Subsequent to the accident involving Mr.
Gautreaux, defendant added a precautionary
warning to the owner's manual for the winch,
and on the winch itself. Defendant now seeks
a motion in limine excluding these warnings
from the evidence presented at trial, on the
ground that they constitute subsequent
remedial measures.

### ANALYSIS

Federal Rule of Evidence 407 provides:
When, after an event, measures are taken
which, if taken previously, would have made
the event less likely to occur, evidence of the
subsequent measures is not admissible to
prove negligence or culpable conduct in
connection with the event. *This rule does not
require the exclusion of evidence of subsequent
remedial measures when offered for another
purpose, such as proving ownership, control, or
feasibility of precautionary measures, if
controverted, or impeachment.*

*2 (emphasis added). As the Advisory

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Committee Notes explain, the main justification for Rule 407 is the "social policy of encouraging people to take, or at least not discouraging them from taking, steps in furtherance of added safety." Fed. R. Evid. 407 advisory committee's note.

The Fifth Circuit has applied Federal Rule of Evidence 407, including its exceptions, to products liability claims in federal court. *Grenada v. Steel Industries v. Alabama Oxygen Company, Inc.,* 695 F.2d 883, 887 (5th Cir. 1983); *Josephs v. Harris Corp.,* 677 F.2d 985,990 (5th Cir. 1982). Accordingly, while plaintiff may not use evidence of Patterson's subsequent warnings as proof of defendant's negligence in designing or manufacturing the winch, it may introduce evidence of these remedial measures for the purpose of proving the controverted issues of (1) feasibility; (2) whether the dangerous condition was "obvious"; and (3) contributory negligence. Evidence of defendant's warnings may also be admitted for purposes of impeachment.

First, evidence of defendant's subsequent warnings may be admitted for the purpose of proving feasibility of the warnings in issue, because defendant has by virtue of its expert reports put feasibility at issue. The expert testimony proffered by defendant suggests that warnings on the winch are likely to be illegible after many coats of paint and the corrosive sea environment, and specific warnings in the instruction manual would have been ineffective since Mr. Gautreaux did not read the manual. *See* supplemental report of defendant's expert Charles E. Prewitt.

Second, evidence of defendant's subsequent remedial measures may be admitted for the purpose of considering defendant's defense of contributory negligence. Defendant in his Answer raised the defense of contributory negligence. Evidence of subsequent remedial measures is not considered prejudicial where it relates to the alleged contributory negligence of plaintiff, and where the trial court is careful to point out to the jury that the evidence is not to bear on the general negligence of the defendant. *Rimkus v. Northwest Colorado Ski Corp.,* 706 F.2d 1060,

1066 (10th Cir. 1983).

Third, evidence of defendant's subsequent remedial measures may also be admitted for the purpose of establishing whether the dangerous condition was "obvious." The Fifth Circuit has held that evidence of subsequent remedial measures is admissible as "proof of subsidiary issues in the case, such as knowledge of the dangerous condition ...." *Rozier v. Ford Motor Co.,* 573 F.2d 1332 (5th Cir.), *reh'g denied,* 578 F.2d 871 (5th Cir. 1978). For example, in *Pitasi v. Stratton Corp.,* 968 F.2d 1558, 1560-61 (2nd Cir. 1992), evidence of a ski resort's subsequent remedial measures following an accident were admissible to rebut the resort's defense that the dangerous conditions were so obvious and apparent that no warnings were necessary. In the instant case, defendant has asserted that "the dangers of operating the winch were so obvious that a warning was unnecessary." Evidence of defendant's subsequent warnings should therefore be admitted for the purpose of rebutting defendant's assertion that the danger posed by the winch was "obvious."

*3 Finally, evidence of defendant's subsequent remedial measures may be admitted for purposes of impeaching defendant and its expert witnesses. In *Polythane Systems, Inc. v. Marina Ventures International, Ltd.,* 993 F.2d 1201, 1210 (5th Cir.), *reh'g denied,* 4 F.3d 992 (5th Cir. 1993), *cert. denied,* 114 S.Ct. 1064 (1994), the court allowed evidence of subsequent remedial measures to impeach defendant's assertion that these measures were not necessary. In the instant case, defendant and its experts also assert that warnings were unnecessary. Evidence of the defendant's subsequent remedial measures in adding warnings to the manual and the winch itself may therefore be admitted to impeach defendant and its witnesses. This use of the evidence of subsequent remedial measures would not offer proof of defendant's negligence, and is thus permissible impeachment under Fed. Rule Evid. 407. *Id.* at 1211.

