UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| CONVERGYS INFORMATION MANAGEMENT GROUP, INC., et al., | : : : : | Civil Action No. C-1-03-252 |
| | | Magistrate Hogan |
| Plaintiffs, | : : : | |
| | : | REPLY TO PLAINTIFFS' |
| v. | : : | MEMORANDUM IN OPPOSITION TO DEFENDANTS' |
| IGATE CAPITAL CORPORATION, et al., | : : : : : | MOTION *IN LIMINE* TO PROHIBIT PLAINTIFFS FROM OFFERING EXPERT TESTIMONY |
| Defendants. | : | |

**REPLY TO PLAINTIFFS' MEMORANDUM
IN OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE*
TO PROHIBIT PLAINTIFFS FROM OFFERING EXPERT TESTIMONY**

Defendants ("Mastech"), by their undersigned counsel, hereby file this Reply to Plaintiffs' ("Convergys") Memorandum in Opposition to Defendants' Motion *In Limine* to Prohibit Plaintiffs From Offering Expert Testimony.

## I. **RELIEF REQUESTED**

Convergys' opposition memorandum fails to disclose to Mastech – or to the Court – what expert opinion contentions it intends to offer at the trial. As indicated by Mastech's counsel at the recent Pretrial Conference, a final ruling on the Motion *In Limine* can be deferred until the time of trial when a complete factual record is before the Court. Nevertheless, interim relief on the Motion *In Limine* should be granted compelling Convergys to disclose its opinion contentions and also, to the extent not already provided in the depositions of its corporate designees, identify the factual basis upon which it relies for such opinion contentions. In particular, as applied to the specific facts presented, the Court should direct Convergys promptly to identify in writing:

1.    The alleged conduct of Mastech's then employee Ragesh Rao ("Mr. Rao") which Convergys contends caused the database file corruption referred to in its Second Amended Complaint and also the facts upon which it relies in making such causation contentions.[1]

2.    Whether it contends that Mr. Rao deleted or otherwise also altered his keystroke log (i.e., shell history), SSP alert log, and/or SSUP alert log for the September 17 – September 21, 1999 time period as well as the facts upon which it relies in making such causation contentions.

3.    The actions by Mr. Rao which it will contend failed to satisfy "the highest degree of skill and care required by customarily accepted good and sound professional practices and procedures" upon which it bases its claims, and also the facts upon which it relies to establish such "customarily accepted good and sound professional practices and procedures".

The fundamental fairness under the circumstances for requiring Convergys to make such contention disclosures is discussed more fully below. A final ruling as to whether Convergys' proffered "employee-experts" (i.e., Messrs. Koopmans and Brown) can be deferred until trial after Convergys has made the above-disclosures and the Court has the opportunity to consider the appropriateness of permitting expert opinion contention testimony by Messrs. Koopmans or Brown in light of their prior deposition testimony as designees and the additional disclosures to be made by Convergys. Moreover, a final ruling on the appropriate relief to be entered against Convergys for its failure to preserve all relevant evidence can be made at the time of trial based upon both Convergys' disclosed and actual expert opinion contentions at the trial and also the factual record developed at trial concerning Convergys' selective preservation of only a portion

---

[1]   In particular, Convergys should identify whether it will contend at trial that the database file corruption was caused by Mr. Rao's alleged running of scripts for the purposes of creating tablespaces, as so stated by Convergys' deposition designees, Messrs. Koopmans and Brown, or whether it will advance some other or additional causation contentions at the trial.

of the contemporaneous record of its database administrator activity at the time of the events and its attempt to prosecute its claims on the basis of such selected records and without providing Mastech with an opportunity to review and defend on the basis of a full and complete contemporaneous record.

## II. <u>ARGUMENT</u>

### A.    EXPERT TESTIMONY IS REQUIRED TO PROVE CAUSATION IN THIS LAWSUIT.

In its Motion *In Limine*, Mastech specifically alleges that the issue of causation in this matter, which involves highly technical issues of computer software analysis, is complex and beyond the comprehension of the average trier of fact, thereby necessitating the need for expert testimony. (*See*, Mastech's Motion *in Limine*, pp. 8 and 9). An examination of Convergys' Brief in Opposition, however, reveals that Convergys fails to directly address this crucial allegation. Rather, Convergys merely argues that any testimony by its employees is lay opinion testimony and therefore admissible under Federal Rule of Evidence 701. Convergys secondarily argues that, to the extent the Court deems such alleged lay opinion testimony as expert testimony, it has complied with the applicable portions of Rule 26 and/or any failure to comply with Rule 26 is harmless to Mastech.

Convergys fails to confront the ultimate issue in the Motion *In Limine*; namely, that expert testimony is required, as a matter of law, and Convergys' failure to provide required disclosures pursuant to Rule 26 forecloses its ability to now present such required testimony at trial. The authorities are unanimous in holding that a plaintiff is under an affirmative duty to provide expert testimony as to the causation of any alleged harm and damages where the underlying lawsuit involves highly complex technical facts, which are beyond the ordinary experience and knowledge of the average trier of fact. *See, Kohus v. Mariol*, 328 F.3d 848, 857-

-3-

58 (6th Cir. 2002) ("The first prong of the inquiry will almost certainly require expert testimony, because the drawings are technical in nature and a lay person is unlikely to understand . . . "); *Herring v. Knab*, 458 F. Supp. 359, 361 (S.D. Ohio 1978)("Because surgical procedures, like the tubal ligation at issue here, are generally complex medical practices, they are usually beyond the experience of laymen and accordingly require expert testimony."); *State v. Bower*, 1996 W.L. 130979 at *6 (Ohio App. Ct. March 1996) ("Generally, expert opinion evidence is required when the inquiry pertains to a highly technical question of science or skill."); *Coastal Aviation, Indus., Inc. v. Nelson,* 2001 W.L. 914864 (Mass. Super Ct. June 1, 2001) ("Where the issue of causation involves questions of technology, the jury requires the assistance of expert testimony.").

Applying this to the present matter, it is beyond reasonable dispute that the issues of causation involving highly technical and sophisticated computer software in the case *sub judice* are beyond the ordinary comprehension of a lay juror. *See, Manufacturing Mgmt. Systems, Inc. v. Data Solutions, Inc.*, 1987 WL 8229 at *2 (Ohio App. 11 Dist. March 20, 1987) (Holding contract interpretation dispute involving computer software required expert testimony) Therefore, any argument by Convergys to the effect that they need only rely on lay opinion testimony is clearly at odds with well-established case law. Consequently, the interim relief referred to above should be granted so that Convergys is required to make full disclosure of exactly what it contends is the alleged conduct by Mr. Rao which caused the database file corruption incident in question, what "customarily accepted good and sound professional practices and procedures" were violated by such alleged conduct, and the facts upon which Convergys relies for such contentions.[2]

---

[2] As an illustration of the need for such disclosure of opinion contentions, Convergys' Mr. Brown testified that Convergys did not have evidence that Mr. Rao altered his keystroke log but, nevertheless, Convergys representatives have contended that Mr. Rao did so. (*See*, Brown Depo., Vol. 1, pp. 211-214, Exhibit 1 hereto). Obviously, in the absence of evidence, Convergys will need to offer expert opinions to support any such contentions at trial.

**B.    EXPERT TESTIMONY IS REQUIRED REGARDLESS HOW THE ACTION IS STYLED**

Convergys alleges that the Motion *in Limine* incorrectly concludes that Convergys must necessarily demonstrate that Mr. Rao was negligent in performing the services he rendered on September 17, 1999.  (*See*, Brief in Opposition, page 3.)  A review of Convergys' own allegations reveals, however, that Convergys is making a distinction without relevance.

The contract alleged by Convergys between the parties states that Mastech was to "perform the services constituting or comprising the Work with the highest degree of skill and care required by customarily accepted good and sound professional practices and procedures to insure that they are correct and fit for the purpose intended and in accordance with prevailing standards of loyalty and ethical conduct." (*See*, Brief in Opposition, page 3).  Given that the contract documents require an examination of the normal and customary skill provided by a professional in this field, as well as the customarily accepted good and sound professional practices applicable in the industry, it is clear that expert testimony is required. *Simon v. Drake Constr. Co., et al*, 621 N.E.2d 837, 839 (Ohio App. Ct. 1993) ("Expert testimony is required to establish the standard of care, unless the lack of skill or care of the professional is so apparent as to be within the comprehension of a lay person and requires only common knowledge and experience to understand it.").  As such, expert testimony is required to establish the applicable industry professional standard of care (and how Mastech allegedly failed to comply therewith) regardless of how Convergys styles its claim.

**C.    CONVERGYS MAY NOT ESTABLISH CAUSATION THROUGH LAY OPINION TESTIMONY OF ITS EMPLOYEES.**

Convergys argues at some length that Rule 702 does not prohibit its employees from proffering opinion testimony as to matters of which they have first-hand knowledge.  (*See*, Brief

in Opposition, pp. 3-5).    Convergys then makes the logical leap, without any supporting

authority, that its employees may therefore proffer opinion testimony related to the causation of

the database file corruption.  An examination of the cases relied on by Convergys, as well as case

law addressing the issue directly, show that Convergys is simply incorrect on this point.

Initially, it must be noted that none of the cases cited by Convergys in Section II(A) of its

Brief in Opposition conclude that a lay witness may provide opinion testimony as to causation in

a complex technical matter.  This is because the authorities are unanimous in requiring expert

testimony whenever a lawsuit involves complex technical matters outside the purview of a

normal lay juror.  *See*, authorities cited above in Section II(A).  Furthermore, the cases cited by

Convergys are not to the contrary.

Thus, for example, in *Wilburn v. Meritrans G.P., Inc.*, a case quoted at great length by

Convergys, there were two separate and distinct issues before the Court.  The first was whether a

lay witness may present opinion testimony based on facts within their personal knowledge; and,

second, was whether expert testimony is required where the facts involved in the matter related

to causation are beyond the ordinary comprehension of a rational jury.  139 F.3d 350, 365 (3rd

Cir. 1998).  While the Court held that a lay witness may present opinion testimony on facts

within their personal knowledge, the Court went on to hold that expert testimony is in fact

required where the issue of causation is beyond the common knowledge possessed by members

of the jury.  Id. at page 61.  As such, *Wilburn* firmly stands for the proposition that expert

testimony is required where a case presents complex facts as to causation beyond the common

knowledge of the jury.  The remainder of the cases cited by Convergys in Section II(A) of its

Brief in Opposition likewise fail from this same flaw.  *See, e.g., Tampa Bay Shipbuilding &*

*Repair Co. v. Cedar Shipping Co., Ltd., et al,* 320 F.3d 1213, 1222 (11th Cir. 2003) (Holding

-6-

proffered evidence was properly considered lay witness testimony as it was not based on specialized knowledge subject to Rule 702.)