Evidence of defendant's providing warnings in its revised owner's manual and winches

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



1997 WL 573405                                                    **Page   3**
**(Cite as: 1997 WL 573405, \*3 (E.D.La.))**

subsequent to Mr. Gautreaux's accident may
thus be admitted for the purposes of proving
the controverted issues of (1) feasibility; (2)
whether the dangerous condition was
"obvious"; and (3) contributory negligence; as
well as for impeachment purposes.
Accordingly,

 IT IS ORDERED that Patterson's Motion in
Limine is DENIED.

1997 WL 573405, 1997 WL 573405 (E.D.La.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.

1997 WL 573405
**(Cite as: 1997 WL 573405 (E.D.La.))**
< KeyCite Yellow Flag >

Only the Westlaw citation is currently
available.

United States District Court, E.D. Louisiana.

SCURLOCK MARINE, INC.
v.
W. W. PATTERSON COMPANY

No. CIV.A. 95-528.

Sept. 12, 1997.

CLEMENT, District J.

*1 Before the Court is defendant W.W.
Patterson's ("Patterson") Motion in Limine to
exclude evidence of defendant's subsequent
remedial measures. For the following reasons,
the defendant's motion is DENIED, and
evidence of defendant's subsequent remedial
measures will be allowed for the limited
purposes described below.

## BACKGROUND

This case stems from an accident which
occurred on February 13, 1994. The plaintiff
in the matter entitled "Charles D. Gautreaux
v. Scurlock Marine, Inc., Civil Action No. 94-
879" sued his employer, Scurlock Marine, Inc.
("Scurlock") asserting a Jones Act claim as
well as a claim for unseaworthiness under
general maritime law for injuries he sustained
when a winch handle struck him in the eye.

A trial on this case was held on December 14-
15, 1994. The jury found: 1) the vessel was
seaworthy; 2) Scurlock was negligent under
the Jones Act for not properly training Mr.
Gautreaux in the use of the winch; and 3) Mr.
Gautreaux was 5% contributorily negligent
while Scurlock was 95% negligent. (Tr.
Transcript, p. 343.) Although a panel of the
Fifth Circuit initially affirmed the trial court's
judgment, *see Gautreaux v. Scurlock Marine, Inc.,*
84 F.3d 776(5th Cir. 1996), the Circuit en banc
concluded that the Fifth Circuit Pattern Jury
Instructions on comparative negligence were

wrong, vacated the judgment as to
comparative fault, and remanded the case
back to the district court to determine the
comparative fault based upon an "ordinary
prudence" standard. *Gautreaux v. Scurlock
Marine, Inc.,* 107 F.3d 331, 334, 339(5th Cir.
1997). The parties subsequently settled the
case.

On February 13, 1995, Scurlock filed the
present suit against Patterson seeking
contribution or indemnity from Patterson. The
complaint alleges that Patterson is in the
business of manufacturing and distributing
electric towing winches and manufactured the
towing winch that caused Mr. Gautreaux's
injuries. Scurlock asserts that Patterson is
liable for Gautreaux's injuries under products
liability law because of "defects or deficiencies
in [Patterson's] towing winch, or... defects in
design or inadequate warnings or
instructions." (Plaintiff's Complaint,
paragraph 12).

Subsequent to the accident involving Mr.
Gautreaux, defendant added a precautionary
warning to the owner's manual for the winch,
and on the winch itself. Defendant now seeks
a motion in limine excluding these warnings
from the evidence presented at trial, on the
ground that they constitute subsequent
remedial measures.

## ANALYSIS

Federal Rule of Evidence 407 provides:
When, after an event, measures are taken
which, if taken previously, would have made
the event less likely to occur, evidence of the
subsequent measures is not admissible to
prove negligence or culpable conduct in
connection with the event. *This rule does not
require the exclusion of evidence of subsequent
remedial measures when offered for another
purpose, such as proving ownership, control, or
feasibility of precautionary measures, if
controverted, or impeachment.*

*2 (emphasis added). As the Advisory

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



1997 WL 573405
(Cite as: 1997 WL 573405, *2 (E.D.La.))

Committee Notes explain, the main justification for Rule 407 is the "social policy of encouraging people to take, or at least not discouraging them from taking, steps in furtherance of added safety." Fed. R. Evid. 407 advisory committee's note.