Furthermore, while Mastech does not dispute that Convergys' employees may testify as to matters of which they had actual first-hand knowledge (i.e., what they saw, observed, stated, etc.), its investigation and conclusions as to the cause of the database file corruption do not fall within such classification. Here, Convergys alleges that the database file corruption somehow was caused by Mr. Rao's actions. It is undisputed that none of Convergys' employees had first-hand knowledge as to what Mr. Rao actually did on September 17, 1999 that allegedly caused the database corruption. Indeed, Convergys has admitted that its records do not support its causation contentions unless its guesses and speculations as to what might have happened are correct (*See*, *e.g.*, Brown, Vol. 1, p. 85, Exhibit 1 hereto; Brown, Vol. 2, pp. 58-64, Exhibit 2 hereto; Koopmans Depo., Vol. 2, at pp. 335-136, Exhibit 4 hereto). Moreover, various of Convergys' employees investigated the events over several days and weeks and then confirmed the results of its investigation in various post-mortem documents. Such *post-hoc* investigation led Convergys to reach a number of conclusions as to the alleged cause or causes of the database file corruption. Therefore, as a matter of law, such conclusions and contentions are not within the first-hand knowledge of the Convergys' employees and consequently, not the proper foundation for lay opinion testimony. *See, In Re: Air Crash at Charlotte, N.C. on July 2, 1994*, 982 F. Supp. 1086, 1091 (D.S. C. 1997) (Holding NTSB employees investigating airline disaster did not possess first-hand knowledge where they "compiled information from various sources and reached conclusions after analyzing that data.)

**D.    CONVERGYS HAS FAILED TO COMPLY WITH
THE DISCLOSURE REQUIREMENTS OF RULE 26**

Convergys next asserts that even if the testimony at issue is deemed expert testimony, it

is still admissible because it has allegedly complied with the applicable portions of Rule 26.

Specifically, Convergys cites case law from other jurisdictions holding that employees who give

expert testimony need not comply with the disclosure requirements of Rule 26. The rationale in

this line of cases holds that "employee experts" are not regularly used as expert witnesses and

therefore are not retained or specially employed to provide expert testimony. Consequently,

these cases allow such testimony without the need for compliance with the disclosure

requirements of Rule 26.

Initially, it must be noted that there currently exists a split among the Circuits as to

whether a regular employee who does not regularly give expert testimony is compelled to

comply with the disclosure requirements of Rule 26. As noted above, one line of cases, which

are cited in Convergys' Brief in Opposition, express the view that where an employee does not

regularly give expert testimony, he or she may give expert testimony without complying with the

Rule 26 disclosure requirements.

In contrast, a second line of cases, which is probably the majority view, hold that a

regular employee proffering expert testimony is required to comply with the disclosure

requirements of Rule 26, the rationale being that the employee is deemed to be specially obtained

(even if not given extra compensation) given that the employee's regular duties do not ordinarily

entail giving testimony in a lawsuit, and that to rule otherwise would frustrate the fundamental

goal of promoting full pre-trial disclosure of expert testimony of the Federal Rules of Civil

Procedure. *See, e.g.*, *KW Plastics v. United States Can Co.*, 199 F.R.D. 687 688-690 (M.D.Ala.

2000); *Day v. Consolidated Rail Corp.*, No. 95 Civ. 968, 1996 WL 257654 (S.D.N.Y. May 15,

1996); *Minnesota Mining and Mfg. Co. v. Signtech USA, Ltd.*, 177 F.R.D., 459, 461 (D.Min. 1998). Research reveals no Sixth Circuit case law addressing this issue and, therefore, it is a matter of first impression for this Court.

Mastech respectfully submits that the majority line of cases reflects the better-reasoned approach to this issue. The Advisory Committee notes to Rule 26 state that the term "expert," as used in Rule 26(a)(2), refers to "those persons who will testify under Rule 702 of the Federal Rules of Evidence with respect to scientific, technical and other specialized matters." The Advisory note further states that the point of Rule 26(a)(2) is to minimize unfair surprise and prejudice regarding from "sketchy and vague" disclosure prior to trial. *See, K.W. Plastics, et al v. United States Can Co.*, 199 F.R.D. 687, 690 (M.D. Ala. 2000); *Chapple v. Alabama*, 174 F.R.D. 698, 699 (M.D. Ala. 1997). Allowing an employee to be designated as an expert, and thereby avoid the disclosure requirements of Rule 26, would clearly frustrate the goal of full and complete disclosure prior to trial contemplated by Rule 26.

Nowhere is this more evident than in the current matter. While Convergys baldly alleges that Mastech may obtain adequate information about the opinions and bases of the "employee experts" testimony through discovery, such assertion simply is not true in the present circumstances. Initially, it must be noted that Convergys has never designated any of its employee witnesses as experts. Therefore, it is entirely unfair to permit Convergys essentially to designate after-the-fact (and after the conducting of their depositions), employees as "experts" who then would be free to offer opinion contention testimony at trial. *See, In Re: Air Crash*, 982 F. Supp. at 1090-91 ("It would be unreasonable in any case to suggest that a party should presume that every person who it deposed, and his testimony contained or consisted of opinion testimony, could fairly be called as an expert even absent some party listing them as an expert.

To make such a ruling would place and undue and unnecessary burden on the Courts and litigants and lead to an extreme waste of resources.")

Furthermore, when Mastech did in fact attempt to question Convergys' supposed "employee experts" as to matters of causation and the like, no consistent or definite opinion contentions were provided and Convergys' counsel further instructed these "employee experts" not to testify as to matters discussed at any time with Convergys counsel. Thus, Mastech was denied notice of the opinion contentions to be asserted by Convergys at trial. To make matters worse, Convergys then asserted attorney-client privilege objections and instructions not to answer based upon the deponents' status as Convergys employees when no such objections or instructions would be available with respect to an independent expert.

The unfairness of the result is illustrated by the following example concerning Convergys' contention or possible contention at trial that Mr. Rao supposedly altered his keystroke log. In February of 2004, during the course of Mastech's depositions of Convergys' purported "employee-experts", Convergys produced for the first time a document ("Defendants' Deposition Exhibit 7") which purported to be a keystroke log relating to Mr. Rao that was different in content than the keystroke log previously produced in discovery by Convergys and upon which Convergys allegedly had relied at the time of the events in September of 1999. At the initial deposition on February 12, 2004 of Convergys' Mr. Koopmans, it was testified by Mr. Koopmans that such document was not relied upon by Convergys to support any assertions against Mastech and Convergys' counsel on the record represented that such document had not been previously produced because it was not relevant to any of the issues. *See*, Koopmans Depo., Vol. 1, at pp. 180-182, Exhibit 3 hereto. That same position subsequently was confirmed by both Mr. Brown and Convergys' counsel the next day at the subsequent February 13, 2004

deposition of Mr. Brown. *See*, Brown Depo., Vol. 1, pp. 66-67, Exhibit 1 hereto. Nevertheless, later at the same deposition, Convergys' counsel then changed Convergys' position and withdrew from the record the prior representation that the document in question was not relevant, and was not being relied on for, Convergys' claims. Moreover, different counsel for Convergys stated on the record that such document would in fact be used (and subsequently was used) to examine Mr. Rao at his deposition. *See*, Brown Depo., Vol. 1, pp. 107-09, Exhibit 1 hereto. After Mr. Rao was deposed, Mastech reconvened the deposition of Convergys' "employee-expert" Brown and attempted to inquire concerning whether Convergys in fact was relying upon such document in support of its claims in this action. Mr. Brown did not provide responses to such questions in compliance with the instruction by Convergys' counsel that he should not provide any testimony concerning any matter he had discussed with Convergys' counsel. *See*, Brown Depo., Vol. 2, pp. 58-61, Exhibit 2 hereto.[3]

If Convergys and its own attorneys apparently do not even know whether Convergys intends to rely on such document in this case -- and, indeed, change their story mid-deposition, then Mastech most certainly has been denied a fair opportunity to be advised of the opinion contentions against which it must defend at trial. As this example clearly illustrates, Convergys has not disclosed to Mastech its opinion contentions in this case (in this example, its opinion contention as to whether Mr. Rao supposedly altered his keystroke log) or the factual basis for such contentions.

Mastech therefore respectfully submits that this Court adopt the majority position and hold that the Convergys "employee experts" Koopmans and Brown are bound under the circumstances by the disclosure requirements of Rule 26. Accordingly, Convergys should be

---

[3] At the same time, Convergys' counsel refused on attorney client privilege grounds to permit Mr. Brown to answer questions concerning what Convergys contends was the specific actions taken by Mr. Rao, which supposedly caused the database file corruption. *See*, Brown Depo., Vol. 2, pp. 62-64, Exhibit 2 hereto.

compelled to promptly make full and complete disclosures as set out initially above and final resolution of whether or the extent they should be permitted to testify should be deferred until the time of trial.

**E.     CONVERGYS' FAILURE TO COMPLY WITH
RULE 26 IS HARMFUL TO DEFENDANTS.**

Convergys takes the untenable position that its failure to comply with Rule 26 is "utterly harmless" to Mastech.  The fallacy of Convergys' argument is illustrated by the underlying policy of Rule 26, as well as the discovery record.

As detailed above, the underlying policy of Rule 26 is to insure full and complete pre-trial discovery of all expert opinions, so as to avoid undue surprise and prejudice at trial concerning such matters.  It is uncontested that the elements of causation and the applicable industry standards of care in this matter involve highly complex technical issues.  As such, Convergys <u>must</u> present expert testimony to show causation in this matter and also to establish the alleged prevailing standards of professional conduct which Convergys contends were violated by Mastech.

While Convergys attempts to argue that Mastech had a full and adequate opportunity to cross-examine Convergys' "employee-experts", a review of the underlying record reveals that this is not the case.  As illustrated by the example of the keystroke log alleged alternation example discussed in the previous section, Convergys simply has not made disclosure of its opinion contentions. As a result, Mastech does not know at the present time (i.e., just several weeks prior to trial) what opinion contentions it will have to defend against at trial concerning,

-12-

for example, the conduct of Mr. Rao which allegedly caused the database file corruption and whether Mr. Rao supposedly altered his keystroke log.[4]

In essence, Convergys is attempting to have its proverbial "cake and eat it too" by obtaining the benefits of expert opinion testimony while failing to provide adequate pre-trial disclosures upon which Mastech may adequately prepare and defend and by also invoking the attorney-client privilege to shield Mastech from receipt of such disclosure. Consequently, Convergys would relegate Mastech to learning such expert opinion contention testimony for the first time at trial which is in clear contravention of the policy behind Rule 26. Such attempted avoidance by Convergys of the fundamental policies of Rule 26 should not be tolerated.

**F.   THE DOCTRINE OF SPOLIATION APPLIES TO THIS MATTER**

Convergys' last argument in its Brief in Opposition is that its failure to provide the destroyed or non-preserved evidence does not constitute spoliation because: (i) at the time the evidence was destroyed or not preserved, litigation was not contemplated by Convergys; (ii) no expert for Convergys ever reviewed the non-preserved evidence; and, (iii) exclusion of evidence is required only where malfeasance or gross negligence is proven. A review of the relevant case law and the record reveals the fallacy of Convergys' arguments.

Initially, it borders on the disingenuous for Convergys to argue that litigation was not contemplated by it when the evidence was destroyed. Indeed, Convergys' counsel specifically stated on the record during depositions that Convergys was contemplating possible litigation at the time of the events in September, 1999. *See*, Brown Depo., Vol. 1, pp. 195-196, Exhibit 2 hereto). Moreover, anticipation of litigation by Convergys can be inferred from the amount of

---

[4] Similarly, Convergys has asserted that certain portions of the SSP alert log are missing but claim it does not know the cause for the missing sections. *See, e.g.*, Brown Depo., Vol. 1 at pp. 140-141, Exhibit 1 hereto). Although Convergys seems to acknowledge that Mr. Rao is not responsible, Mastech is entitled to know with certainty that it need not defend against a possible claim at trial that Mr. Rao alleges caused these circumstances.

the claim involved, as well as the timeliness of any investigation into the cause of the subject matter of the eventual litigation. *See, Travelers Ins. Co. v. Dayton Power & Light Co.*, 663 N.E.2d 1383, 1385 (Ohio Ct. App. 1996). Furthermore, a plaintiff is under a duty to preserve evidence even if the plaintiff did not suspect the evidence was the cause of the events in dispute in the eventual lawsuit, if it is foreseeable that the evidence would be important to resolving fault from a neutral point of view. *See, Id.* at 1386.