The Fifth Circuit has applied Federal Rule of Evidence 407, including its exceptions, to products liability claims in federal court. *Grenada v. Steel Industries v. Alabama Oxygen Company, Inc.,* 695 F.2d 883, 887 (5th Cir. 1983); *Josephs v. Harris Corp.,* 677 F.2d 985,990 (5th Cir. 1982). Accordingly, while plaintiff may not use evidence of Patterson's subsequent warnings as proof of defendant's negligence in designing or manufacturing the winch, it may introduce evidence of these remedial measures for the purpose of proving the controverted issues of (1) feasibility; (2) whether the dangerous condition was "obvious"; and (3) contributory negligence. Evidence of defendant's warnings may also be admitted for purposes of impeachment.

First, evidence of defendant's subsequent warnings may be admitted for the purpose of proving feasibility of the warnings in issue, because defendant has by virtue of its expert reports put feasibility at issue. The expert testimony proffered by defendant suggests that warnings on the winch are likely to be illegible after many coats of paint and the corrosive sea environment, and specific warnings in the instruction manual would have been ineffective since Mr. Gautreaux did not read the manual. *See* supplemental report of defendant's expert Charles E. Prewitt.

Second, evidence of defendant's subsequent remedial measures may be admitted for the purpose of considering defendant's defense of contributory negligence. Defendant in his Answer raised the defense of contributory negligence. Evidence of subsequent remedial measures is not considered prejudicial where it relates to the alleged contributory negligence of plaintiff, and where the trial court is careful to point out to the jury that the evidence is not to bear on the general negligence of the defendant. *Rimkus v. Northwest Colorado Ski Corp.,* 706 F.2d 1060,

1066 (10th Cir. 1983).

Third, evidence of defendant's subsequent remedial measures may also be admitted for the purpose of establishing whether the dangerous condition was "obvious." The Fifth Circuit has held that evidence of subsequent remedial measures is admissible as "proof of subsidiary issues in the case, such as knowledge of the dangerous condition ...." *Rozier v. Ford Motor Co.,* 573 F.2d 1332 (5th Cir.), *reh'g denied,* 578 F.2d 871 (5th Cir. 1978). For example, in *Pitasi v. Stratton Corp.,* 968 F.2d 1558, 1560-61 (2nd Cir. 1992), evidence of a ski resort's subsequent remedial measures following an accident were admissible to rebut the resort's defense that the dangerous conditions were so obvious and apparent that no warnings were necessary. In the instant case, defendant has asserted that "the dangers of operating the winch were so obvious that a warning was unnecessary." Evidence of defendant's subsequent warnings should therefore be admitted for the purpose of rebutting defendant's assertion that the danger posed by the winch was "obvious."

*3  Finally, evidence of defendant's subsequent remedial measures may be admitted for purposes of impeaching defendant and its expert witnesses. In *Polythane Systems, Inc. v. Marina Ventures International, Ltd.,* 993 F.2d 1201, 1210 (5th Cir.), *reh'g denied,* 4 F.3d 992 (5th Cir. 1993), *cert. denied,* 114 S.Ct. 1064 (1994), the court allowed evidence of subsequent remedial measures to impeach defendant's assertion that these measures were not necessary. In the instant case, defendant and its experts also assert that warnings were unnecessary. Evidence of the defendant's subsequent remedial measures in adding warnings to the manual and the winch itself may therefore be admitted to impeach defendant and its witnesses. This use of the evidence of subsequent remedial measures would not offer proof of defendant's negligence, and is thus permissible impeachment under Fed. Rule Evid. 407. *Id.* at 1211.

Evidence of defendant's providing warnings in its revised owner's manual and winches

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



1997 WL 573405
**(Cite as: 1997 WL 573405, \*3 (E.D.La.))**

subsequent to Mr. Gautreaux's accident may thus be admitted for the purposes of proving the controverted issues of (1) feasibility; (2) whether the dangerous condition was "obvious"; and (3) contributory negligence; as well as for impeachment purposes. Accordingly,

IT IS ORDERED that Patterson's Motion in Limine is DENIED.

1997 WL 573405, 1997 WL 573405 (E.D.La.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works