Applying this standard to the present facts, the large amount of the claim, as well as the promptness of Convergys' investigation into the matter, clearly show that litigation should have been anticipated at the time by Convergys. *See, Id.* at 1385-86. Such conclusion is further bolstered by Convergys' decision to selectively preserve only evidence favorable to it. Indeed, Convergys' designees have admitted that Messrs. Koopmans and Brown (and others) decided what they deemed relevant and preserved and that they did so without consulting its customers (Sprint), its computer server and software providers (Sun Microsystems and Oracle), or Mastech. *See, e.g.*, Koopmans Depo., Vol. 1, pp. 157-161, Exhibit 3 hereto).

Convergys' argument that no expert reviewed the evidence is likewise unavailing. As noted above, expert testimony is a necessary prerequisite to proving causation in this matter. As such, Convergys' employees must be deemed experts in order for Convergys to prove causation of Convergys' alleged damages. Convergys does not contest that its employees reviewed the destroyed evidence that would have likely been beneficial to Mastech's defense. For example Convergys' now purported "employee-experts" reviewed the keystroke logs and other contemporaneous activity logs of the database administrators who were involved at the time in dealings with Mr. Rao on September 17, 1999, but did not preserve those keystroke logs. *See*, Brown Depo., Vol. 1, pp. 151-152, Exhibit 1 hereto; Koopmans Depo., Vol. 2, pp. 143-144,

Exhibit 4 hereto). Moreover, the keystroke or other logs of the Convergys so-called "employee-experts" themselves, as well as other database administrators, were not preserved despite the admissions by Convergys in depositions that all such Convergys employees had the ability to access and edit or change Mr. Rao's keystroke logs and several of them in fact did at least access Mr. Rao's keystroke log. *See, e.g.*, Walters Depo., pp. 76-85, Exhibit 5 hereto; Brown Depo., Vol. 2, pp. 22-25, Exhibit 2 hereto). As such, Convergys' "experts" did in fact review and have the opportunity to review the destroyed or not preserved evidence, but never preserved such evidence for Mastech's benefit.

Finally Convergys' allegation that a strong showing of malfeasance, or at least gross negligence, is required before disallowing evidence based on spoliation is at odds with Ohio case law. Thus, it has been specifically held that exclusion of evidence is sufficient where evidence is negligently or inadvertently destroyed. *See, Travelers Ins. Co., supra* at 1385 ("However, negligent or inadvertent destruction of evidence is sufficient to trigger sanctions where the opposing party is disadvantaged by the loss.") Therefore, Convergys' allegations that such evidence was destroyed in the absence of malfeasance or gross negligence is of no avail.

### III.    CONCLUSION

For all of the foregoing reasons, Mastech respectfully requests the Court reject Convergys' arguments in its Brief in Opposition and grant the interim relief requested above with a final ruling on the Motion *In Limine* to be made based upon the record at trial.

Respectfully submitted,


___/s/ Jacqueline Schuster Hobbs_____
Donald J. Mooney, Jr. (0014202)
Jacqueline Schuster Hobbs (0068236)
ULMER & BERNE LLP
600 Vine Street, Suite 2800
Cincinnati, Ohio 45202
(513) 698-5000
(513) 698-5001 (Fax)
dmooney@ulmer.com
jhobbs@ulmer.com


OF COUNSEL:

Kevin P. Lucas, Esq.
Pa. I.D. No. 25596
Robert J. Williams, Esq.
Pa. I.D. No. 76139
MANION McDONOUGH & LUCAS, P.C.
Firm I.D. No. 786
600 Grant Street, Suite 1414
Pittsburgh, Pennsylvania 15219
(412) 232-0200

Attorneys for Defendants


## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing was filed electronically with the Court and served electronically upon Grant S. Cowan, Esq., Robert D. Shank, Esq., Frost Brown Todd LLC, Attorneys for Plaintiffs, 2200 PNC Center, 201 East Fifth Street, Cincinnati, Ohio 45202-4182, this 8th day of April, 2004.


/s/ Jacqueline Schuster Hobbs_____


-16-

Westlaw.

Not Reported in N.E.2d
**(Cite as: 1996 WL 130979 (Ohio App. 4 Dist.))**

Page 1

C
Only the Westlaw citation is currently available.

CHECK OHIO SUPREME COURT RULES FOR REPORTING OF OPINIONS AND WEIGHT OF LEGAL AUTHORITY.

Court of Appeals of Ohio, Fourth District, Ross County.

STATE of Ohio, Plaintiff-Appellee,
v.
Kenneth E. BOWER, Jr., Defendant-Appellant.

#### No. 94 CA 2053.

March 15, 1996.

COUNSEL FOR APPELLANT:James T. Boulger, 14 South Paint Street, Suites 10- 14, Chillicothe, Ohio 45601,

COUNSEL FOR APPELLEE:Judith A. Heimerl, Asst. Law Director, 32 South Paint Street, Chillicothe, Ohio 45601.

DECISION AND JUDGMENT ENTRY

ABELE, P.J.

**\*1** This is an appeal from a judgment of conviction and sentence entered by the Chillicothe Municipal Court. The jury found Kenneth E. Bower, Jr., defendant below and appellant herein, guilty of driving with a breath alcohol concentration above the statutory limit in violation of R.C. 4511.19(A)(3).

Appellant assigns the following errors:
FIRST ASSIGNMENT OF ERROR:
"THE TRIAL COURT ERRED TO THE PREJUDICE OF THE DEFENDANT BY DENYING THE DEFENDANT'S MOTION TO SUPPRESS, WHICH MOTION ASSERTED THE ARRESTING OFFICER LACKED REASONABLE SUSPICION TO STOP AND DETAIN THE DEFENDANT ON THE DATE OF HIS ARREST, SAID DETENTION BEING IN VIOLATION IN RIGHTS SECURED TO THE DEFENDANT UNDER THE FOURTH AND FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND ARTICLE ONE, SECTION FOURTEEN OF THE CONSTITUTION OF THE STATE OF OHIO. "[*sic* ]
SECOND ASSIGNMENT OF ERROR:
"THE TRIAL COURT ERRED TO THE PREJUDICE OF THE DEFENDANT AND DENIED TO THE DEFENDANT THE RIGHT OF DUE PROCESS OF LAW SECURED TO THE DEFENDANT UNDER THE FIFTH AND FOURTEENTH AMENDMENTS OF THE

UNITED STATES CONSTITUTION, BY REFUSING TO PERMIT THE DEFENDANT TO PLACE IN EVIDENCE AT TRIAL THOSE MATTERS WHICH WERE THE SUBJECT OF THE STATE'S MOTION IN LIMINE OF AUGUST 17, 1994, AND WHICH WERE PRESENTED TO THE COURT BY PROFFER DURING THE COURSE OF THE TRIAL ON AUGUST 18, 1994, AS FOLLOWS. "[*sic* ]
THIRD ASSIGNMENT OF ERROR:
"THE TRIAL COURT ERRED TO THE PREJUDICE OF THE DEFENDANT IN FAILING TO EXCLUDE FROM EVIDENCE AT TRIAL IN THIS MATTER ALL ITEMS OF EVIDENCE OBTAINED AS A RESULT OF THE ARREST OF THE DEFENDANT, THE COURT HAVING PREVIOUSLY DETERMINED THAT THE ARRESTING OFFICER DID NOT HAVE REASONABLE CAUSE FOR SAID ARREST. THE FRUITS OF ARREST WERE OBTAINED IN VIOLATION OF RIGHTS SECURED TO THE DEFENDANT UNDER THE FOURTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE ONE SECTION FOURTEEN OF THE CONSTITUTION OF THE STATE OF OHIO. "

On February 2, 1994, at approximately 3:51 a.m., Ohio State Patrol Trooper Terrell Barnes observed appellant's vehicle turn from State Route 159 into the Medical Center Hospital parking lot and drive to the rear of the premises. Several minutes later, appellant's vehicle re-entered State Route 159. The officer followed the vehicle and observed appellant stop in a residence driveway and park for several minutes. Appellant then backed out of the driveway and drove toward Sulphur Springs Road. Several minutes later, Trooper Barnes observed appellant turn left onto Sulphur Springs Road. Appellant drove for approximately one and one-half miles before turning into another residential driveway. The officer testified that he drove past appellant's last stop and pulled into the Zane Trace High School parking lot. When appellant drove past him, the officer followed appellant for approximately two- tenths of a mile before activating his pursuit lights and stopping appellant's vehicle.

The officer approached appellant's vehicle and detected a strong odor of alcoholic beverage. After appellant failed to satisfactorily complete several physical coordination tests, Trooper Barnes arrested appellant. Appellant's breath-alcohol test revealed a concentration of .133 hundredths of one gram by weight of alcohol per 210 liters of breath. Trooper Barnes issued uniform traffic citations to appellant charging him with: (1) operating a vehicle while under the influence of alcohol in violation of R.C. 4511.19(A)(1); (2) operating a vehicle with a breath-alcohol concentration above the statutory limit in violation of R.C.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.

Not Reported in N.E.2d                                                        Page 2
**(Cite as: 1996 WL 130979 (Ohio App. 4 Dist.))**

4511.19(A)(3); and (3) driving left of center, in violation of R.C. 4511.25. Appellant's driver's license was also seized and placed under suspension pursuant to R.C. 4511.191(H)(1), the administrative license suspension statute.

**\*2** At his arraignment, appellant entered not guilty pleas and appealed his administrative license suspension (ALS). On February 18, 1994, a referee conducted a hearing to consider the ALS appeal. The referee recommended that appellant's administrative license suspension be terminated. The referee's report provides in pertinent part as follows:
    "The officer did not have reasonable grounds to believe Defendant was operating a vehicle while under the influence, or with alcohol above the specified limits."
By judgment entry filed the same day, the court adopted the findings and recommendations in the referee's report and terminated appellant's administrative license suspension.

On April 19, 1994, appellant filed a motion to suppress evidence asserting that the arresting officer did not possess a reasonable and articulable suspicion to stop appellant. On April 22, 1994, the court held a hearing on the matter. After considering the testimony and evidence presented by the parties, the court overruled appellant's motion. The court found that appellant's driving in the center of the road provided the officer with a valid basis for the investigative stop.

On August 17, 1994, one day before trial, the trial court held a hearing to consider several unresolved motions. At the hearing, the state dismissed the R.C. 4511.19(A)(1) charge of operating a motor vehicle while under the influence of alcohol and the R.C. 4511.25 violation for travelling left of center.

Appellant also sought to exclude the results of his breath-alcohol test. Appellant argued that because the court, during the ALS proceeding, had previously found a lack of reasonable and articulable suspicion for the stop, the doctrines of *res judicata* and collateral estoppel precluded the introduction of that evidence during the criminal proceedings. The trial court overruled appellant's motion.

Additionally, at the August 17, 1994, hearing, the state filed a motion *in limine* regarding appellant's prospective testimony concerning his use of an oral denture product ("Anbesol") at or near the time of his arrest. The state contended that without expert testimony, the court and the jury could not know with certainty the amount of alcohol contained in appellant's dentures at the time of his arrest and the effect the Anbesol had on appellant's breath-alcohol test results. On August 18, 1994, prior to the commencement of the jury trial, the trial court granted the state's motion *in limine*. [FN1] At trial, appellant proffered the evidence which formed the basis of the prosecution's motion *in

*limine*. [FN2]

    FN1. In pertinent part, the court stated:
    "The Court then, in consideration of that testimony, has and does hereby on the record rule that the Motion will be granted that until or unless testimony can be specifically adduced that would allow a trier of fact to conclude how, if at all, and what manner, the alcohol in the Anbesol would effect the test result, that such is not relevant as it cannot be used by the trier of fact as the trier of fact must guess as to whether or not it's even adverse or positive on the test result, and further, even if it were, even if the inference could have been drawn that it adversely effected it, that without precision as to or in what manner and what degree that such limited probative value is far outweighed by any effort ... so the Motion for Limine is granted and counsel are instructed to abide by the Court's ruling."

    FN2. The trial court judge stated as follows:
    "The Court will abide by its prior ruling. The Court finding that in the absence of any testimony to relate what effect, if any, this would have on the test sample and/or result over this period of time is so highly speculative that: (1) it is not probative and therefore not relevant, and even if the Court could stretch the point that it were, it has such limited ... it relies so on conjection, therefore, it is prejudiced and substantially (inaudible), and it will not be permitted."

At the conclusion of the trial, the jury found appellant guilty of violating R.C. 4511.19(A)(3). Appellant filed a timely notice of appeal.

I

In his first assignment of error, appellant asserts that the trial court erred by overruling his motion to suppress evidence. Appellant contends that the arresting officer did not have a proper constitutional basis for the initial stop of appellant's vehicle.

**\*3** In particular, appellant argues that straddling the center of an unmarked roadway is not sufficient to establish a reasonable suspicion to support a traffic stop. Appellant asserts that because the roadway was unlined, he was only required to yield one-half of the roadway to on-coming traffic. Appellant reasons that because he did not encounter any on-coming traffic while traveling on Sulphur Springs Road, he did not violate R.C. 4511.25 [FN3] and, therefore, Trooper Barnes had no basis to stop him.

    FN3. R.C. 4511.25(A) provides:

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in N.E.2d

**(Cite as: 1996 WL 130979 (Ohio App. 4 Dist.))**

Upon all roadways of sufficient width, a vehicle or trackless trolley shall be driven upon the right half of the roadway, except as follows:

(1) When overtaking and passing another vehicle proceeding in the same direction, or when making a left turn under the rules governing such movements;

(2) When an obstruction exists making it necessary to drive to the left of the center of the highway; provided, any person so doing shall yield the right of way to all vehicles traveling in the proper direction upon the unobstructed portion of the highway within such distance as to constitute an immediate hazard;

(3) When driving upon a roadway divided into three or more marked lanes for traffic under the rules applicable thereon;

(4) When driving upon a roadway designated and posted with signs for one- way traffic; (5) When otherwise directed by a police officer or traffic control device.

Initially, we point out that in a hearing on a motion to suppress evidence, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and evaluate the credibility of the witnesses. *State v. Venham* (1994), 96 Ohio App.3d 649, 645 N.E.2d 831; *State v. Lewis* (1992), 78 Ohio App.3d 518, 605 N.E.2d 451; *State v. Clay* (1973), 34 Ohio St.2d 250, 298 N.E.2d 137; *State v. Warren* (Aug. 12, 1991), Hocking App. No. 90CA7, unreported. Thus, it is the trial court's function to determine the credibility of witnesses giving testimony at a suppression hearing. A reviewing court should not disturb the trial court's findings on the issue of credibility. *State v. Fanning* (1982), 1 Ohio St.3d 19, 437 N.E.2d 583; *State v. Tutt* (Apr. 14, 1986), Warren App. No. CA85-09-056, unreported. Accordingly, in our review, we are bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusions, whether they met the appropriate legal standards. See *Venham, supra; State v. Shelpman* (May 23, 1991), Ross App. No. 1632, unreported; *State v. Simmons* (Aug. 3, 1990), Washington App. No. 89CA18, unreported.

The Fourth and Fourteenth Amendments to the United States Constitution as well as Section 14, Article I of the Ohio Constitution, prohibit any governmental search or seizure, including a brief investigative stop, unless supported by an objective justification. *Terry v. Ohio* (1968), 392 U.S. 1; *State v. Andrews* (1991), 57 Ohio St.3d 86, 565 N.E.2d 1271; *Venham, supra.* The investigative stop exception to the Fourth Amendment warrant requirement allows a police officer to stop any individual if the officer

has a reasonable suspicion, based upon specific and articulable facts, that criminal behavior has occurred or is imminent. *Terry, supra; State v. Andrews* (1991), 57 Ohio St.3d 86, 565 N.E.2d 1271. To justify an investigative stop, a police officer must be able to articulate specific facts which, taken together with rational inferences from those facts, would warrant a person of reasonable caution in the belief that the person stopped has committed or is committing a crime. *Terry, supra* at 19-21.

In *State v. Simmons* (Aug. 30, 1990), Washington App. No. 89 CA 18, unreported, we wrote:

**\*4** "Law enforcement encounters with suspected drunk drivers involve two stages: (1) a stop and (2) a subsequent arrest. *State v. Finch* (1985), 24 Ohio App.3d 38, 492 N.E.2d 1254. Pursuant to *Terry, supra,* an officer may briefly detain an individual awhile he investigates the suspicious behavior which gave rise to the stop. A detention conducted pursuant to *Terry* must be based upon a reasonable and articulable suspicion of criminal activity. *United States v. Sharpe* (1985), 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605. The articulable and reasonable suspicion must exist in the officer's mind at the time of the stop and cannot be based on facts obtained after the initial stop. *State v. Freeman* (1980), 84 Ohio St.2d 291, 294, 414 N.E.2d 1044. See, also, *Delaware v. Prouse* (1979), 440 U.S. 648, 59 L.Ed.2d 660, 99 S.Ct. 1391. *State v. Brandenburg* (1987), 41 Ohio App.3d 109, 534 N.E.2d 906; *State v. Heinrichs* (1988), 46 Ohio App.3d 63, 545 N.E.2d 1304."

Thus, if specific and articulable facts exist that indicate that a criminal violation has occurred, or is occurring, a vehicle may be stopped and the driver detained for further investigation. The propriety of an investigative stop must be determined in light of the totality of the circumstances. *State v. Freeman* (1980), 64 Ohio St.2d 291, 414 N.E.2d 1044; *State v. Chatton, supra; State v. Meadows* (Dec. 31, 1991), Hocking App. No. 91 CA 6, unreported.

R.C. 4511.25(A) imposes a mandatory duty to drive solely upon the right half of the roadway unless, *inter alia,* an obstruction exists preventing a driver from obeying the statute's requirement. See *Oechsle v. Hart* (1967), 12 Ohio St.2d 29, N.E.2d; *State v. Ingram* (Nov. 27, 1991), Wayne App. No. 2649, unreported. Additionally, lines or markings on the roadway are not required to establish a violation of R.C. 4511.25(A). [FN4] In *State v. Arredondo* (May 6, 1994), Wood App. No. 93WD107, unreported, the court wrote:

FN4. We note that R.C. 4511.33 speaks to the rules for driving in marked lanes.

"A brief investigative detention is authorized where the detaining officer has a reasonable suspicion, based upon

Not Reported in N.E.2d
**(Cite as: 1996 WL 130979 (Ohio App. 4 Dist.))**

articulable facts, that the suspect has committed, is committing, or is about to commit a criminal offense. *Terry v. Ohio* (1968), 392 U.S. 1, 20 L.Ed.2d 889, 88 S.Ct. 1868. In this case, the detaining officer testified,and the trial court found, that appellant was observed violating R.C. 4511.25 by failing to drive on the right side of the road. Appellant, nevertheless, argues that the court's finding is not dispositive because the center line of the road is unmarked. However, R.C. 4511.25(A) requires a motorist to drive on the right side of a roadway except under some limited circumstances; those circumstances are not applicable to this case. Therefore, the trial court was justified in finding that the officer had sufficient cause for the initial detention of appellant based upon the fact that the officer observed appellant driving left of center."

**\*5** See, also, *State v. Stamper* (Apr. 7, 1995), Ashtabula App. No. 94-A- 0013, 94-A-0044, unreported; *State v. Grotz* (Oct. 7, 1994), Wood App. No. 94WD029, unreported; *State v. Beaver* (Sept. 8, 1994), Washington App. No. 93CA27, unreported; *State v. Bryant* (May 21, 1990), Clermont App. No. CA89- 10-085, unreported.

In the case *sub judice,* we agree with the trial court's conclusion that Trooper Barnes articulated sufficient facts to constitute a reasonable suspicion to justify an investigative stop of appellant's vehicle. At the suppression hearing, appellant testified that he did not "feel" that he drove his vehicle in the center of the road. The officer's testimony, however, provided sufficient facts warranting a person of reasonable caution to believe that appellant was committing or about to commit a crime. The officer observed appellant straddle the center of the roadway. Trooper Barnes testified that appellant "was driving down the center of the road so I stopped him." We note that the testimony revealed that this particular portion of the road is straight and that no obstructions existed to prevent appellant from traveling on the right side of the road. We further note that appellant's failure to drive on the right side of the road cannot be characterized as a momentary or minimal failure to comply with the statute's requirements.

We recognize that the officer's testimony and the appellant's testimony conflicted. The trial court, however, chose to believe the version of the facts as stated by Trooper Barnes. In *State v. Awan* (1986), 22 Ohio St.3d 120, 123, 489 N.E.2d 277, 280, the court emphasized that appellate courts must defer conflicts in the evidence to the trier of fact who had the opportunity to hear the witnesses and observe their demeanor:

"The choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the trier of fact."

Therefore, we must defer to the trial court's choice to believe the arresting officer's testimony concerning appellant's failure to drive on the right side of the roadway.

In the instant case we conclude that under the totality of the circumstances the officer possessed the requisite reasonable and articulable suspicion of criminal activity to justify the investigative stop. Accordingly, based upon the foregoing reasons we overrule appellant's first assignment of error.

II

In his second assignment of error, appellant asserts that the trial court erred when it refused to allow appellant to introduce evidence concerning his use of Anbesol, an oral pain product which contains ethyl alcohol, shortly before his arrest. Appellant argues that his use of Anbesol, in conjunction with the fact that he has two partial dental plates, could have trapped residual alcohol and affected the accuracy of his breath-alcohol test. We note that the trial court determined that appellant could not introduce evidence of this nature unless it is supported by expert testimony. The trial court granted the motion "until testimony can be adduced that would allow the trier of fact to conclude that alcohol in Anbesol would affect the test results."

**\*6** We begin our discussion by noting that the decision to admit or to exclude evidence rests within the sound discretion of the trial court. *State v. Combs* (1991), 62 Ohio St.3d 278, 581 N.E.2d 1071; *State v. Sage* (1987), 31 Ohio St.3d 173, 510 N.E.2d 343; *State v. Hymore* (1967), 9 Ohio St.2d 122, 224 N.E.2d 126. An abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. *State v. Xie* (1991), 62 Ohio St.3d 521, 584 N.E.2d 715; *State v. Montgomery* (1991), 61 Ohio St.3d 410, 575 N.E.2d 167. When applying the abuse of discretion standard, a reviewing court is not free to merely substitute its judgment for that of the trial court. See *In re Jane Doe 1* (1991), 57 Ohio St.3d 135, 566 N.E.2d 1181, citing *Berk v. Matthews* (1990), 53 Ohio St.3d 161, 559 N.E.2d 1301. In *City of Columbus v. Taylor* (1988), 39 Ohio St.3d 162, 164, 529 N.E.2d 1382, 1385, the court wrote:

"It is axiomatic that a determination as to the admissibility of evidence is a matter within the sound discretion of the trial court. See *Calderon v. Sharkey* (1982), 70 Ohio St.2d 218, 24 O.O.3d 322, 436 N.E.2d 1008. The issue of whether testimony is relevant or irrelevant, confusing or misleading, is best decided by the trial judge who is in a significantly better position to analyze the impact of the evidence on the jury."

We agree with appellant that a defendant may challenge the accuracy of his or her particular breath-alcohol test result. We note, however, that in some instances expert testimony is necessary in order to present and explain to the trier of

Not Reported in N.E.2d                                                                                                   Page 5
**(Cite as: 1996 WL 130979 (Ohio App. 4 Dist.))**

fact the nature of the particular contention or challenge. Unless a matter is within the comprehension of a layperson, expert testimony is necessary. *Ramage v. Central Ohio Emergency Serv., Inc.* (1992), 64 Ohio St.3d 97, 102, 592 N.E.2d 828, 833; Evid.R. 702 and 703. Experts have the knowledge, training, and experience to enlighten the jury concerning the facts and their opinion regarding the facts. *Id.*; *McKay Machine Co. v. Rodman* (1967), 11 Ohio St.2d 77, 228 N.E.2d 304. Generally, expert opinion evidence is required when the inquiry pertains to a highly technical question of science or skill. See *Jones v. Hawkes Hospital of Mt. Carmel* (1964), 175 Ohio St. 503, 196 N.E.2d 592, paragraph one of the syllabus. A litigant may not introduce into evidence unsubstantiated or unproven scientific arguments or theories.

In the case *sub judice* the trial court determined that absent testimony to indicate how the use of Anbesol could affect the breath-alcohol test results, appellant's proffered evidence is speculative and lacks probative value. We agree with the trial court's conclusion.

In order to advance his theory regarding the effect or impact that the use of Anbesol may have on the breath-alcohol test result, appellant must elicit expert opinion testimony on the subject. Pursuant to Evid.R. 403(A), "although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

**\*7** We find no abuse of discretion with the trial court's conclusion that the probative value of appellant's proffered evidence is substantially outweighed by the danger of confusion of the issues and misleading the trier of fact. Arguments in the category advanced by appellant in the instant case must, because of their highly technical and scientific nature, be advanced through expert testimony.

Accordingly, based upon the foregoing reasons we overrule appellant's second assignment of error.

### III

In his third assignment of error, appellant asserts that when the trial court found in his favor on the probable cause issue during the ALS proceeding, the doctrines of *res judicata* and collateral estoppel precluded any finding to the contrary during the subsequent criminal proceeding. We disagree with appellant.

In *State v. Williams* (Mar. 20, 1995), Athens App. No 94 CA 1626, unreported, we recently addressed the issue raised in the case *sub judice*. In *Williams,* the trial court determined in an ALS appeal hearing that no reasonable grounds existed to justify an investigatory stop of the defendant. The defendant argued that the trial court should

be bound by its ALS determination and, therefore, should have granted his motion to suppress evidence. In *Williams* we noted that procedural differences exist between an ALS appeal hearing and a hearing on a motion to suppress evidence. We pointed out that during an ALS appeal, the issues are not fully litigated to the extent that collateral estoppel will apply to the same issue raised during a motion to suppress evidence.

In *Williams* we wrote:
"The doctrine of collateral estoppel precludes further action on an identical issue which has actually and necessarily been litigated as part of a prior action among the same parties or those in privity with these parties. *Goodson v. McDonough Power Equip. Inc.* (1983), 2 Ohio St.3d 193. Although originally a civil doctrine, the federal rule of collateral estoppel has been a part of criminal jurisprudence for over three quarters of a century. See *United States v. Oppenheimer* (1916), 242 U.S. 85, 87-88.
This court has previously held that collateral estoppel does not apply in the context of suppression hearings. *State v. Chelikowsky* (Aug. 18, 1992), Pickaway App. No. 91 CA 27, unreported. This court reasoned that the collateral estoppel rule arose from the guaranty against double jeopardy and, because a motion to suppress does not place one in jeopardy, this rule cannot be relied upon in that context. See *Chelikowsky, supra,* and *State v. McCord* (Fla.1981), 402 So.2d 1147, 1149.
ALS proceedings under R.C. 4511.191 are civil and administrative in nature. The Ohio Supreme Court has held that these proceedings are independent of any criminal proceeding pursuant to other statutes or ordinances. *State v. Starnes* (1970), 21 Ohio St.2d 38. Therefore, in light of the *Starnes* holding, it would be anomalous to hold that a determination made during an ALS hearing would dictate the outcome of a motion to suppress hearing pertaining to the underlying criminal offense of driving under the influence.
**\*8** The reality of the differences between the ALS hearing and a motion to suppress also weigh against finding that collateral estoppel should be applied in this context. As stated above, an ALS proceeding is civil, while a motion to suppress is a criminal proceeding. The purpose behind the ALS appeal is to determine whether or not an alleged offender's license should be restored, while the purpose behind a motion to suppress hearing is to determine whether certain evidence should be allowed at trial. Also, motions to suppress must comply with particularity requirements of Crim.R. 47. *State v. Marion* (1992), 73 Ohio App.3d 752. ALS suspension appeals, on the other hand, are allowed at arraignments by oral motion with little or no notice given to the state as to the particularity of the motion. ALS hearings are also typically scheduled within five days from the arrest of the defendant, which

Westlaw.

Not Reported in N.E.2d                                                    Page 6
**(Cite as: 1996 WL 130979 (Ohio App. 4 Dist.))**

often leaves the state with little time to prepare and to ensure that the proper witnesses can be present. Consequently, many ALS get dismissed based on lack of testimony and not for fully litigating the issues relating to the arrest and detention. Finally, because no written motion is required and no particularity need be stated, the state often does not know what is being attacked at the ALS hearing.

Because of the procedural differences between the ALS appeal and a motion to suppress, it is clear that the issues during an ALS appeal are not fully litigated to the extent that collateral estoppel would then apply to the same issue raised again during a motion to suppress. The purpose of ALS appeal is to decide whether an alleged offender's license should be restored, not what evidence should be allowed during trial. Thus, for all the reasons outlined above, collateral estoppel does not apply in this context, and appellant's first assignment of error is overruled."

Thus, in *Williams* we identified many reasons why the doctrine of collateral estoppel does not apply in this situation. We noted that: (1) collateral estoppel does not apply in the context of suppression hearings; (2) the purpose of an ALS appeal is to determine whether an alleged offender's operator's license should be reinstated, whereas the purpose of a motion to suppress evidence hearing is to determine whether certain evidence will be admissible at trial; and (3) ALS hearings require minimal preparation time and scant notice to the prosecution as to the particularity of the motion, whereas motions to suppress evidence hearings must comply with the Crim.R. 47 requirements. See, also *State v. Roberts* (May 4, 1995), Ross App. No. 93 CA 2020, unreported.

Accordingly, based upon the foregoing reasons, we overrule appellant's third assignment of error.

*JUDGMENT AFFIRMED.*

### JUDGMENT ENTRY

It is ordered that the judgment be affirmed and that appellee recover of appellant costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

**\*9** It is ordered that a special mandate issue out of this Court directing the Chillicothe Municipal Court to carry this judgment into execution.

If a stay of execution of sentence and release upon bail has been previously granted, it is continued for a period of sixty days upon the bail previously posted. The purpose of said stay is to allow appellant to file with the Ohio Supreme Court an application for a stay during the pendency of the

proceedings in that court. The stay as herein continued will terminate at the expiration of the sixty day period.

The stay will also terminate if appellant fails to file a notice of appeal with the Ohio Supreme Court in the forty-five day period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Ohio Supreme Court. Additionally, if the Ohio Supreme Court dismisses the appeal prior to the expiration of said sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.

STEPHENSON, J.: concurs in judgment & opinion.

HARSHA, J.: dissents with dissenting opinion.

### NOTICE TO COUNSEL

Pursuant to Local Rule No. 12, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.

HARSHA, J., dissenting:

I respectfully dissent on the basis of the third assignment of error.

1996 WL 130979 (Ohio App. 4 Dist.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.

2001 WL 914864
**(Cite as: 2001 WL 914864 (Mass.Super.))**

Only the Westlaw citation is currently
available.

Superior Court of Massachusetts.

COASTAL AVIATION INDUSTRIES, INC.,
v.
Henry E. NELSON [FN1] et al. [FN2]

FN1. D/b/a Nelson Balancing Service.

FN2. Ernest Jones and Presmet Corporation d/b/a
Massachusetts Steel Treating.

No. 981965.

June 1, 2001.

MEMORANDUM OF DECISION AND
ORDER ON DEFENDANT PRESMET
CORPORATION'S MOTION FOR
SUMMARY JUDGMENT

BURNES.

### INTRODUCTION

*1 Plaintiff Coastal Aviation Industries, Inc.
("Coastal") filed this action against
Defendants Harry Nelson d/b/a Nelson
Balancing Service, Ernest Jones, and Presmet
Corporation d/b/a Massachusetts Steel
Treating alleging fraud, breach of contract,
negligence and violation of G.L.c. 93A in
connection with the defendants' work on
aviation engine crank shafts which Coastal
installed in its customers' engines, and which
proved to be defective. This matter is before
the court on defendant Presmet's motion for
summary judgment on the First Amended
Complaint pursuant to Mass.R.Civ.P. 56. For
the reasons discussed below, the defendant's
motion for summary judgment is *ALLOWED*.

### BACKGROUND

The summary judgment record reveals the
following undisputed facts and disputed facts
viewed in the light most favorable to the non-
moving party. Coastal operates an aviation

engine repair shop which overhauls and
rebuilds general aviation aircraft engines.
(Verified Complaint ¶ 4; Field Aff. ¶ 3.) The
defendant Harry Nelson does business under
the name Nelson Balancing Service
("Nelson"). (Rule 9A Statement, No. 2.)
Defendant Ernest Jones ("Jones") is employed
by Nelson. (Verified Complaint ¶ 3.) Nelson's
advertisements specifically mention "Precision
Crankshaft Grinding." (Ex. A to Verified
Complaint.) Beginning in 1996, Coastal
entered into an agreement with Nelson to
regrind, repair, overhaul and certify twenty-
nine aviation engine crank shafts in
accordance with relevant Federal Aviation
Administration ("FAA") regulations. (Verified
Complaint ¶ 5.) In connection with the
manufacturing process, Nelson performed a
grinding process on the crank shafts, which
involves grinding metal to a specific diameter
to remove metal for the purpose of shaping the
remaining metal. (Rule 9A Statement, No. 2,
3.)

Massachusetts Steel Treating ("MST"), a
division of the defendant Presmet
Corporation, is in the business of heat treating
various types of metals. (Rule 9A Statement,
No. 1; Weldon Aff. ¶ 4.) Between 1994 and
1997, Nelson requested that MST nitride
certain steel parts, including crank shafts,
that Nelson manufactured. (Rule 9A
Statement, No. 2; Weldon Aff. ¶ 3.) Nitriding
is a specific heat-treatment process in which
metal is coated with a surface layer to make
metal parts more wear resistant. (Rule 9A
Statement, No. 4; Weldon Aff. ¶ 4.) According
to FAA regulations, nitriding must be
performed pursuant to specifications provided
by the aircraft engine manufacturer and
approved by the FAA, or other FAA approved
technical data or process specifications.
(Johnson Aff. ¶ 7; Field Aff. ¶ 10.) Nitriding
that is not done consistent with the
manufacturer's specifications and FAA
approved data can result in crank shaft
failures. (Field Aff. ¶ 11.) MST performed
nitriding on the crank shafts provided by
Nelson but did not perform any grinding work
on them. (Weldon Aff. ¶ 16.) Nelson never

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



advised MST that the crank shafts would be installed in aircraft. (Weldon Aff. ¶ 5.) However, Coastal received work orders and invoices from MST for all Nelson crank shafts on which they worked. (Field Aff. ¶ 14.) These invoices list the names of customers who were obviously in aviation related businesses, such as Bay State Aerial, General Aviation, Don's Flying Service, Aero Tyme, Modern Aircraft, Canadian Aero, Aero Care, and Sky Dynamics. (Field Aff. ¶ 14 & Exhibit.)

*2 Coastal installed twenty of the crank shafts treated by Nelson in customers' engines during the course of engine rebuilding. (Verified Complaint ¶ 8.) In December of 1997, Coastal was notified of an engine in-flight failure involving an engine that it had rebuilt using a Nelson certified crank shaft. (Verified Complaint ¶ 9.) An inspection of that crank shaft revealed that it was broken. (Verified Complaint ¶ 10.) Several weeks later, Coastal was informed of another engine failure in an aircraft which contained a Nelson certified crank shaft. (Verified Complaint ¶ 11.) Accordingly, Coastal inspected all crank shafts which had been re-ground and certified by Nelson and determined that all were defective. (Verified Complaint ¶¶ 11-12.) On February 10, 1998, Coastal received a notification from the FAA, issued to owners, operators and maintenance providers, that crank shafts repaired by Nelson may be unairworthy due to Nelson's failure to utilize proper grinding procedures. (Ex. B to Verified Complaint; Field Aff. ¶ 6 .) The notification stated that Nelson's procedures resulted in an increased grinding temperature concentrated in the bearing journal radius, resulting in undetected heat check cracks as well as improper radius. (Ex. B to Verified Complaint.) Thereafter, the FAA issued an Airworthiness Directive, AD 98-17-1 1, recalling all Nelson aircraft crank shafts. (Field Aff. ¶ 7.) The summary of the FAA's action on the Airworthiness Directive states that it was prompted by "reports of crankshafts exhibiting heat check cracking of the nitrided bearing surface which led to crankshaft cracking and subsequent failure." (Ex. B to Amended Complaint.) According to the American Society of Materials' Metal

Handbook, heat checking is "a pattern of parallel surface cracks that are formed by alternate rapid heating and cooling of the extreme surface metal, sometimes found on forging dies and piercing punches." (Weldon Aff. ¶ 13.)

Coastal filed a complaint on April 22, 1998 asserting claims for fraud and deceit, breach of contract, and violation of G.L.c. 93A, § 11 against Nelson and Jones based on their alleged fraud in certifying the crank shafts as compliant with FAA regulations. On April 19, 1999, Leroy Field ("Field"), the President and CEO of Coastal, spoke to Dennis Creed ("Creed"), who purported to be an employee of Presmet. (Field Aff. ¶¶ 2, 12.) Creed stated that Presmet was not an FAA Certified Repair Station, and that the nitriding performed on the Nelson crank shafts was not performed in accordance with FAA approved technical data or process specifications. (Field Aff. ¶ 12.) Thereafter, on August 31, 2000, Coastal was granted leave to amend its complaint to add MST as a defendant. Count I of the Amended Complaint alleges negligence against MST, while Count II alleges a violation of G.L.c. 93A, § 11. MST then filed a cross- claim seeking contribution and indemnification from Nelson and Jones.

*3 Walter R. Johnson ("Johnson"), a metallurgist and professional engineer for thirty-one years, conducted a metallurgical examination of a fractured nitrided crank shaft from a Lycoming 320 aircraft engine which had been ground by Nelson and nitrided by MST. (Johnson Aff. ¶¶ 1, 2, 4.) Johnson is familiar with FAA Airworthiness Directive No. 98-17-11 regarding Nelson. (Johnson Aff. ¶ 6.) According to Johnson, in order to properly perform aircraft crank shaft nitriding, it is essential that the heat treating shop obtain specifications from the manufacturer or use other FAA approved technical data delineating the entire procedure, including the required depth, temperature and duration of the heat treating process, as well as approved equipment and personnel. (Johnson Aff. ¶ 7.) Johnson opines that if nitriding and re- nitriding is not done pursuant to FAA approved specifications or

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



other FAA approved technical data, metal fatigue and heat treat cracking can occur. (Johnson Aff. ¶ 8.) According to Johnson, "If the nitriding was not done properly, as appears to be the case here, the improper nitriding could be a substantial contributing cause of crank shaft failures." (Johnson Aff. ¶ 8.) Further, according to Coastal CEO and President Leroy Field, who is familiar with the processes for aircraft nitriding, failure to nitride aircraft engine crank shafts in accordance with manufacturer and FAA approved technical data and specifications can cause metal fatigue and heat treat cracking, and can be a significant contributing cause of crank shaft failures. (Field Aff. ¶ 13.)

However, according to Donald Weldon ("Weldon"), a metallurgist employed by MST, breaking of the crank shafts could only occur from improper and excessive grinding of parts, which creates excessive heat, resulting in heat checking when the metal cools. (Weldon Aff. ¶ ¶ 1, 10.)

According to Weldon, the nitriding process performed by MST occurs at relatively low temperatures and the parts are slowly brought to the nitriding temperature. (Weldon Aff. ¶ 12.) When the nitriding process is complete, the parts are gradually cooled to room temperature. Weldon opines that MST's nitriding process could not and would not result in heat checking. (Weldon Aff. ¶¶ 12, 13.)

### DISCUSSION

Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. *Cassesso v. Commissioner of Correction,* 390 Mass. 419, 422 (1983); *Community Nat'l Bank v.. Dawes,* 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the summary judgment record entitles the moving party to judgment as a matter of law. *Pederson v. Time, Inc.,* 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting

affirmative evidence that negates an essential element of the opposing party's case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. *Flesner v. Technical Communications Corp.,* 410 Mass. 805, 809 (1991); *Kourouvacilis v. General Motors Corp.,* 410 Mass. 706, 716 (1991). Summary judgment is generally not an appropriate means to resolve negligence cases because whether a defendant has breached the relevant standard of care usually presents an issue of fact. *Mullins v. Pine Manor College,* 389 Mass. 47, 56 (1983); *Roderick v. Brandy Hill Co.,* 36 Mass.App.Ct. 948, 949 (1994). However, a judge may decide a negligence case as a matter of law when no rational view of the evidence permits a finding of negligence. *Roderick v. Brandy Hill Co.,* 36 Mass.App.Ct. at 949.

\*4 MST contends that it is entitled to judgment as a matter of law because Coastal has no reasonable expectation of demonstrating at trial that the crank shaft failures are attributable to its nitriding work. The plaintiff in a negligence action bears the burden of proving that the defendant breached the duty of reasonable care, that the plaintiff suffered actual loss, and that the defendant's negligence caused the loss. *Glidden v. Maglio,* 430 Mass. 694, 696 (2000). Causation is an essential element of the plaintiff's case and the plaintiff must adduce evidence that there is a greater likelihood or probability than not that the harm to the plaintiff flowed from conduct for which the defendant was responsible *Id.; Alholm v. Wareham,* 371 Mass. 621, 626 (1976); *Held v. Bail,* 28 Mass.App.Ct. 919, 921 (1989), *rev. den.,* 407 Mass. 1101 (1990). Where the issue of causation involves questions of technology, the jury requires the assistance of expert testimony. *Held v. Bail,* 28 Mass.App.Ct. at 921.

In support of its negligence claim, Coastal has proffered the affidavit of metallurgist and professional engineer Walter R. Johnson, who conducted a metallurgical examination of a fractured nitrided crank shaft from a Lycoming 320 aircraft engine which had been ground by Nelson and nitrided by MST.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



2001 WL 914864
(Cite as: 2001 WL 914864, *4 (Mass.Super.))

Johnson opines that "[i]f the nitriding was not done properly, as appears to be the case here, the improper nitriding could be a substantial contributing cause of crank shaft failures." This affidavit fails to establish a sufficient causal connection between MST's failure to perform its nitriding services in accordance with FAA regulations and the defect in the crank shafts to survive summary judgment. It is well established that in order to have evidentiary value, an expert's opinion must be expressed in terms of probability, not mere possibility. *Berardi v. Menicks*, 340 Mass. 396, 400 (1960); *Black v. Boston Consolidated Gas Co.*, 325 Mass. 505, 508 (1950); *Patterson v. Liberty Mutual Ins. Co.*, 48 Mass.App.Ct. 586, 592, 597-98 (2000). An expert opinion stated in terms of possibilities does not satisfy the plaintiff's burden to establish by a preponderance of the evidence that the defendant's negligence proximately caused the injury complained of. *See Goffredo v. Mercedes-Benz Truck Co.*, 402 Mass. 97, 102-03 (1988); *Corsetti v.. Stone Co.*, 396 Mass. 1, 25 (1985).

Johnson's opinion that improper nitriding by MST "could be" a substantial contributing cause of crank shaft failure is a mere statement of possibility and is insufficient, as a matter of law, to establish that the defect in the crank shafts was more likely than not caused by conduct for which MST was responsible. The expert affidavit of Coastal CEO and President Leroy Field opining that failure to nitride aircraft engine crank shafts in accordance with manufacturer and FAA approved technical data and specifications "can" cause metal fatigue and heat treat cracking, and "can be" a significant contributing cause of crank shaft failures is similarly defective. Although in deciding this motion, the court must draw all reasonable inferences in favor of Coastal, inferences are reasonable only where they are based on probabilities rather than possibilities. *Ferragamo v. Massachusetts Bay Transportation Authority*, 395 Mass. 581, 590 (1985); *Alholm v. Wareham*, 371 Mass. at 627. On the present summary judgment record, no fair-minded jury could return a verdict for Coastal on its negligence claim against MST. *Glidden v. Maglio*, 430 Mass. at 696; *Zavras v. Capeway*

*Rovers Motorcycle Club, Inc.*, 44 Mass.App .Ct. 17, 21 (1997). See *Goffredo v. Mercedes Benz Truck Co.*, 402 Mass. at 103 (affirming a directed verdict where the plaintiff's expert opined only that a defect "could have" caused the vehicle door to open accidentally). Compare *Blood v. Lea*, 403 Mass. 430, 434 (1988) (concluding that an expert's opinion that a hospital's negligence "probably" contributed to a patient's brain damage was sufficient evidence of causation to survive a directed verdict); *Ferragamo v. Massachusetts Bay Transportation Authority*, 395 Mass. at 592 (concluding that a jury verdict for the plaintiff was supported by the evidence where the experts opined that the cause of death was "most likely" PVC intoxication and that PVC was "the only likely or sensible explanation" for the death); *Noble v. Goodyear Tire & Rubber Co.*, 34 Mass.App.Ct. 397, 398, *rev. den.*, 415 Mass. 1105 (1993) (denying summary judgment in a negligence action where the expert's affidavit opined "within reasonable scientific probability" that a defective tire caused the accident at issue).

*5 Where expert testimony is necessary to establish proximate cause, the party bearing the burden of proof cannot prevail if the expert evidence consists of testimony expressed only in terms of various possibilities. See *Atlas Tack Corp. v. Donabed*, 47 Mass.App.Ct. 221, 227-28 (1999); *Cleary v. Knapp Shoes, Inc.*, 924 F.Sup. 309, 318 (D.Mass.1996). Accordingly, because Coastal has no reasonable expectation of establishing causation at trial, MST is entitled to judgment as a matter of law on Count I of the First Amended Complaint alleging negligence.

MST further contends that it is entitled to summary judgment on Count II of the First Amended Complaint, which alleges that MST's failure to conduct the nitriding of the crank shafts in accordance with FAA regulations constitutes a violation of G.L.c. 93A, § 11. Not every unlawful act is automatically a violation of Chapter 93A. *Mechanics National Bank of Worcester v. Killeen*, 377 Mass. 100, 109 (1979). Violation of a statute or regulation may constitute a violation of Chapter 93A where the statute or

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.

2001 WL 914864
**(Cite as: 2001 WL 914864, \*5 (Mass.Super.))**

regulation is intended to protect consumers in matters of health, safety or welfare, and the defendant's violation of the statute or regulation at issue is unfair and deceptive. See 940 Code Mass.Regs. § 3.16; *Duclersaint v. Federal National Mortgage Association,* 427 Mass. 809, 814-15 (1998); *Piccuirro v. Gaitenby,* 20 Mass.App.Ct. 286, 290-91 (1985). Assuming, without deciding, that the Federal Aviation Act, 49 U.S.C. § 40101 *et. seq.,* and the regulations promulgated thereunder, 14 C.F.R. §§ 43.1-43.17, are consumer protection statutes which are actionable under Chapter 93A, Coastal nonetheless cannot prevail on its claim against MST.

Causation is an essential element of a Chapter 93A claim, and any alleged violation of a statute or regulation must be causally related to the loss sustained by the plaintiff. *Heller Financial v. Insurance Co. of North America,* 410 Mass. 400, 409 (1991); *Atwood v. Best Buick, Inc.,* 21 Mass.App.Ct. 70, 74 (1985). As discussed above, on the present summary judgment record, Coastal has no reasonable expectation of establishing a causal connection between MST's alleged violation of the FAA regulations concerning nitriding and the defects in the crank shafts.

Accordingly, MST is entitled to judgment as a matter of law on Count II of the First Amended Complaint. [FN3]

> FN3. This Court need not address Presmet's motion for leave to file a supplemental affidavit, which is opposed by Coastal, as nothing in the supplemental affidavit would change the outcome on summary judgment.

### ORDER

For the foregoing reasons, it is hereby *ORDERED* that defendant Presmet's motion for summary judgment be *ALLOWED.*

2001   WL   914864,   2001   WL   914864 (Mass.Super.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Westlaw.

Not Reported in N.E.2d

**(Cite as: 1987 WL 8229 (Ohio App. 11 Dist.))**

Page 1

**C**

Only the Westlaw citation is currently available.

CHECK OHIO SUPREME COURT RULES FOR REPORTING OF OPINIONS AND WEIGHT OF LEGAL AUTHORITY.

Court of Appeals of Ohio, Eleventh District, Lake County.

MANUFACTURING MANAGEMENT SYSTEMS, INC., Plaintiff-Appellant, Plaintiff-Appellee,
v.
DATA SOLUTIONS, INC., Defendant-Appellee, Defendant-Appellant.

**No. 11-074/76.**

March 20, 1987.

Civil Appeal from Lake County Common Pleas Court, Case No. 83 CIV 0278.

David H. Davies, Davies, Rosplock, Coulson, Perez, Deeb & Harrell, Willoughby, for plaintiff-appellant.

David J. Pasz, Kraig & Pasz, Cleveland, for defendant-appellee.

Before LYLE W. CASTLE, Ret., 12th, RICHARD B. McQUADE, JR., Fulton Common Pleas, and MELVIN RESNICK, Lucas Common Pleas, Assigned by the Supreme Court to The Eleventh District.

*OPINION*

RESNICK, Judge.

**\*1** This appeal is before this Court from a judgment of the Lake County Common Pleas Court. On March 21, 1983, appellant Manufacturing Management Systems, Inc. (hereinafter MMS) filed a complaint alleging that they had entered into a contract with appellee, Data Solutions, Inc. (hereinafter DSI) pertaining to a joint marketing agreement of March 1, 1982. On January 20, 1984, MMS filed an amended complaint wherein they alleged the same contract having been entered between MMS and DSI and that DSI breached this contract by failing and refusing to meet its obligations under the contract in that they refused to return to MMS the software transmitted to DSI and further by failing to turn over to MMS any and all modifications and derivative works in accordance with the above mentioned contract.

MMS sought injunctive relief and damages for breach of

contract and fraud. DSI filed an answer and counterclaim also alleging breach of contract. The case was tried to the Court on January 16, 1985, wherein the Court entered judgment for DSI on the amended complaint, and judgment was entered for MMS on the counterclaim of DSI.

It is from that judgment which MMS filed a timely notice of appeal asserting the following as its sole assignment of error:

"The trial court erred to the prejudice of Plaintiff-Appellant by relying on a lay dictionary definition of a word with a specialized meaning in a highly technical field and further by isolating and enforcing specified parts of the contract by giving validity or special definition to specific words contained therein while excluding or ignoring words within the same sentence."

DSI also filed a timely notice of appeal as to the judgment on its counterclaim, asserting the following assignment of error:

"The trial court erred to the prejudice of the Defendant-Appellant in finding that the Defendant-Appellant's sole contribution to the Joint Marketing Agreement was the conversion of software when the contract manifests a different intention."

Prior to a consideration of the foregoing assignments of error it is necessary to briefly review the facts of the case before us.

On or about March 1, 1982, MMS and DSI entered into an agreement whereby MMS would provide computer software to be converted by DSI into a format suitable for use by DSI on its micromation mini-computer. The end product would then be sold as a "Turnkey system".

In April 1982 MMS delivered to DSI its software, and DSI shortly thereafter began the process of converting the same to make it compatible with the hardware of DSI.

On May 12, 1982 the parties entered into a proprietary rights agreement restricting unauthorized use and disclosure by DSI of the original MMS software or any conversion thereof. DSI continued with its conversion process until November 23, 1982, when MMS wrote DSI of its intent to cancel the agreement. MMS requested the return of its original software along with any modifications and derivative works as per the agreement of March 1, 1982. DSI tendered the original hard discs which it had received from MMS, and a current source code listing which documented all changes which had been made to the date of cancellation. MMS demanded delivery of all modifications that had been made to its software in machine readable form. DSI refused, contending that it had none since it had

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in N.E.2d

**(Cite as: 1987 WL 8229 (Ohio App. 11 Dist.))**

deleted all copies of MMS software from its computer library and that all listings and documentation had been destroyed.

**\*2** The trial court, in interpreting the contract, looked to Webster's Seventh New Collegiate Dictionary (1969) for guidance in defining the term "derivative works" which was used in the contract. MMS contends that the latter is a technical term and, therefore, expert testimony is required to define the term in relation to its meaning in the computer industry. Thus, they claim it was error for the trial court to rely on a lay dictionary for its definition. The Court in *Madden v. American News* (1967) 11 Ohio Misc. 119, at 120 stated:

"a word having a technical legal sense will be so construed, unless a different intention is clearly expressed." "18 Ohio Jurisprudence 3d 28, Contracts, Section 143"

In *Ajax Petroleum Products Co. v. Blake* (App) 70 O.L.Abs., 126 NE 2 926 it was expressed that:

"Where a word has a special meaning in a particular business it must be interpreted as ordinarily used in that business. 18 Ohio Jurisprudence 3d 28, Contracts, Section 143."

And in *Mose Cohen & Sons, Inc. v. Kuhr* (CP) 13 OO2d 453, 85 O.L.Abs. 302 aff'd (App) 13 OO2d 460, 171 NE2d 216, m.c.o. 10/13/60, it was held that:

"A word having a technical legal sense will be so construed, unless a different intention is clearly expressed. So, too, a term or phrase which has a technical meaning in the business to which the contract relates will be interpreted according to that meaning unless a contrary intention is expressed." 11 O.J. 2nd, p. 386, Sec. 141. See also: Central National Bank v. Bennett, 33 Ohio App. 396, 169 N.E. 707, Syl. par. 2; Henderson v. Liverpool & London & Globe Insurance Co., 26 Ohio N.P., N.S., 103, at top of page 106 of the opinion."

Additional aid in the interpretation of words is discussed in the Restatement of Law Second, Contracts 2nd, Section 202, wherein it is stated in pertinent part that:

"(1) Words and other conduct are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight.

(2) A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together.

(3) Unless a different intention is manifested,

(a) where language has a generally prevailing meaning, it is

interpreted in accordance with that meaning;

(b) *technical terms and words of art are given their technical meaning when used in a transaction within their technical field.*" (emphasis added)

In the case sub judice we are involved in the area of computer and software contracts, a high technology and specialized field with a language all its own. Therefore, in order to intelligently interpret the words "derivative works" in conjunction with the specialized field from which it is derived, the trier of the facts must resort to expert testimony inasmuch as they must be considered as words of art and be given their technical meaning.

It is well established that "contracts are to be interpreted so as to carry out the intent of the parties, as that intent is evidenced by the contractual language." *Skirolock v. East Ohio Gas Co.* (1974) 38 O.S.2d 244, 247. Appellant MMS contends that expert testimony is required to define technical terms, and we agree. However, the record is devoid of any such expert testimony, and it was the burden of the Plaintiff MMS to produce the expert testimony to establish its claim that "derivative works" did not mean "completed works".

**\*3** It is generally held that parol evidence can be introduced to explain technical terms. Although Ohio courts have not specifically addressed this question, reference to other jurisdictions is enlightening. The court in *Sierra Life Ins. Co. v. First National Life Ins. Co.* (1973) 512 P.2d 1245, 1247, stated:

"Parol evidence may be received to explain technical terms used in a written contract, and is always admissible to define and explain the meaning of words or phrases in a written instrument which are technical or where a word or phrase is used in a peculiar sense that is applicable to a particular industry or trade. Hartford Steam Boil. Insp. I. Co. v. Schwartzman Pack. Co., 423 F.2d 1170 (10th Cir.1970). See also 30 Am.Jur.2d Evidence Sec. 1075; 32A C.J.S. Evidence Sec. 962."

Plaintiff's president on cross examination testified as to his interpretation of "derivative works", but he acknowledged that he was no expert in software products and, therefore, this court must hold that Plaintiff failed in its burden of proof to establish that "derivative work" meant anything more than a completed product as found by the trial court. We therefore hold that any error by the trial court in using a lay definition of "derivative works" was non-prejudicial, and the judgment of the trial court on the Plaintiff's complaint is hereby affirmed. [FN1] (see footnote at bottom of Page 7)

Proceeding now to a consideration of DSI's assignment of

Westlaw.

error wherein it is contended that the trial court erred in determining that DSI's sole contribution to this joint marketing venture was the conversion of software.

For a determination of this issue we must consider Paragraph three (3) of the letter of agreement. This is the only place where any discussion of compensation is discussed in any finalized agreement, other than Paragraph four (4) and five (5) of the same letter of agreement. However, Paragraphs 4 and 5 clearly pertain to sales only. Paragraph three (3) provides:

"The professional service capability of MMS and DSI will be *made available to each other, and to end-user customers of both firms on a normal hourly rate basis, as will be* mutually *agreed upon* from time to time." (emphasis added)

This paragraph is sufficiently clear. There is no evidence in the record that at the time of the execution of the agreement there was ever any intention of the parties that DSI would be compensated for the conversion process. The Supreme Court of Ohio stated in *Alexander v. Pipe Line* (1978) 53 OS2d 242 that:

"... where the terms in an existing contract are clear and unambiguous, this court cannot in effect create a new contract by finding an intent not expressed in the clear language employed by the parties. Paragraph one of the syllabus in Blosser v. Enderlin (1925), 113 Ohio St. 121; Fidelity & Casualty Ins. Co. v. Hartzell Bros. Co. (1924), 109 Ohio St. 566, 569."

Therefore, from the terms of the contract there is nothing to indicate an intent to compensate DSI for any services in conversion of the software. DSI's compensation was to come from the sales of the turnkey operation and any additional services provided by them after the sale. The exhibits submitted during the period of dissatisfaction on the part of MMS do not indicate or satisfy any mutually agreed to completed contract or amended contract for payment of services during the conversion process. The negotiations at that time were not finalized and, therefore, not binding on either party.

*4 For the reasons above the assignment of error by DSI is found not well taken and overruled, and the judgment of the trial court in that regard is hereby affirmed.

> FN1. The Court notes that it would appear that the software or computer program involved in these causes is subject to Copyright law, to- wit, the Copyright Act of 1976, Public Law 94-553 (90 STAT 2541). In Section 101 thereof derivative works is defined. A reading thereof appears to be in agreement with the definition that the trial judge used.

1987 WL 8229 (Ohio App. 11 Dist.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.

1996 WL 257654                                                          **Page    1**
**(Cite as: 1996 WL 257654 (S.D.N.Y.))**
< KeyCite Yellow Flag >

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Daniel J. DAY, Plaintiff,
v.
CONSOLIDATED RAIL CORPORATION, Defendant.

No. 95 CIV. 968 (PKL).

May 15, 1996.

Gregory Nester, Marvin I. Barish Law Offices, P.C., Philadelphia, Pennsylvania.

Lawrence R. Bailey, Jr., Walker & Bailey, New York City.

*MEMORANDUM & ORDER*

DOLINGER, United States Magistrate Judge:

*1 On the eve of trial, plaintiff and defendant in this FELA case are in vigorous dispute over the adequacy of their respective disclosures concerning their designated expert witnesses. Each seeks to preclude experts named by the other side for failure to comply with the rules that govern the production of expert witness information. (*See, e.g.,* April 22 & 23, 1996 letters to the Court from Lawrence R. Bailey, Jr., Esq.; April 23, 1996 letter to the Court from Gregory L. Nester, Esq.). [FN1]

> FN1. Both sides have named a number of trial experts concerning whom there is no controversy.

A. *Defendant's Experts*

Plaintiff requests that defendant be precluded from calling two individuals, Walter L. Heide and Dr. James Pugh. Heide apparently is primed to testify about track inspection requirements and Pugh, who is described as an accident reconstruction expert, is to testify about the likelihood that plaintiff's alleged failure to wear a seat belt may have caused

his injuries.

On March 7, 1996 defendant served two documents signed by trial counsel, each labelled "Expert Witness Disclosure", one for Mr. Heide and the other for Dr. Pugh. Both were manifestly inadequate to meet the requirements of Fed.R.Civ.P. 26(a)(2)(B). Each gave only the barest description of the subject matter of testimony and the general conclusions of each witness. Neither contained the required report of the expert containing "a complete statement of all opinions to be expressed and the basis and reasons therefore; the data and other information considered by the witness in forming the opinions;" publications, if any by the witness; compensation, if any, of the witness; and a list of all cases in which the witness has testified.

In response, plaintiff's counsel belatedly brought this matter to the court's attention by telephone call on March 28, 1996, at which time counsel was instructed to consult with opposing counsel. The matter was not presented to the court for resolution until April 9, 1996. At a telephone conference on April 17, 1996, defendant was directed to proffer a written explanation for the apparent inadequacy of the so-called "Expert Witness Disclosures."

We have since received letter briefs from both sides. Defendant argues both that the objections were untimely and too informal and that the federal rule governing expert-witness discovery does not apply to Mr. Heide. I address these matters in reverse order.

The argument about Mr. Heide is premised on the undisputed fact that he is an employee of defendant Con Rail. Defendant then points to the language from the rule governing the scope of Rule 26(a)(2)(B), which applies to "a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony...."

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



1996 WL 257654
(Cite as: 1996 WL 257654, *1 (S.D.N.Y.))

**Page   2**

According to defendant, Mr. Heide's job duties at Con Rail do not "regularly involve giving expert testimony" and he was not "retained or specially employed to provide expert testimony in the case." Accordingly, defendant argues that it need not provide the information otherwise required for expert witnesses.

**\*2** The principal difficulty with this argument is that even if the quoted language is perhaps susceptible to several alternative interpretations, the reading proposed by defendant would create a distinction seemingly at odds with the evident purpose of promoting full pre-trial disclosure of expert information.  The logic of defendant's position would be to create a category of expert trial witness for whom no written disclosure is required--a result plainly not contemplated by the drafters of the current version of the rules and not justified by any articulable policy. *See* Fed.R.Civ.P. 26(a)(2)(B), Advisory Committee Notes at 125 (West 1996 ed.) (noting that 1993 amendments broadened expert discovery); *Ferriso v. Conway Org.*, 1995 WL 580197, at \*2 (S.D.N.Y. Oct. 3, 1995) (1993 amendments impose additional duty to disclose information).

The implausibility of defendant's position on this point is underscored by the language of the relevant Advisory Committee notes both for the current version of the rules and for its predecessor.   Thus, in commenting on the 1970 amendments, which first defined a broad scope of required written disclosure concerning trial experts' anticipated testimony, including summaries of their opinions and the grounds for them, the Advisory Committee made no suggestion that the rule applied only to certain trial experts, and instead emphasized that broad disclosure was required concerning "those experts whom a party expects to call as trial witnesses."   The only distinction was between that category of experts and those "who have been retained or specially employed by the party but who are not expected to be witnesses." Advisory Committee Notes at 118.

The 1993 amendments retain that distinction,

and, as noted, have in fact broadened the scope of disclosure required for trial experts. As explained in the notes, this expansion in the discovery requirement was enacted because "[t]he information disclosed under the former rule in answering interrogatories about the 'substance' of expert testimony was frequently so sketchy and vague that it rarely dispensed with the need to depose the expert and often was even of little help in preparing for a deposition of the witness." *Id.* at 125.

Although Rule 26(b)(4)(A), governing depositions of experts, appears to imply that some category of experts may be exempt from the report requirement, that exemption is apparently addressed to experts who are testifying as fact witnesses, although they may also express some expert opinions--for example, treating physicians. *See* 4 James W. Moore *et al. Moore's Federal Practice* ¶ 26.04[4] at 26-107 (2d ed. 1995).  *See also* Advisory Committee Notes at 125; *Patel v. Gayes*, 984 F.2d 214, 218 (7th Cir.1993) ("Rule 26 focuses not on the status of the witness but rather on the substance of the testimony"); *Zarecki v. National R.R. Passenger Corp.*, 914 F.Supp. 1566, 1573 (N.D.Ill.1996) (rejecting plaintiff's argument that treating physician was exempt from report requirement where physician's testimony concerned professional opinion developed for trial and not simply information acquired through observation and care of patient).   In such an instance, we may infer that the reasons for requiring an expert's report are far less compelling and may unfairly burden a non-party who is appearing principally because he or she witnessed certain events relevant to the lawsuit.

**\*3** In a case such as this, in which it appears that the witness in question--that is, Mr. Heide--although employed by the defendant, is being called solely or principally to offer expert testimony, there is little justification for construing the rules as excusing the report requirement. Since his duties do not normally involve giving expert testimony, he may fairly be viewed as having been "retained" or "specially employed" for that purpose. Moreover, although defendant might argue that Mr. Heide is not receiving extra

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



compensation for that performance--the record is silent on the matter--the rules contain no disclosure exemption for experts who are not monetarily compensated.

As for the other expert, Dr. Pugh, he is apparently not employed by Con Rail. Accordingly, defendant must concede the applicability of the report requirement to him.

Defendant's alternative grounds for resistance are that plaintiff never made a formal motion to preclude defendant's experts and that the current application is untimely. The degree of formality of the request was established by the court, which permitted letter briefing and oral argument. Defendant makes no showing either that it was surprised by this manner of proceeding or that it was in any other way unfairly prejudiced.

Timing is another matter. By order dated January 18, 1996, the court set the final expert witness discovery schedule, which included a proviso for defendant to provide the Rule 26(a)(2)(B) expert witness information by March 7, 1996, and further specified that if either party failed to assert an objection in court to its adversary's production within seven days after the default, the objection would be deemed waived. (Jan. 18, 1996 Order at ¶ 7.) In this case defendant telexed to plaintiff's counsel on March 7 the purported expert disclosure reports, and plaintiff failed to raise the issue with the court for at least three weeks, until March 28, 1996, and did not press his objection in writing to the court until April 9, 1996. [FN2] Moreover, contrary to S.D.N.Y. Civil Rule 3(f), it appears that plaintiff's counsel never fulfilled his obligation to consult with adversary counsel.

> FN2. We may question whether an *ex parte* phone call to chambers constitutes compliance with the court's directive, but that issue need not be addressed here.

These failings have prejudiced defendant to a degree since the issue was not framed for decision until shortly before trial. Moreover, given the longstanding policy of this court to encourage the disposition of cases on their merits, we are inclined to exercise our broad discretion to permit defendant to call the two named experts to testify on the following conditions: (1) that defendant provide the information required by Rule 26(a)(2)(B) for both experts, (2) that defendant make them both available for depositions before their appearance at trial and (3) that defendant bear the full expense of those depositions. *Cf. Williams v. Monarch Mach. Tool Co.*, 26 F.3d 228, 230-31 (1st Cir.1994) (upholding trial court's refusal to exclude testimony of expert witness because trial judges have inherent discretionary authority to manage scheduling, expert discovery, and sanctions).

### B. *Plaintiff's Expert*

*4 The remaining issue concerns a witness named by plaintiff in the pre-trial order as a trial expert. The witness, a Dr. William Simon, was listed "as an expert to testify as to causation of the injuries, nature and extent of the medical treatment and prognosis for future recovery." This subject exactly duplicates the area on which another, properly disclosed expert witness--Dr. Richard Radna--is to testify for plaintiff.

According to defendant's counsel, plaintiff had never previously disclosed that Dr. Simon was to be called as an expert witness and thus never provided the required expert witness disclosure. Defendant therefore seeks to preclude plaintiff from calling Dr. Simon as an expert. (*See* April 23, 1996 letter to the Court from Lawrence R. Bailey, Jr.). Plaintiff has not responded to this application, and thus must be deemed to have conceded the point. Since plaintiff failed to identify Dr. Simon as an expert witness and apparently did not provide the required disclosures as to his opinions, the application for preclusion of Dr. Simon as an expert witness should be granted. *See, e.g., Derby v. Godfather's Pizza, Inc.*, 45 F.3d 1212, 1215 (8th Cir.1995); *see also* Rule 37(c)(1) ("A party that without substantial justification fails to disclose information required by Rule 26(a) ... shall not, unless such failure is harmless, be permitted to use as evidence at a trial ... any witness or information not so disclosed.")

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



1996 WL 257654
(Cite as: 1996 WL 257654, *4 (S.D.N.Y.))

 SO ORDERED.

1996 WL 257654, 1996 WL 257654 (S.D.N.Y.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.