CONVERGYS INFORMATION MGMT. GROUP, INC., et al. vs. IGATE CORP., et al.
DARIN BROWN
2/13/04

SHEET 1   PAGE 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

CONVERGYS INFORMATION          :
MANAGEMENT GROUP, INC. and     :
CHUBB CUSTOM INSURANCE         :
COMPANY,                       :
         Plaintiffs            :
      -v-                      : Case No. CV-01-618
                               :(Judge Beckwith/Magistrate
                               : Judge Sherman)
IGATE CORPORATION, et al.,     :
         Defendants            :
                     - 0 -

        The deposition of DARIN BROWN, taken before
Susan K. Lee, CVR-CM, Court Reporter and Notary Public
in and for the State of Ohio, at the law offices of
Ulmer & Berne LLP, 600 Vine Street, Suite 2800,
Cincinnati, Ohio, on the 13th day of February, 2004,
beginning at the hour of 9:15 a.m. and ending at 5:12
p.m. of the same date.
                     - 0 -
              RIVERSIDE REPORTING
           Certified Court Reporters
                 P.O. Box 949
           Covington, Kentucky  41012
       KY(859)291-6110   OH(513)574-7017

COPY

EXHIBIT
1

CONVERGYS INFORMATION MGMT. GROUP, INC., et al. vs. IGATE CORP., et al.

DARIN BROWN

2/13/04

SHEET 18  PAGE 66

**66**

1       A    When you say from what was it
2   generated, I mean, the shell history is generated by
3   Unix as you execute commands.
4       Q    This particular document in the form
5   that it is in was produced in discovery for the first
6   time by Convergys within the past several days.  Where
7   was this document in Convergys' records?
8       A    This particular file still resides on
9   magnetic disk on the database server.
10      Q    So it has been there since 1999 up to
11  the present?
12      A    It exists today.  My presumption is
13  it's been there since 1999.
14      Q    Do you know why this document was not
15  produced in the form it's in until this week?
16          MR. SHANK:  Objection.
17          THE WITNESS:  No, I don't.
18  BY MR. LUCAS:
19      Q    Did you locate it or gather it to
20  provide it to counsel within the past month or so for
21  purposes of it being used in the litigation?
22          MR. SHANK:  I'll take that one, Darin.
23  This one -- this document was provided to
24  counsel as part of the process of responding to
25  defendants' requests for admissions sometime,

PAGE 67

**67**

1   again, in the September to October 2003 time
2   period.
3   BY MR. LUCAS:
4       Q    Let me ask you:  Why was the document
5   then not produced until this week?
6           MR. SHANK:  He doesn't -- he doesn't
7   know the answer to that question.
8           MR. LUCAS:  Well, I mean, you're
9   answering the questions for him, so I'll direct
10  it to you.  Why was this document not produced
11  until this week?
12          MR. SHANK:  This -- this document was
13  not produced until this week because counsel
14  did not believe and still doesn't believe that
15  it really has anything to do with the case, but
16  in the course of preparing witnesses for
17  depositions, counsel erred on the side of
18  deciding to produce this document within the
19  last week.
20  BY MR. LUCAS:
21      Q    What does this document reflect, Mr.
22  Brown?  Start, if you will, with a general description.
23  What does this reflect?
24      A    Generally a shell history reflects the
25  commands that are executed by someone logged into a

PAGE 68

**68**

1   Unix system.
2       Q    What is the time period that is covered
3   by the entries on Exhibit Number 7?
4       A    It's not possible to determine that.
5       Q    So in the normal course when you have a
6   shell history, there's not a time stamp that becomes
7   part of it; is that correct?
8       A    That is correct.
9       Q    And just to clarify, when we were
10  looking in the last group of exhibits on an alert log,
11  in comparison the time stamps appear as part of the
12  document itself; is that correct?
13      A    Yes, that is correct.
14      Q    Exhibit Number 7, what time frame do
15  these entries, in fact, relate to?
16      A    September 20th or earlier of 1999.
17      Q    Can you be any more specific than that?
18      A    I cannot.
19      Q    What is the basis for your conclusion
20  that it relates to the September 20th or earlier time
21  frame?
22      A    The time stamp on the file on magnetic
23  disk is September 20th of 1999.
24      Q    Let me just ask you:  If you look at
25  the center, top center, of the first page of Exhibit

PAGE 69

**69**

1   Number 7 --
2       A    Mm-hmm.
3       Q    -- it says rrao_hist_0920.txt.  What
4   does that 0920 refer to?
5       A    September 20th of 1999.
6       Q    Is there -- how frequently are these
7   preserved on magnetic disk?
8           MR. SHANK:  Objection to form.  What's
9   the reference to these, Kevin?
10          MR. LUCAS:  A document of this short, a
11  shell history.  Let me rephrase the question.
12          THE WITNESS:  Sure.
13  BY MR. LUCAS:
14      Q    You indicated that, to the best of your
15  knowledge, this particular document relates to some
16  time period on or before September 20th of 1999,
17  correct?
18      A    That is correct.
19      Q    And the reason for that is, you said,
20  because that's what is indicated on the magnetic disk;
21  is that correct?
22      A    More specifically, it's what is
23  indicated by the time stamp of the file on magnetic
24  disk, yes.
25      Q    Okay.  What other time stamps on files

CONVERGYS INFORMATION MGMT. GROUP, INC., et al. vs. IGATE CORP., et al.
DARIN BROWN
2/13/04

SHEET 22   PAGE 82

82

1   Hulin?
2        A    I -- I don't recall a specific date.
3        Q    Do you recall how often or how many
4   times you met with him during this time frame to
5   discuss the cause or possible causes of the September
6   17th database corruption?
7        A    No, I don't recall.
8        Q    Do you have any notes of any meetings
9   during this time frame that you had with Mr. Hulin or
10  Mr. Koopmans or Mr. Kura or anyone else at Convergys
11  concerning discussions of the cause or possible cause
12  of the database corruption?
13           MR. SHANK:  I assume you're not
14       including e-mail in that question.
15           MR. LUCAS:  Yes.
16           THE WITNESS:  No.  I -- there were no
17       notes taken of --
18  BY MR. LUCAS:
19       Q    Mr. George -- is it Robson?  If that's
20  how you pronounce it, R-O-B-S-O-N, his name has been
21  indicated in the files.  Did you have discussions with
22  Mr. Robson during the September 17 to September 21 time
23  frame concerning the cause or possible causes of the
24  database corruption?
25       A    I don't believe so, no.

PAGE 83

83

1        Q    Mr. Mike DeCarlo, during this same time
2   frame, did you have any discussions with him concerning
3   the cause or possible causes of the database
4   corruption?
5        A    It's -- it's likely that I would have,
6   but I don't have a specific recollection.
7        Q    And did you have any discussion during
8   this time frame with either Rick Litton or with Ravi
9   Kura concerning any activities they were involved in
10  with Mr. Rao on September 16th or September 17th as
11  part of the usage split project?
12       A    Not to my recollection, no.
13       Q    Now, you indicated what you were told
14  concerning Mr. Hulin's conclusions or view after
15  reviewing Exhibit Number 7.  When you first looked at
16  Exhibit Number 7, whatever time that was, was there any
17  significance in Exhibit 7 in terms of what you saw in
18  Exhibit 7, significance for you in reaching a
19  conclusion as to the cause of the database corruption?
20           MR. SHANK:  Object to form.  I'm not
21       sure this witness has testified that he ever
22       looked at this particular exhibit in trying to
23       determine the cause of the database corruption.
24       And if he said that, I missed it.
25           THE WITNESS:  Yeah.  So, I guess, can

PAGE 84

84

1   you rephrase.
2           MR. LUCAS:  I'm trying to think of a
3       way of rephrasing without trying to
4       characterize Mr. Koopmans' testimony yesterday
5       since we don't have a transcript yet.  Let me
6       see if I can do it in a series of questions.
7           THE WITNESS:  Okay.
8   BY MR. LUCAS:
9        Q    This particular document, Exhibit
10  Number 7, is a shell history with a file date of
11  September the 20th of 1999, correct?
12       A    That is correct.
13       Q    You said there is another document that
14  exists that is a shell history of Mr. Rao dated
15  September 17th, 1999; that's correct?
16       A    Yes, that is correct.
17       Q    Okay.  You looked at the shell history
18  dated September 17th, 1999 prior to the time that Mr.
19  Rao was terminated on September 21; is that correct?
20       A    Yes, that is correct.
21       Q    And I thought your testimony was you
22  couldn't recall when you first reviewed Exhibit Number
23  7, which is the shell history of September the 20th of
24  1999.
25       A    Right.  That is correct.

PAGE 85

85

1        Q    But you have read it prior to today?
2   Or not?
3        A    I have not read the contents of this
4   file, no.
5        Q    Then let me ask you a broad question.
6   Maybe I misunderstood part of Mr. Koopmans' testimony,
7   and I can follow up with specifics.
8           Is it your understanding that there's
9   anything in Exhibit Number 7, which is the shell
10  history dated September 20th, that is not in the shell
11  history dated September 17th that is significant for
12  any conclusion or contention of Convergys as to the
13  cause of the database destruction or concerning Mr.
14  Rao's activities during this September 16th to
15  September 21st time frame?
16           MR. SHANK:  Object to form.
17           THE WITNESS:  There is nothing in this
18       September 20th file that was used to draw
19       conclusions in this case.
20  BY MR. LUCAS:
21       Q    Now, let me phrase it another way
22  because I want to make sure that I'm understanding, I
23  mean, that we're not missing each other with the
24  question and the answer.
25           As a general matter, you understand

CONVERGYS INFORMATION MGMT. GROUP, INC., et al. vs. IGATE CORP., et al.
DARIN BROWN
2/13/04

SHEET 28  PAGE 106

106

1   second set that I told you about.
2        Q.   Okay.  Keep that in mind because I'm
3   going to come back and have you explain the
4   significance of those two sets, but let me at least
5   have you complete your review of the document.
6             Is there any other set of commands or
7   any other commands that are significant to you for the
8   purposes that I asked you about?
9        A.   I would say potentially significant are
10  the -- next command is the cd, space, bdump.  Then
11  four lines below that you see vi, space, alert_ssp.log;
12  Then the ls command following; then potentially three
13  lines down from that another vi alert_ssp.log.
14       Q.   Is that part of the third set of
15  commands or is this now a fourth set of commands as
16  you're looking at them?
17       A.   I guess given the number of commands
18  I'm indicating here, I'd prefer that we go through them
19  one by one while we're talking about them.
20       Q.   That's fine.
21       A.   I don't to get confused on the
22  groupings.  At this point -- well, I'll continue to
23  give commands that I find significant.  So the cd and
24  to the /RDBMS, that next line after vi alert_ssp.log;
25  ls-l following that; another cd into the

PAGE 107

107

1   /RDBMS/oracle/data/sSUP; followed by an ls command;
2   followed by an exclamation point, pwd.
3             And then on the next page which is 282,
4   cd, space, bdump; two ls commands following that; and a
5   cd, dot, dot; an ls command.  And I think that's the --
6   the -- primarily the significant -- in the recent shell
7   history anyway.
8        Q.   Let me ask you to take a moment to
9   yourself here and I'm going to ask you to take a pencil
10  or a pen and in the left-hand margin compared to those
11  if you could just bracket off any of them that you
12  think you would prefer to explain as a group, because
13  otherwise we'll go through one line at a time.
14       A.   Okay.
15       Q.   But if there are any that you think
16  that it would make more sense in explaining your
17  understanding or reasoning to treat as a group -- and
18  let me ask you to do this:  Start at the top and mark
19  number one.  If it's a single line you want to talk
20  about as a single line, make that number one.  Then go
21  down to number two, number three.  And if there's any
22  ones you're going to group, then group them and number
23  them as that number, just so we'll walk through that
24  way.
25       A.   Okay.

PAGE 108

108

1             MR. SHANK:  Kevin, while the witness is
2   doing that, I might as well -- there's a
3   statement that I made that I want to clarify
4   and/or correct before.  And the question that
5   was posed to the witness that I answered on
6   behalf of the witness concerned the 9/20
7   command history of Ragesh Rao and specifically
8   the question was why it was not produced
9   earlier in discovery.
10            The reason why it was not produced
11  earlier in discovery is that counsel did not
12  realize that it was different than the one that
13  had already been produced in discovery and it
14  was not utilized as a document that was
15  consulted in responding to the defendants'
16  requests for admissions.
17            Previously I made some
18  characterizations as to whether or not
19  Convergys believes that it was an important
20  document or not an important document and it's
21  those characterizations that I want to clarify,
22  that I'm withdrawing on the record.
23            So the simple answer to your question
24  on the record is:  It was not produced earlier
25  in discovery because, one, counsel didn't

PAGE 109

109

1   realize it was different than the previous
2   document already produced and, second, to the
3   extent it was responsive to defendants'
4   discovery requests, which is something that is
5   questionable, but to the extent it was
6   responsive, it was inadvertently not produced.
7             MR. LUCAS:  The document that we're
8   talking about the shell history with a file
9   date of September 20th, 1999, is that going to
10  be a document, either as a document or its
11  content, that's the subject of questioning of
12  Mr. Rao at his upcoming deposition?
13            MR. SHANK:  I am not participating in
14  that deposition, but --
15            MR. HART:  Yes.
16            MR. SHANK:  -- yes.
17            MR. LUCAS:  Then I think we have a
18  separate issue to address and that is whether
19  or not that document should be made available
20  to Mr. Rao or permitted to be made available to
21  him prior to his deposition.  I mean, if it's
22  going to be the subject of questioning, I think
23  it has to be.  And I'll go off the record and
24  talk to you about this and then if you want to
25  come back on the record, we can.  So maybe we

CONVERGYS INFORMATION MGMT. GROUP, INC., et al. vs. IGATE CORP., et al.
DARIN BROWN
2/13/04

SHEET 36  PAGE 138

138

```
1    BY MR. LUCAS:
2        Q    Is there any other document, other than
3    Exhibit 19, that even purports to reflect even any
4    discussion that you had with Mr. Koopmans in September
5    of 1999 concerning any allegation or contention that
6    Mr. Rao's keystroke log or shell history may have been
7    edited or modified?
8            MR. SHANK:  Objection to form.
9            THE WITNESS:  Well, I think there are
10       other documents that would support that.
11           MR. LUCAS:  Now, that's a different
12       question.  Come on, let's --
13           THE WITNESS:  Well, I --
14           MR. SHANK:  He's trying to answer your
15       question, Kevin, so --
16           MR. LUCAS:  Well, I'll ask it again
17       because, I mean --
18           MR. SHANK:  Well, it's not the clearest
19       of questions.
20           MR. LUCAS:  Well, whatever.  That's
21       fine.
22   BY MR. LUCAS:
23       Q    Is there any other document anywhere,
24   other than Exhibit 19, that purports to summarize or
25   constitute an opinion you expressed to Mr. Koopmans
```

PAGE 139

139

```
1    back in September of 1999 that Mr. Rao's keystroke log
2    or shell history may have been edited or modified?
3            MR. SHANK:  Objection to form and to
4        the extent he's already answered this question
5        in part.
6            THE WITNESS:  This is the only one I
7        know of.
8    BY MR. LUCAS:
9        Q    Now, the other question that you were
10   answering, you were saying there are other documents
11   that may reflect or evidence the possibility of an
12   editing or amendment to Mr. Rao's keystroke log or
13   shell history, correct?
14       A    Correct.
15       Q    Okay.  What other documents in your
16   mind or in your view provide such additional evidence
17   or support?
18       A    Well, in corroborating or discrediting
19   what's in this file, there are a number of database
20   files that could be -- database log files that could be
21   referenced to determine the commands in this file
22   versus what was done in the database.
23       Q    Well, why don't you tell me what those
24   various files are?
25       A    The things I'm thinking of is the alert
```

PAGE 140

140

```
1    logs for the databases.
2        Q    Well, let me ask you:  Which alert logs
3    for which databases?
4        A    Presumably it would be the alert logs
5    for the same time period contained in this file, this
6    history file, which we've already established we don't
7    know exactly the time frame contained in this history
8    file.
9        Q    Are you talking about the alert log for
10   the SSUP instance?
11       A    For the SSP or SSUP instances.
12       Q    Didn't you testify earlier that you're
13   not contending and Convergys is not contending that the
14   alert file for the SSP instance has been edited or
15   modified?
16           MR. SHANK:  Objection to the extent
17       that it's already been asked and answered and I
18       think that mischaracterizes to some extent his
19       previous answer.
20           THE WITNESS:  I -- I did not -- I did
21       not testify to that.
22   BY MR. LUCAS:
23       Q    Do you contend that the alert log for
24   the SSP instance was edited or modified by Mr. Rao?
25       A    I don't specifically contend that it
```

PAGE 141

141

```
1    was modified by Mr. Rao.
2        Q    Do you know whether Mr. Koopmans in
3    your discussions with him asserts that Mr. Rao edited
4    or modified the alert log for the SSP instance?
5        A    I don't -- I don't know that -- I don't
6    know of anybody at Convergys that is contending
7    specifically that Mr. Rao edited the alert log for the
8    customer database.
9        Q    Well, what I feel uncomfortable with is
10   that I don't know your answer when you keep saying
11   specifically.
12       A    The alert log for the customer database
13   appears to have been edited, but I don't think anybody
14   has contended that Mr. Rao necessarily did that
15   editing.
16       Q    And what was the edit that took place
17   in the SSP alert log?
18       A    The alert log that exists on magnetic
19   disk today, which I believe has been produced, is
20   missing all of the entries for September 17th of 1999.
21       Q    And how did that come about?  You don't
22   know?
23       A    I don't know.
24       Q    And as far as you know, Convergys
25   doesn't know, correct?
```

CONVERGYS INFORMATION MGMT. GROUP, INC., et al. vs. IGATE CORP., et al.
DARIN BROWN
2/13/04

─ SHEET 39  PAGE 150 ─

150

1   communication with Mr. Rao as to what Mr. Koopmans
2   asked for or how Mr. Rao characterized what he
3   provided; is that correct?
4        A        That is correct.
5        Q        This is what Mr. Koopmans gave you with
6   his Exhibit 18, correct?
7        A        That is correct.
8        Q        Okay.  And did you read these
9   documents?
10       A        I reviewed -- I -- I presume I did read
11  them.  I mean, I reviewed them.  I don't know what you
12  mean by read.
13       Q        Well, let me ask you with respect to
14  the first two pages of Exhibit 14.  It's a document
15  that has 26 numbered paragraphs and then an unnumbered
16  paragraph at the end.  Did you read each of these
17  paragraphs?
18       A        I -- I did.
19       Q        Did you do anything to compare what was
20  stated in these paragraphs with other documents that
21  were then available to you?
22       A        Are you talking about on receipt of the
23  e-mail at the time -- I mean, in September of 1999?
24       Q        Yes.
25       A        No, I did not.

─ PAGE 151 ─

151

1        Q        Did you -- so you didn't make any kind
2   of comparison of what's stated in the first two pages
3   of Exhibit 14 with other documents before you sent Mr.
4   Koopmans your reply e-mail that's been marked as
5   Exhibit 19, correct?
6        A        That's correct.
7        Q        And if you'll look at Exhibit 18, Mr.
8   Koopmans says that he had met -- that he first had
9   grilled Mr. Rao with a purpose to trap him and then he
10  had gotten together with Neil Hulin and Ravi Kura and
11  discussed matters with them and then all three of them
12  met with Mr. Rao and went over all these matters.  Did
13  you see that?
14       A        Yes.
15                MR. SHANK:  Object to form.
16  BY MR. LUCAS:
17       Q        And you see, for example, that there
18  are statements in there about Ravi verifying certain
19  approaches, doing certain work?
20                MR. SHANK:  Object to form.
21  BY MR. LUCAS:
22       Q        Do you see that?
23       A        Yes, I see that.
24       Q        Do you see the reference to the
25  histories of Ravi and Rick Litton that's referred to in

─ PAGE 152 ─

152

1   the third paragraph?
2        A        Yes, I see that.
3        Q        Did you understand that those were the
4   shell histories or keystroke logs for Ravi and Rick
5   Litton?
6                MR. SHANK:  Objection to foundation.
7   BY MR. LUCAS:
8        Q        Is that your understanding?
9        A        That's what I would believe to be the
10  case, yes.
11       Q        Have they been preserved by Convergys?
12                MR. SHANK:  Objection.  I think he's
13  already talked about this topic.
14                THE WITNESS:  No.
15  BY MR. LUCAS:
16       Q        Did you have any discussion after your
17  receipt of Exhibit Number 18 with Ravi or Neil
18  concerning the statements that are set forth in Exhibit
19  18?
20                MR. SHANK:  Object to form.
21                THE WITNESS:  Again, at the time prior
22  to preparing my e-mail?
23                MR. LUCAS:  Your e-mail response of
24  6:12 a.m. on the 21st that's been marked as
25  Exhibit 19.

─ PAGE 153 ─

153

1                THE WITNESS:  No, I didn't.
2   BY MR. LUCAS:
3        Q        Mr. Rao's services were terminated in
4   the morning of Tuesday, September 21, 1999.  Did you
5   have any discussion with Neil or Ravi concerning any of
6   these matters prior to the termination of Mr. Rao's
7   services?
8        A        I don't believe so.
9        Q        Do you see the reference in the second
10  paragraph where Mr. Koopmans says "We went to your home
11  directory and deduced you had locked it away in the
12  history directory"?  You see that reference?
13       A        Yes.
14       Q        What did you understand he was
15  referring to?
16                MR. SHANK:  Objection to foundation.
17  Calls for speculation.
18                THE WITNESS:  He was referring to the
19  preservation of the history file from September
20  17th at 1:02 p.m.
21  BY MR. LUCAS:
22       Q        That's what you've identified earlier
23  as being the shell history or the keystroke log with a
24  file date of September 17th, correct?
25       A        That's correct.

CONVERGYS INFORMATION MGMT. GROUP, INC., et al. vs. IGATE CORP., et al.
DARIN BROWN
2/13/04

SHEET 50  PAGE 194

194

1  BY MR. LUCAS:
2      Q      Did he tell you who instructed him to
3  do it?
4              MR. SHANK:  Hang on.  Hang on, Mr.
5  Lucas.  For this entire topic, if you feel like
6  you need to disclose communications between Mr.
7  Koopmans and counsel or between you and
8  counsel, do not disclose those communications.
9  If you feel like you do not need to disclose
10 those to properly answer Mr. Lucas' question,
11 then you may answer it, if you feel like that.
12 Do you understand?
13             THE WITNESS:  No.  Can you repeat what
14 you just said?
15             MR. SHANK:  Let's go question by
16 question.  What's the question, Mr. Lucas?
17 BY MR. LUCAS:
18     Q      Did Mr. Koopmans tell you who the
19 person was that instructed him to make these notes?
20     A      Yes.
21     Q      Okay.  Who did he say it was?
22     A      I mean, this is where I don't know.
23             MR. SHANK:  You can answer who.
24             THE WITNESS:  Okay.  It was -- I
25 believe it was Jill Fuchs.

PAGE 195

195

1  BY MR. LUCAS:
2      Q      Did he tell you what the notes were to
3  be used for, in his understanding?
4              MR. SHANK:  Objection.  I'm going to
5  instruct the witness not to answer that
6  question.
7  BY MR. LUCAS:
8      Q      Would you take a look at Exhibit Number
9  17, please?
10             MR. LUCAS:  Let me ask -- before we do
11 this, let me ask on the record:  Rob, what is
12 the basis of the objection?
13             MR. SHANK:  I think I've clearly said
14 it a number of times.
15             MR. LUCAS:  I'd like to hear it again.
16             MR. SHANK:  Attorney/client privilege.
17             MR. LUCAS:  Is that the sole privilege?
18             MR. SHANK:  Well, yeah, I guess I
19 should add -- I think I said this before, but I
20 guess I should add attorney work product as
21 well.
22             MR. LUCAS:  Is Convergys maintaining
23 that in September of 1999 it was contemplating
24 litigation as a result of these events?
25             MR. SHANK:  Depending on what point in

PAGE 196

196

1  time you're talking about, I think that's
2  certainly the case.
3              MR. LUCAS:  As of the time Mr. Koopmans
4  prepared the notes, which he testified to was
5  no later than September the 23rd.
6              MR. SHANK:  Convergys is maintaining
7  that communications between their attorneys
8  that were investigating the case and Convergys'
9  business people fall within the attorney/client
10 privilege and attorney work product.
11             MR. LUCAS:  Well, that's not the
12 question that's on the table.  The question
13 that's on the table:  Are you arguing that as
14 of September 23rd, 1999 that Convergys was
15 contemplating litigation as a result of the
16 alleged events of September 17th, 1999?
17             MR. SHANK:  I think I stated my
18 position, Mr. Lucas.  I've stated that they're
19 both attorney/client privilege and possibly
20 attorney work product.
21             MR. LUCAS:  You don't see a distinction
22 between my question and what you answered?
23             MR. SHANK:  I think I've stated my
24 position.
25 BY MR. LUCAS:

PAGE 197

197

1      Q      Take a look at Exhibit 17, please.  Do
2  you recognize this as being -- this is a document you
3  looked at earlier today -- as being the final
4  postmortem or part of the final postmortem done by
5  Convergys concerning the root cause and the irrevocable
6  corrective actions relating to the events on or about
7  September 17th of 1999?
8      A      Yes.
9      Q      Will you turn your attention to the
10 root cause portion?  It states "The technical root
11 cause of the problem was that the script created to add
12 the six tablespaces (17 datafiles) to the database
13 contained..." -- and it describes some words that are
14 in the file.  Then it says it "...contained an error in
15 that they pointed to identically named datafiles
16 associated with the customer database."  Do you see
17 that?
18     A      Yes.
19     Q      And was that your understanding at the
20 time?
21     A      Yes.
22     Q      See the next sentence when it says
23 "When the script was run to create the
24 tablespaces/datafiles in the usage database..." -- do
25 you see that?

CONVERGYS INFORMATION MGMT. GROUP, INC., et al. vs. IGATE CORP., et al.
DARIN BROWN
2/13/04

SHEET 54  PAGE 210

210

1      Q      Is it your understanding that Convergys
2   is not contending that Mr. Rao revised his shell
3   histories or keystroke logs to remove entries or
4   commands that would have been made for the purpose of
5   creating or running the tablespaces/data files in the
6   usage database which are believed to have caused the
7   corruption of data in the customer or SSP instance?
8                  MR. SHANK: Object to form.
9                  THE WITNESS: Can you -- can you ask
10          the question again? I didn't understand the
11          question.
12                 MR. LUCAS: Let me rephrase it.
13   BY MR. LUCAS:
14      Q      Is Convergys contending in this lawsuit
15   that Mr. Rao edited or amended his shell histories or
16   keystroke logs so as to remove or alter evidence in
17   those shell histories or keystroke logs that would
18   reflect that he had run and/or created scripts for
19   purposes of creating tablespaces/table files in the
20   usage database that resulted in the corruption in the
21   customer instance?
22                 MR. SHANK: Objection to form and I
23          think the witness has already answered a
24          question similar to this.
25                 THE WITNESS: So is Convergys

PAGE 211

211

1          contending that -- I want to make sure I
2          understand. Is Convergys contending that Mr.
3          Rao edited his keystroke history file to remove
4          the commands that would have been executed to
5          create these data files?
6                  MR. LUCAS: That's correct.
7                  THE WITNESS: Because the commands that
8          get executed aren't even in that file, I don't
9          believe Convergys is contending that.
10   BY MR. LUCAS:
11      Q      Is Convergys contending in this lawsuit
12   that Mr. Rao edited his shell histories or keystroke
13   logs for any purposes related to the September 17th
14   database corruption or any alleged cover-up relating to
15   those events?
16      A      I believe, yes, Convergys is contending
17   that.
18      Q      What is the contention?
19      A      At a minimum, the contention is that
20   the keystroke history of Mr. Rao on September 20th of
21   1999 was apparently different from the keystroke
22   history of Mr. Rao on September 17th at 1:02 p.m.
23      Q      And, now, is this something you
24   discussed between your testimony right now and your
25   testimony this morning concerning these matters?

PAGE 212

212

1                  MR. SHANK: Objection. Don't answer
2          that question.
3   BY MR. LUCAS:
4      Q      You had never even read the shell
5   history or the keystroke log as of 9/20 before Mr.
6   Rao's services were terminated, correct?
7                  MR. SHANK: Objection. Asked and
8          answered.
9                  THE WITNESS: That is correct.
10   BY MR. LUCAS:
11      Q      So you never made any comparison at the
12   time between keystroke logs as they existed as of 9/20
13   versus keystroke logs as they existed on 9/17, correct?
14                 MR. SHANK: Objection. Asked and
15          answered.
16                 THE WITNESS: Prior to Mr. Rao's
17          discharge, that's true.
18                 MR. LUCAS: Okay.
19   BY MR. LUCAS:
20      Q      And, in fact, prior to Mr. Rao's
21   discharge Mr. Hulin had told you that he had reviewed a
22   keystroke log of Mr. Rao either from September the 20th
23   or at least after September the 17th and he didn't find
24   anything that was suspicious or a problem, correct?
25                 MR. SHANK: Objection. Asked and

PAGE 213

213

1          answered.
2                  THE WITNESS: That's correct.
3   BY MR. LUCAS:
4      Q      When is the first time you ever heard
5   from anyone that Convergys was contending or believed
6   that Mr. Rao's keystroke log as it related to the
7   events or his actions of 9/16 or 9/17 of 1999 had been
8   or may have been edited or amended?
9                  MR. SHANK: Objection to form.
10                 THE WITNESS: When was the first time I
11          heard about that?
12                 MR. LUCAS: Yes.
13                 THE WITNESS: I don't recall.
14   BY MR. LUCAS:
15      Q      Well, was it in September of 1999?
16   Because you've already testified it wasn't before
17   September 21 of 1999.
18      A      I don't believe that was my testimony.
19      Q      You never heard that allegation by
20   Convergys prior to September 21, 1999, did you?
21                 MR. SHANK: I think he's trying to
22          clarify that point.
23                 THE WITNESS: I have never heard an
24          allegation that Convergys has proof that Mr.
25          Rao modified his shell history. But --

CONVERGYS INFORMATION MGMT. GROUP, INC., et al. vs. IGATE CORP., et al.
DARIN BROWN
2/13/04

SHEET 55  PAGE 214

214

BY MR. LUCAS:

1  BY MR. LUCAS:
2      Q      As of when is that answer?
3      A      That's -- I've never -- that's --
4      Q      Even as of today?
5      A      Even as of today, I have not heard any
6  evidence that we have proof that he modified his shell
7  history.
8      Q      Okay. Now, separate from proof, when
9  was the first time you heard Convergys contend that
10  they believe Mr. Rao modified his shell history or
11  keystroke log?
12     A      I don't know when I first heard that.
13     Q      Well, was it -- I'm sorry. I didn't
14  mean to interrupt your answer. Go on.
15     A      Is the question when did I formulate
16  that opinion?
17     Q      Well, let me ask you first whether you
18  heard it from anybody.
19     A      Not -- not that I recall. I mean --
20     Q      I take it you've heard it from someone
21  at some point in time or not?
22     A      I'm sure it was discussed over the
23  course of -- you know, it probably was discussed in
24  September of 1999.
25     Q      Okay. But you don't recall that; is

PAGE 215

215

1  that a correct statement?
2      A      I don't recall that.
3      Q      As of September 21, 1999 did you
4  contend or tell anyone that you believed Mr. Rao had
5  edited his shell history or keystroke log?
6      A      I don't recall specifically telling
7  people that.
8      Q      And it's not mentioned in your Exhibit
9  19, correct, that we just went through?
10     A      Well, I believe it's pretty
11  specifically inferred, but I don't -- I did not state
12  it explicitly.
13     Q      And then did anyone else within
14  Convergys ever state to you prior to September 21, 1999
15  of their belief that Mr. Rao had edited somehow his
16  shell history or keystroke log?
17     A      No, I don't believe so.
18     Q      Can you show me on Exhibit 19 where it
19  is strongly inferred, in your mind, that Mr. Rao had or
20  may have edited his shell history or keystroke log?
21     A      Well, I can't tell you with only
22  Exhibit 19, but if we get I think it's Exhibit 18 which
23  is Mr. Koopmans' e-mail, between the two of them I can
24  show that.
25     Q      So on Exhibit 18 -- I'm sorry. I'm

PAGE 216

216

1  looking for a specific statement in here. So in
2  paragraph three on Exhibit 18 Mr. Koopmans states that
3  "So I asked Neil to take a look at the original history
4  file. We scoured every line of the file and found
5  nothing that disproved Ragesh's assertions." I read
6  that to mean that they did not find the lines that I
7  outlined to you earlier where it appears that Mr. Rao
8  removed the alert log, the lines we were discussing in
9  the shell history, because that would clearly be
10  suspicious behavior associated with this particular
11  incident.
12     Q      That's the entirety of your answer?
13     A      Yes.
14     Q      After -- you've now told me the
15  entirety of any statement, contention, inference that
16  any Convergys representative made prior to September
17  21, 1999 that Mr. Rao may have edited his shell
18  histories or keystroke logs, correct?
19     A      Prior to September 21st you said. Yes.
20     Q      When is the next time when anyone on
21  behalf of Convergys indicated to you that Mr. Rao may
22  have edited his keystroke logs or shell histories?
23     A      I don't know.
24     Q      Well, do you recall anybody even saying
25  it at any time in 1999?

PAGE 217

217

1      A      I feel confident that that was stated.
2  I mean, that was a -- that was a presumption, a basis
3  for the -- part of the -- part of the basis for the
4  discharge of Mr. Rao.
5      Q      So that presumption was important, as
6  you understood it, in Convergys' determination that Mr.
7  Rao had done something inappropriate in the nature of a
8  cover-up activity?
9          MR. SHANK: Objection. Lack of
10     foundation. Calls for speculation.
11  BY MR. LUCAS:
12     Q      Isn't that correct?
13     A      I can't state how significant it was,
14  for example, in the discharge decision which --
15     Q      No. I didn't ask you that. I asked
16  you with respect to significant in concluding that
17  there was a cover-up activity.
18         MR. SHANK: Same objection.
19         THE WITNESS: I think it was one of
20     many factors.
21  BY MR. LUCAS:
22     Q      And you've described those factors; is
23  that correct?
24     A      Yes.
25     Q      So you don't recall any specific



DARIN BROWN                                          February 19, 2004

VOLUME II
IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


CONVERGYS INFORMATION            :
MANAGEMENT GROUP, INC.,
and CHUBB CUSTOM INSURANCE       :
COMPANY,
                                 :
        Plaintiffs,
                                 :
     -v-                            CASE NO.: CV-01-618
                                 :    (Judge Beckwith)
IGATE CORPORATION, et al.,
                                 :
        Defendants.
                                 :

                * * * * * * * * * *

        The continuation of the deposition of DARIN
BROWN, taken before Debra A. Sprague, Certified Court
Reporter and Notary Public in and for the State of Ohio,
at the offices of Ulmer and Berne, LLP, 600 Vine Street,
Suite 2800, Cincinnati, Ohio, on the 19th day of February,
2004, beginning at the hour of 1:37 p.m., and ending at
the hour of 3:03 p.m.



RIVERSIDE REPORTING
Certified Court Reporters
P.O. Box 949
Covington, Kentucky 41012-0949
KY:  859-291-6110/OH:  513-574-7017



EXHIBIT
2

CONVERGYS                                    D. SPRAGUE, CVR>
IGATE, et al.                                  513-923-4680>

DARIN BROWN                                        February 19, 2004

Page 22

1  of weeks prior to me joining.
2      Q.  And Mr. Ravi Kura, was he already there as
3  an employee or a contractor when you first came to
4  Convergys as a contractor in August of 1999?
5      A.  Yes, he was.
6      Q.  Okay.  Do you know how long he had been
7  there prior to your joining?
8      A.  If I recall correctly, he may have been
9  hired in June of 1999, but I don't know.
10     Q.  You spoke in your -- in the earlier
11 session of your deposition about shell histories.  And I
12 think at various times I referred to them in asking you
13 questions as keystroke logs and/or as shell histories.
14 And I take it from your prior testimony that in September
15 of 1999, you accessed, at some point in time, Mr. Rao's
16 shell history as it then existed.
17     A.  Yes, I did.
18     Q.  Can you recall the first occasion on which
19 you accessed Mr. Rao's shell history?
20     A.  No, I can't.
21     Q.  Can you describe for me the process or
22 procedure by which or the manner in which you accessed Mr.
23 Rao's shell history?  What did you have to do to actually
24 access it?
25     A.  I can testify to what I likely did.  I

Page 23

1  don't --
2      Q.  Let's start -- That's fine.  You don't
3  recall exactly what you did, okay.
4      A.  No, I don't recall exactly what I did.
5      Q.  So what would have been the most likely
6  means, in your mind, that you would have followed to
7  access Mr. Rao's shell history back in September of 1999?
8      A.  I likely would have run the strings
9  command on the history file and viewed the results on my
10 screen.
11     Q.  Would you have had to call over to -- at
12 the operating system group within Convergys to get access
13 to Mr. Rao's shell history?
14     A.  The shell history file that I'm referring
15 to, no.
16     Q.  Let me ask you, is there a certain way you
17 could describe the shell history file that you're
18 referring to, so I understand what you mean?
19     A.  I can't recall if I described this before
20 or not.  But when you log into Unix, you log in as your
21 individual user ID.  Presumably nobody knows your password
22 except you.  Then you do what's called an op, O-P command,
23 to become the Oracle user, to be able to administer the
24 database.
25     Q.  And then what do you do?

Page 24

1      A.  The -- After you've done the op Oracle
2  command to be able to administer the database, that shell
3  history file, I can access without having to request
4  permission to access it.
5      Q.  And when you access, at that time, when
6  you are able to access, in this case Mr. Rao's shell
7  history file, are you able to read it?
8      A.  Yes.
9      Q.  Are you able to write to it or edit it?
10     A.  There's nothing technically that would
11 prevent that.
12     Q.  Now, I'm taking from your answer that
13 there perhaps is another shell history.  Maybe I'm wrong.
14 But you had said the shell history as you're referring to
15 it.  Is there some other shell history or keystroke log of
16 a -- that would have related to production DBAs like Mr.
17 Rao back in September of 1999, that's different than what
18 you just described?
19     A.  There is.
20     Q.  Okay.  Can you tell me --
21     A.  It's not really -- It's not different in
22 content.  But when you log in to the Unix server as your
23 individual ID, you have a shell history that only that
24 particular user can access.
25     Q.  And you're saying the content is the same

Page 25

1  as the type of shell history that you were just talking
2  about?
3      A.  It would still track the commands.  It
4  would just be the commands run under that individual user
5  account instead of under the Oracle user account.
6      Q.  If you were to print it up, if you were to
7  make a hard copy of it, would it look different, these two
8  different types of shell histories?
9      A.  Other than the content, no.
10     Q.  I'm sorry, what do you mean other than the
11 content?  Now, I thought the content was the same.
12     A.  Well, the content is the command history
13 that that individual user ran, which is likely not the
14 same as the command history that the Oracle user would
15 have run.
16     Q.  Okay.  Cause there could -- there would --
17 Why would that be?
18     A.  Actually, most of the DBA team logs into
19 the server and immediately does an op Oracle.  So very few
20 of the database administrators do things under their
21 individual accounts.
22     Q.  So the shell history, as a general matter,
23 is something that with the way the production DBAs work,
24 they would all, as a general matter, have access to it
25 because they all generally logged in under the op command?

CONVERGYS                              D. SPRAGUE, CVR>
IGATE, et al.                              513-923-4680>

Page 58

1   recall, you hadn't even looked or reviewed this document
2   in September of 1999, correct?
3        A.   Right, as far as I can recall, that's
4   true.
5        Q.   So now I'm asking you in the capacity --
6   And I'm not asking you to disclose communications with
7   Convergys counsel. But as a Convergys designee in this
8   case or one of two designees on various subject matters,
9   are there entries on Exhibit 7 which Convergys believes
10  are significant for purposes of the determination of the
11  cause or likely cause of the September 17 production data
12  corruption, or any alleged coverup activities by Mr. Rao
13  with respect to those matters?
14            MR. SHANK:  If you can answer the
15       question, Mr. Brown, without disclosing
16       communications you've had with Convergys
17       counsel, then you can answer; if not, then
18       please don't answer that question.
19            THE WITNESS:  Can I confer with you
20       on this issue to --
21            MR. SHANK:  Yeah.
22            THE WITNESS:  -- clarify what's
23       considered privileged?
24            MR. LUCAS:  Would you like to step
25       out, or you want me to step out?  Whatever --

Page 59

1            MR. SHANK:  We'll step out.
2            (OFF THE RECORD)
3            MR. SHANK:  Can we have her -- either
4       have that read back or can you restate it?
5            MR. LUCAS:  I'll try and restate it
6   BY MR. LUCAS:
7        Q.   Mr. Brown, is there any entries or
8   omission of entries, I guess, in Exhibit Number 7 which
9   Convergys believes are significant for purposes of
10  determining the cause or possible cause or causes of the
11  September 17th, 1999 production database corruption, or of
12  any alleged coverup type activities by Mr. Rao with
13  respect to those events?
14            MR. SHANK:  Mr. Brown, as the
15       question's worded, you can tell Mr. Lucas your
16       beliefs, but you cannot tell Mr. Lucas, and
17       I'm instructing you not to tell him any
18       communications that you've had with Convergys
19       counsel as to what they've said to you or what
20       you've said to them.
21            So you can tell Mr. Lucas your
22       beliefs, but do not disclose any communications
23       you've had with Convergys counsel or Convergys
24       counsel has had with you.  Do you understand
25       the instruction?

Page 60

1            THE WITNESS:  Yes.  This might take a
2       few minutes.
3            MR. LUCAS:  That's all right  Let's
4       go off the record.
5            (OFF THE RECORD)
6            MR. SHANK:  After conferring with the
7       witness again, I'm going to modify the
8       instruction a bit.  Mr. Brown testified in his
9       previous deposition that the topic of this
10      particular exhibit was referenced either
11      directly or indirectly in his e-mail to Bill
12      Koopmans dated September 20th.  I'm sorry,
13      September 21st.
14           He can answer the question to the
15      extent the question is directed at those
16      communications.  Any other beliefs that Mr.
17      Brown may or may not have that are responsive
18      to the question that you've asked Kevin, would
19      implicate the attorney work product privilege
20      and also the attorney/client privilege.  So I'm
21      not going to let him testify as to any other
22      beliefs that he has responsive to your
23      question, other than as they relate to his e-
24      mail and his communications with Mr. Hulin.
25           MR. LUCAS:  Mr. Hulin or Mr. Koopmans

Page 61

1   or both?
2            MR. SHANK:  Mr. Hul -- Well, Mr.
3       Hulin and Mr. Koopmans at the time -- around
4       the time of the outage.
5            MR. LUCAS:  Okay.  Well, I mean, I
6       don't think that's an appropriate objection,
7       but there's nothing I can do about that.
8   BY MR. LUCAS:
9        Q.   So, Mr. Brown, in light of your
10  understanding of what your counsel just stated, can you
11  answer my question?
12       A.   The only significant difference that I
13  know of between the two files, outside of instructions by
14  counsel, is the fact that Mr. Hulin had looked at the
15  history file at that time, did not find certain commands
16  that existed on September 17th; namely, the removal of
17  the alert log file.  And, therefore, the presumption was
18  made that those commands were likely removed from the
19  file.
20       Q.   Okay.  So there's nothing you could point
21  out to me in Exhibit 7, which would be a line item or a
22  command in response to my question?
23            MR. SHANK:  There's nothing that's
24       non-privileged, Kevin.
25            MR. LUCAS:  I'm not trying to -- I

16 (Pages 58 to 61)

Page 62

1    mean, subject to the objection that's been made
2    --
3         THE WITNESS: Correct, there's
4    nothing.
5  BY MR. LUCAS:
6    Q   -- there's nothing you could point to, to
7  indicate that because you're telling me what it is an
8  omission; is that correct?
9    A   As -- Correct.
10    Q   Now, you attended Mr. Rao's deposition
11  yesterday; is that correct?
12    A   Yes, that's correct.
13    Q   And I'm not going to try to characterize
14  his testimony. We can get his transcript when the time
15  comes. But as a general matter, Mr. Rao was asked certain
16  questions in your presence as to whether he could or would
17  speculate or venture some thoughts on what might have been
18  the cause of the production database corruption on
19  September 17th, 1999. Do you recall that testimony,
20  generally?
21    A   I do.
22    Q   Okay. And do you recall that Mr. Rao
23  indicated a view that the import function that he
24  testified to or import command that he testified to as
25  having issued on September 17th, might have caused the

Page 63

1    data -- database -- I'm sorry -- the production database
2  corruption? Do you recall that testimony generally?
3    A   Yes.
4    Q   Had you considered, you personally, prior
5  to September 21, 1999, the question or issue as to what
6  effect, if any. the import command or function in question
7  had or may have had on the production database corruption
8  in question?
9    A   I don't believe I had.
10    Q   Had anyone within Convergys made such a
11  consideration prior to September 21 of 1999?
12         MR. SHANK: If you know, Mr. Brown.
13         THE WITNESS: I don't recall anybody
14    telling me that.
15  BY MR. LUCAS:
16    Q   So you don't recall, for example, Mr.
17  Koopmans or Mr. Hulin addressing that issue or having
18  indicated that they considered such an issue back in
19  September of 1999, correct?
20    A   I don't recall.
21    Q   Prior to yesterday, had you ever
22  considered what effect or possible effect the import
23  command or import function may have had in connection with
24  the production database corruption of September 17th,
25  1999?

Page 64

1         MR. SHANK: Carve out -- I'm going to
2  instruct the same wit -- the witness the same
3  way I did before. If to answer Mr. Lucas'
4  question you have to disclose privileged
5  communications, don't answer the question. So
6  I think Kevin will agree to carve out
7  privileged communications from your question.
8  Is that correct, Kevin?
9         MR. LUCAS: I can't change the
10  instruction. I'm not sure -- As a general
11  matter, yes. But I don't know what constitutes
12  those discussions here. But that's the
13  instruction that's on the table. So follow
14  your counsel's instruction and answer the
15  question as best your able.
16         THE WITNESS: I -- Then I can't
17  answer the question.
18         MR. LUCAS: In light of the
19  instructions in the last five minutes, there's
20  nothing else. I mean, I would have additional
21  questions if the witness could provide other
22  testimony, but for the instructions, he's not.
23  So that'll be the end of my questioning of Mr.
24  Brown. Thank you for your time.
25         MR. SHANK: We'll reserve signature,

Page 65

1    for the record.
2         * * * * * * * * * *
3         (WHEREUPON, THE DEPOSITION OF DARIN BROWN
4  WAS CONCLUDED AT 1:37 P.M.)
5         * * * * * * * * * *

CONVERGYS vs. IGATE CORPORATION, et al.
William P. Koopmans
February 12, 2004



PAGE 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

CONVERGYS INFORMATION          :
MANAGEMENT GROUP, INC.,        :
AND CHUBB CUSTOM               :
INSURANCE COMPANY,             :
        Plaintiffs             :
    -v-                        :    Case No. CV-01-618
                               :      (Judge Beckwith)
IGATE CORPORATION, et al., :
        Defendants             :
                        - 0 -

        The deposition of WILLIAM P. KOOPMANS, taken
before Melea E. Chaney, Court Reporter and Notary
Public in and for the State of Ohio, at the law offices
of Ulmer & Berne, 600 Vine Street, Suite 2800,
Cincinnati, Ohio, on the 12th day of February, 2004,
beginning at the hour of 9:23 a.m. and ending at the
hour of 6:09 p.m. of the same date.
                        - 0 -
                RIVERSIDE REPORTING
            Certified Court Reporters
                   P.O. Box 949
            Covington, Kentucky  41012
                 KY(859)291-6110
                 OH(513)574-7017



EXHIBIT
3

COPY

CONVERGYS vs. IGATE CORPORATION, et al.
William P. Koopmans
February 12, 2004

PAGE 154

1    Q    Did you take any steps or anyone else
2  at your direction take steps to preserve anything else
3  at that time, such as keystroke logs, alert logs,
4  activities of the data recovery efforts, anything else
5  at all having to do with activities that Mr. Rao had
6  been engaged in prior to November 17th of 1999 or after
7  September 17th.
8        MR. SHANK:  Hang on a second.  I just
9  want to make it clear that there are other
10  witnesses who are also going to testify on this
11  topic as well.  So I'm assuming that this
12  question is being asked of Mr. Koopmans in his
13  personal capacity and not in his corporate
14  capacity.
15        MR. LUCAS:  I'm asking in both
16  capacities.  If he's answering in one, only you
17  can control that, not me.
18        MR. SHANK:  Well, the point is, is
19  there are other witnesses who can also testify
20  to this issue as well.
21        MR. LUCAS:  You've conveyed that on the
22  record.  So --
23        THE WITNESS:  Up through the 20th we
24  recovered or stored away things like the
25  history file and we recovered the alert log.

PAGE 155

1  Following our analysis and conclusion, there
2  were no additional steps to -- to retrieve or
3  retain any additional electronic or
4  computerized logs with respect to the outage.
5        The data recovery continued in -- in
6  its entirety for three months and, as part of
7  that process, we retained documents about the
8  methods that we used to recover data.  Most of
9  those were published in the postmortem to
10  Sprint so that in the event this ever occurred
11  again, we had those documents.
12  BY MR. LUCAS:
13    Q    Let me take those one at a time, if I
14  can.  The electronic documents which you called like
15  the history file and the alert logs, did you or
16  Convergys make any efforts to maintain and preserve the
17  keystroke logs, for example, of all other production
18  DBAs or development DBAs that were involved in the
19  Sprint project?
20    A    No.
21    Q    With respect to --
22        MR. SHANK:  Hang on.  Hang on.  There
23  has been at least one of those documents
24  produced recently in discovery.  So I'm going
25  to object to that question to the extent that

PAGE 156

1  it ignores the fact that there has been a
2  history file produced recently in discovery by
3  Convergys.
4        MR. LUCAS:  All I can do is ask this
5  witness.  I mean, I haven't even seen these
6  documents.  They were delivered here.  We'll
7  take a look at them and then maybe you can
8  identify them.
9  BY MR. LUCAS:
10    Q    This witness -- at least no active
11  steps were taken that you know of to preserve those
12  type of documents, correct?
13    A    Other than the documents that we
14  preserved as part of the identifying of the root cause,
15  that is correct.
16    Q    So only those specific documents that
17  you preserved in terms of a history file or portions of
18  a history file relating to Ragesh Rao, correct?
19    A    Correct.
20    Q    Relating to a alert log for a certain
21  time period, correct?
22    A    Correct.
23    Q    And no other history files of Mr. Rao
24  for his prior work at Convergys, including the work he
25  did in implementing the usage split in the Y2K, the UAT

PAGE 157

1  or the pre-production environments, correct?
2    A    That is correct.  Those history files
3  are circular and recycle themselves.
4    Q    When do they recycle?
5    A    I think it's every 5000 lines.  Darin
6  would probably know more precisely.  I believe that's
7  correct.
8    Q    Well, were any efforts made to go back
9  and retain other history files of Mr. Rao or to see if
10  they existed on any other tape or any other backup
11  system?
12    A    No.
13    Q    And you did not make the determination
14  of what was even going to be preserved, right; somebody
15  else did?
16        MR. SHANK:  Objection.
17        MR. LUCAS:  I'll rephrase the question.
18  BY MR. LUCAS:
19    Q    Did you gather Mr. Rao's history file?
20    A    Did I personally?  No.
21    Q    Who did?
22    A    Darin.
23    Q    Did you do anything to gather, preserve
24  alert logs for either the SSUP or SSP?
25    A    Darin and I made sure the documents

CONVERGYS vs. IGATE CORPORATION, et al.

William P. Koopmans

February 12, 2004

PAGE 158

1 that were pertinent to our identification of root cause
2 were stored.
3        Q      What was pertinent to your
4 identification, what you viewed as pertinent, correct?
5        A      Correct.
6        Q      So if other people thought other things
7 were pertinent and relevant, those were not preserved;
8 is that correct?
9               MR. SHANK: Objection to form.
10              THE WITNESS: I was not aware anybody
11       had any other opinion in terms of documents
12       that were pertinent.
13 BY MR. LUCAS:
14       Q      Well, let me just see if I understand.
15 At the time, let's say the period between September
16 16th and September 23rd which is the latter part when
17 you would have completed your notes, did you have any
18 discussion with any of the defendants here, Mastech or
19 iGate, concerning these matters?
20       A      In what time frame?
21       Q      Between September the 17th and, say,
22 September the 23rd.
23       A      I had many discussions with Ragesh.
24       Q      Other than Mr. Rao, did you have any
25 discussions with anyone from Mastech or iGate?

PAGE 159

1        A      I did not, to the best of my knowledge.
2        Q      Did anyone from Convergys have any
3 discussions during that time period, for example, with
4 Mr. Rao's then employer?
5               MR. SHANK: Objection to foundation.
6        You can answer to the extent you know, Mr.
7        Koopmans.
8               THE WITNESS: I don't have any idea if
9        HR or legal --
10 BY MR. LUCAS:
11       Q      Did Sprint instruct Convergys or you
12 what documents it wanted to see?
13       A      Not that I recall.
14       Q      In fact, the process worked just the
15 opposite, you gathered and Convergys gathered
16 information, you did your analysis and then you
17 presented your results or your conclusions to Sprint,
18 correct?
19       A      Correct. The burden of proof is on us
20 to explain to them what happened with our system.
21       Q      So what Sprint might have viewed as
22 relevant at the time was not something that was
23 inquired into by you or Convergys when you were
24 deciding what documents or electronic media to
25 preserve, correct?

PAGE 160

1               MR. SHANK: Objection to form and
2        foundation.
3               THE WITNESS: Historically if Sprint is
4        interested in something, they tell us.
5 BY MR. LUCAS:
6        Q      But in this case Convergys didn't
7 confer with them to ask, correct?
8               MR. SHANK: Objection to foundation.
9               THE WITNESS: We had lots of dialogue
10       on this outage and what we were doing and --
11       and how we were doing it.
12 BY MR. LUCAS:
13       Q      Mr. Koopmans, I just want to go to your
14 answer. You said you preserved everything that anyone
15 thought was relevant. And I just want to understand
16 that the only people who made the determination that
17 what was relevant was Convergys.
18              MR. SHANK: I think he's already
19       answered your question a couple times.
20              MR. LUCAS: Well, no, let him answer
21       the question.
22 BY MR. LUCAS:
23       Q      Did Sprint ever have any discussion
24 with you during this time period as to what documents
25 should be preserved as relevant?

PAGE 161

1        A      Did they specify anything they thought
2 was relevant? No.
3        Q      And the same thing would be true with
4 respect to Sun Microsystems, correct?
5        A      Correct.
6        Q      And the same thing would be true with
7 respect to Oracle, correct?
8        A      Darin could answer that. Oracle
9 frequently asks for specific database logs when we open
10 a TAR. So if we go back to the TAR history, they might
11 have asked for logs or documents to transmit to -- to
12 their site for analysis.
13       Q      TAR is a technical assistance request
14 to Oracle?
15       A      That is correct.
16       Q      And you just don't know the answer to
17 that question?
18       A      Correct. I presume the answer is stuff
19 was sent to Oracle.
20       Q      Now, you indicated that efforts in the
21 recovery were summarized as part of your postmortem,
22 correct?
23       A      Correct.
24       Q      But the underlying documents that would
25 show what it is that Convergys actually did in its

CONVERGYS vs. IGATE CORPORATION, et al.

William P. Koopmans

February 12, 2004

PAGE 178

```
1    from, what you were dealing with back at the time?
2         A     I believe this is the one that was
3    retained in the normal location for Ragesh. This is
4    the one that would have been reviewed and is referenced
5    in -- in some of the e-mails regarding the
6    investigation. This would have been the one that
7    Ragesh edited.
8              What we had done was in the middle of
9    that event saved off a copy of his keystroke log and
10   that is the one we had produced.
11        Q     Let me ask you: At the time back in
12   mid-September of 1999 did somebody at Convergys
13   consciously and deliberately preserve in the files that
14   record you have in your hand, that keystroke log you
15   have in your hand?
16        A     Consciously, no.
17        Q     It was just there?
18        A     Correct.
19        Q     And then you're saying some subset of
20   this was, what, printed up or --
21        A     A copy of that history log as it -- as
22   it existed somewhere in the middle of the day on 9/17
23   was copied off.
24        Q     And who did the copying off of that?
25        A     Darin Brown.
```

PAGE 179

```
1         Q     And what do you mean by copied off?
2         A     He took a copy of the production
3    keystroke log for Ragesh and copied it, made a
4    duplicate into a secure directory.
5         Q     And you're saying that that copy that
6    Mr. Darin Brown did at the time is a subset or a
7    portion of the document you have in your hand?
8              MR. SHANK: Object to form.
9              THE WITNESS: That -- that copy was a
10   duplicate copy of the entire log as it existed
11   at the point in time he made a copy. That file
12   would continue to change as Ragesh did more
13   activity. It's a 5000 line rolling log, so as
14   he entered a new line, a line in the front was
15   deleted. So that log changed up until his last
16   activity on the system.
17   BY MR. LUCAS:
18        Q     And so I take it then, and you correct
19   me if I'm wrong, the document you have in your hand
20   then is different or would be different than what Mr.
21   Brown locked off on the 17th, depending upon whether or
22   not Mr. Rao did additional keystroke entries after
23   whatever time that was on the 17th; is that correct?
24        A     Well, what we know is it's different in
25   two ways. Additional activity as well as edited, the
```

PAGE 180

```
1    file was edited.
2         Q     Now, are you saying that the document
3    that contains the additional activity and the document
4    that contains the editing or the document that exists
5    after the editing as a result of the editing is the
6    document you have in your hand?
7         A     Let me restate. That this document
8    would contain activity that he did after Darin copied
9    off the production copy and it also includes the edits
10   or changes that he made specifically to this history
11   file.
12        Q     Why don't we mark that then with an
13   exhibit number. We'll mark it as Exhibit Number 7.
14   Now, Mr. Koopmans, I just want to make sure I
15   understand. When you were making your determinations
16   and your investigation back in mid-September of 1999,
17   did you have and were you referring to the version of
18   the keystroke log that had been locked in by Mr. Darin
19   Brown sometime on September the 17th or were you
20   relying on and referring to what I'll call the updated
21   keystroke log that now appears as Exhibit 7?
22        A     We looked at both.
23        Q     I'm going to put that aside. I can't
24   imagine why in this litigation, why we're getting this
25   now for the first time, so I'm going to put it aside
```

PAGE 181

```
1    and take a look at it. I've never seen this document
2    before. Frankly, I haven't looked at it until it came
3    within the past 24 hours.
4              MR. SHANK: Well, hang on. I do want
5    to note for the record, the relevant
6    portions of his alert log history have been
7    produced in discovery. You're suggesting --
8              MR. LUCAS: We're not talking about any
9    alert log, are we?
10             THE WITNESS: History log.
11             MR. LUCAS: This is a keystroke log.
12             MR. SHANK: I misspoke. The relevant
13   portions of his keystroke history have been
14   produced in discovery that do reveal what he
15   did. So your implication that this document
16   wasn't produced -- the documents essential to
17   your defense of the case were not produced is
18   not correct.
19             MR. LUCAS: Well, let me ask the
20   witness.
21   BY MR. LUCAS:
22        Q     After the locked-in version, the
23   version that was locked in on 9/17, is that what was
24   produced in this case, excerpts from the locked-in
25   version?
```

CONVERGYS vs. IGATE CORPORATION, et al.

William P. Koopmans

February 12, 2004

PAGE 182

```
1        A      Both excepts and the document in its
2    entirety, yes.
3        Q      The locked-in version in its entirety
4    and excerpts from it?
5        A      Correct.
6        Q      But this, what I'm going to call -- I
7    mean, I don't know what to call it -- the updated
8    keystroke log was not produced?
9        A      I don't believe the entire log was
10   produced.  I'm not sure if excerpts from it were
11   produced or not.
12       Q      Okay.  In the entries that appear after
13   the locked-in time on 9/17, so the new entries that
14   would appear that would not have appeared in the
15   version that was produced in discovery, do they reflect
16   -- I don't have your exact language, that's what I was
17   looking for -- do they reflect what you indicated were
18   keystrokes reflecting editing of this log?
19              MR. SHANK:  Do the documents that were
20          produced reflect that?
21              MR. LUCAS:  No.  I'm trying to use what
22          you guys are giving me to work with, which is
23          pretty hard.
24   BY MR. LUCAS:
25       Q      The portion that's in Exhibit 7 --
```

PAGE 183

```
1        A      Yes.
2        Q      -- that was not in the locked-in
3    version, so it's --
4        A      Right.
5        Q      -- got to be something near the back,
6    right?
7        A      Right.
8        Q      The way you described this 5000 line --
9        A      Correct.
10       Q      -- rolling system.  Does the editing
11   that you're talking about, what you view as being
12   editing, does that appear in the portion of Exhibit 7
13   after the locked-in version or does it appear in the
14   portion of Exhibit 7 that was in the locked-in version?
15              MR. SHANK:  Objection.  Form and
16          foundation.
17              THE WITNESS:  Editing of the alert log
18          does appear.  What is likely and presumably
19          editing of the alert log does appear in the
20          locked-down version but not in the final
21          version.
22   BY MR. LUCAS:
23       Q      And what is your understanding of why
24   it does not appear in the final version?
25       A      It -- it is my strong belief that he
```

PAGE 184

```
1    removed those entries from his history file.
2        Q      Now, let me see if I understand.  What
3    we're calling the keystroke log or the history log that
4    we're looking at like Exhibit Number 7 --
5        A      Mm-hmm.
6        Q      -- and then the locked-down version
7    we're talking about, these are keystrokes that take
8    place at the operating system level, correct?
9        A      That is correct.
10       Q      These do not reflect what, if anything,
11   took place within various Oracle utilities, correct?
12       A      That is correct.
13       Q      And that's, in fact, in the normal
14   course that you don't -- when you go into an Oracle
15   utility, in the normal course that would not show up on
16   an operating system log, correct?
17       A      That is correct.
18       Q      Now, to make a change in the operating
19   system keystroke log you would have to enter keystrokes
20   that would appear, would they not, in the operating
21   system keystroke history log itself?
22       A      If they were done on the system, yes.
23   If the editing were done on the Solaris host.
24       Q      I'm sorry.  Say that again.
25       A      If the editing were done on the Solaris
```

PAGE 185

```
1    host, that would be correct.
2        Q      Are there any keystrokes on Exhibit 7
3    that show editing to the operating system Rao keystroke
4    history log?
5               MR. SHANK:  Objection to foundation.
6          Again, I don't think this is the witness to ask
7          that question to.
8               THE WITNESS:  I was going to say, you
9          need to ask Darin that question.
10   BY MR. LUCAS:
11       Q      Well, are you aware of any entries on
12   Exhibit Number 7 that reflect that Mr. Rao made some
13   sort of editing of the keystrokes that appear, the
14   operating system keystrokes that appear in the history
15   log?
16              MR. SHANK:  Same objection, Kevin.  I'm
17          not even sure this witness has reviewed Exhibit
18          7.
19              MR. LUCAS:  Well, I think we're going
20          to find that this witness decided to terminate
21          Mr. Rao's employment and make a series of
22          allegations about it and so I would hope he had
23          some reason for making his decisions.
24              MR. SHANK:  Well, let me say, I don't
25          think he's reviewed Exhibit 7 recently.
```

CONVERGYS vs. IGATE CORPORATION, et al.
William P. Koopmans
February 17, 2004

PAGE 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

CONVERGYS INFORMATION          :
MANAGEMENT GROUP, INC.,        :
AND CHUBB CUSTOM               :
INSURANCE COMPANY,             :
          Plaintiffs           :
     -v-                       :    Case No. CV-01-618
                               :      (Judge Beckwith)
                               :
IGATE CORPORATION, et al., :
          Defendants           :
                               :
                      - 0 -

     The deposition of WILLIAM P. KOOPMANS,
continued in progress, taken before Melea E. Chaney,
Court Reporter and Notary Public in and for the State
of Ohio, at the law offices of Ulmer & Berne, 600 Vine
Street, Suite 2800, Cincinnati, Ohio, on the 17th day
of February, 2004, beginning at the hour of 9:23 a.m.,
adjourning at 10:57 a.m., resuming at 3:49 p.m. and
ending at the hour of 6:09 p.m. of the same date.
                      - 0 -
                 RIVERSIDE REPORTING
               Certified Court Reporters
                    P.O. Box 949
               Covington, Kentucky  41012
                   KY(859)291-6110
                   OH(513)574-7017



EXHIBIT
4

CONVERGYS vs. IGATE CORPORATION, et al.

William P. Koopmans

February 17, 2004

PAGE 134

1    with Mr. Rao on Monday the 20th?
2         A    I got together with Neil and Ravi and
3    kind of walked through what Ragesh had told me and it
4    raised more questions again.  I'm not as technical as
5    the rest of these guys, so they had a bunch of
6    questions, so the three of us went back and sat down
7    with Ragesh.
8         Q    And what time of day was that?
9         A    As I recall, that was late afternoon.
10        Q    And how long did that meeting last?
11        A    Again, I can't remember for sure, but I
12   would guess probably on the order of 45 minutes or --
13   or so.
14        Q    Do you recall anything that was stated
15   or anything that was done at that meeting other than or
16   in addition to what's set forth on paragraphs, what,
17   two and three of your Exhibit 18?
18        A    This is pretty cursory.  We went
19   through what we deemed were probably five or six logs
20   or locations where we believed there would be evidence
21   of the activity to create the tablespaces or the
22   corruption, where that would be.  And we went and
23   looked at every one of those and every one was clean,
24   had no evidence of -- did not provide that fingerprint
25   or evidence of the corruption or activity.

PAGE 135

1         Q    Do you recall any particular question
2    that you, Ravi or Neil asked Mr. Rao during this
3    meeting or any particular information or response that
4    Mr. Rao provided to you?
5         A    No.  We were directing him to go look
6    in different places and -- and he was, as I recall,
7    doing the keyboard work to -- to take us to those
8    places.
9         Q    So you would tell him where you wanted
10   to look, he would then punch it up on his terminal, you
11   would all look at it together?
12        A    That is correct.
13        Q    And then it appears, however, from your
14   Exhibit 18 that you also met with Ravi and Neil alone
15   at one point and then just met with Neil alone.  Is
16   that, in fact, what happened?
17        A    That is correct.
18        Q    When you, Ravi and Neil were together,
19   the three of you, what did you do and what did the
20   three of you look at?
21        A    Well, we were mainly going over what we
22   had just -- when the three of us met, what we had just
23   gone through with Ragesh.  We had had, you know,
24   evidence and what we felt were pretty good leads on
25   Friday that Ragesh was behind the corruption, but in

PAGE 136

1    trying to find substantive proof on Monday of what he
2    had done, we could not find it.
3         Q    And after the three of you met, did you
4    then have a private meeting without Ravi and just with
5    Neil?
6         A    Yes.  As I recall, Ravi went home.
7    Neil and I continued to work on trying to understand or
8    come up with proof of what had happened.
9         Q    And how long did you meet with Ravi and
10   Neil and you, the three of you together?
11        A    Again, I don't recall precisely, but I
12   would guess on the order of 30 minutes.
13        Q    And then you and Neil met after it was
14   all over.  For how long did the two of you meet?
15        A    Again, I can't remember precisely, but,
16   as I recall, it was on the order of an hour to two
17   hours we spent.
18        Q    Your Exhibit 18 was actually sent at
19   10:45 or 10:44 p.m., so late in the evening of Monday
20   the 20th.  Were you meeting with Neil right up to the
21   time you did this e-mail?
22        A    I don't know if it was right up to that
23   time, but it was well into the evening.
24        Q    Would you look at Exhibit 14?  Keep
25   that document in front of you, Exhibit 18.  You may

PAGE 137

1    want to look at it.
2         But if you look at Exhibit 14 -- and
3    you've already been through this in terms of
4    documents -- I just want you to talk right now at least
5    or direct your attention to the first two pages of
6    Exhibit 14 --
7         A    Mm-hmm.
8         Q    -- where it says procedure followed to
9    create the usage instance.
10        A    Right.
11        Q    CVG 283 and 284.  You had received
12   these two pages early in the day from Mr. Rao, correct?
13        A    That is correct.
14        Q    What did you do with this two-page
15   document?
16        A    As I recall, we walked through this at
17   some level, but we really focused on the scripts and
18   the logs, the one.SQL, two.SQL, three.SQL.
19        Q    When you say we walked through it, are
20   you talking about with Mr. Rao or are you talking about
21   in your separate meetings with Ravi and Neil together
22   or with Neil alone?
23        A    I know Ragesh and I walked through this
24   in the first meeting I had with him.  I can't recall
25   whether we went through this again with Ravi, Neil,

CONVERGYS vs. IGATE CORPORATION, et al.

William P. Koopmans

February 17, 2004

PAGE 142

1    Q    But do you recall at all looking into
2  this paragraph at all further at the time?
3    A    Again, as I just said, when you read
4  this, there's nothing damning in -- in this that says
5  Ragesh did something. It's only by inference, if you
6  really read it and think about it, that his implication
7  here is something different was done in production than
8  we did in the test environment and that was the fatal
9  mistake or change in process.
10   Q    But were you just looking for damning
11 evidence against Mr. Rao --
12             MR. SHANK: Objection.
13             MR. LUCAS: -- or were you looking to
14   find out what happened?
15             MR. SHANK: Objection to form.
16             THE WITNESS: Clearly we were looking
17   to find out what happened.
18 BY MR. LUCAS:
19   Q    Now, I take it you've told me
20 everything that you recall concerning your discussions
21 with Mr. Rao, Mr. Kura or Mr. Hulin on the 20th, on
22 Monday the 20th, concerning Mr. Rao's activities; is
23 that correct?
24   A    Other than, and it's implied here, we
25 haven't talked about what Neil and I did in the evening

PAGE 143

1  of the 20th.
2    Q    Okay. Well, I haven't mentioned Mr
3  Brown yet. But at least with respect to Mr. Rao, Mr.
4  Hulin and Mr. Kura, have you told me everything, your
5  dealings with those three gentlemen, either alone,
6  together or together with some of them, that took place
7  on the 20th concerning Mr. Rao or the data corruption
8  or Mr. Rao's alleged cover-up activities?
9             MR. SHANK: I think he was trying to
10   tell you something additional that he and Neil
11   Hulin did on the 20th, the night of the 20th.
12   Was that not what you were saying?
13             THE WITNESS: That -- that is correct.
14   There is more that I haven't -- we haven't
15   talked about that Neil and I went through.
16             But what you're asking, was there other
17   stuff in the meeting with Rao Ragesh -- or
18   Ragesh, Neil and Ravi and myself that I haven't
19   talked about, the only thing I can recall in
20   addition is we did talk through the process we
21   had expected to follow, the schedule, that data
22   files weren't going to be created until after
23   SRDF and hot backup testing. SRDF testing was
24   to occur in the morning, hot backup testing in
25   the afternoon. And the -- the execution -- or

PAGE 144

1  the creation of the data files would have been
2  Friday night or Saturday morning.
3             We also went -- reiterated that Ravi
4  was the backup and that he was to have reviewed
5  -- I mean, we just confirmed the process we've
6  talked about before that Ravi was to have
7  reviewed the scripts.
8  BY MR. LUCAS:
9    Q    Okay. Now, did you review that Mr.
10 Rao?
11   A    Yes.
12   Q    Do you recall anything in particular in
13 terms of anything that you said or he said either of
14 the other parties disagreed with?
15   A    As I --
16             MR. SHANK: Objection to form.
17             THE WITNESS: As I recall, I went
18   through what I just described as, this was our
19   plan of record, correct, and Ragesh answered
20   yes or affirmed all of those points.
21             MR. LUCAS: Okay. I didn't want to cut
22   off your testimony.
23 BY MR. LUCAS:
24   Q    You indicated that there was something
25 else, I believe, that you did on the 20th, on Monday

PAGE 145

1  the 20th, related to these matters with Mr. Hulin?
2    A    Yes.
3    Q    Can you tell me what that additional
4  activity was and when it took place?
5    A    Neil and I just spent another hour or
6  two. We talked about the time he and I spent, but what
7  we did in that time is described in the third paragraph
8  where we went almost line by line through Ragesh's
9  history file. We went through Eric's history file. We
10 went through and did some scans on -- well, also Ravi
11 and Rick Litton, but then we went also through and --
12 and did a grep for specific commands on all history
13 files.
14   Q    Let me ask you: When you went through
15 Ravi's history file, what were you and Neil looking
16 specifically for?
17   A    Just any evidence if Ravi might have
18 been in -- you know, if he had run commands that would
19 have implied that he played some role.
20   Q    And what were you looking for or why
21 were you looking at Rick Litton's keystroke logs?
22   A    Rick was involved in -- in the -- in
23 this project. He was not really involved in the
24 production activity, but Rick was responsible for
25 maintaining our scripts to do the SRDF replication to

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


CONVERGYS INFORMATION          :
MANAGEMENT GROUP, INC.,
and CHUBB CUSTOM INSURANCE     :
COMPANY,
                               :

        Plaintiffs,

                               :

        -v-                         CASE NO.: CV-01-618
                               :     (Judge Beckwith)

IGATE CORPORATION, et al.,

                               :

        Defendants.


\* \* \* \* \* \* \* \* \* \*


        The deposition of ERIC JAY WALTERS, taken
before Debra A. Sprague, Certified Court Reporter and
Notary Public in and for the State of Ohio, at the offices
of Ulmer and Berne, LLP, 600 Vine Street, Suite 2800,
Cincinnati, Ohio, on the 19th day of February, 2004,
beginning at the hour of 9:46 a.m., and ending at the hour
of 12:26 p.m.


\* \* \* \* \* \* \* \*
COPY

RIVERSIDE REPORTING
Certified Court Reporters
P.O. Box 949
Covington, Kentucky 41012-0949
KY:  859-291-6110/OH:  513-574-7017

EXHIBIT
5

Page 74

1         A   I gave him a specific time frame.
2         Q   Let me ask you -- I'm going to show you a
3   document that's been produced by Convergys, and we'll mark
4   it as Exhibit Number 49.
5         A   Ye gad.
6         Q   Do you recognize this document?  Well, let
7   me just first, for the record, this is a document that's
8   been produced by Convergys in discovery  It has no -- I
9   don't think it was ever marked with Convergys litigation
10  stamp numbers, but it was produced last week and it's
11  numbered at the bottom page one through one seventy-seven.
12  And for identification purposes, the heading or whatever
13  it is you want to call it at the top of the page is
14  ewalters_hist_bak txt.
15        A   Um-hmm
16        Q   Can you tell me what this document is, Mr
17  Walters?
18        A   This is a history file of your Unix
19  commands
20        Q   How did you know that this was available
21  to you?
22        A   It's part of the configuration of the
23  environment to set up individual history files when you
24  log in  You have to opt in to Oracle and then it
25  automatically grabs your ID that you're opting into, to

Page 75

1   create your personal history file  So your keystrokes are
2   then available to you as you're running to kinda go back
3   up and reimplement keystrokes that you've done before.
4         Q   Is that something you knew based upon your
5   prior Unix administrator background?
6         A   Part of my Unix experience, yes  Whether
7   it was because of my system administration, I don't --
8   maybe, yeah  I mean, yeah.
9         Q   But part of your Unix background, you were
10  aware of that; is that correct?
11        A   Yes
12        Q   Now, then I take it you called it up at
13  your terminal  You said it was, I think the term you used
14  that Mr. Williams would have made it available, recovered
15  it as a file on the Unix box, I think is what you said
16        A   Um-hmm
17        Q   And then what?  Then you reviewed it --
18        A   I just searched for the archive log that
19  was in question  I would not sit there and try and read
20  all this
21        Q   Okay  And then let me show you a document
22  or ask Mr  Shank to show you a document -- Maybe this'll
23  be quicker. -- that's been marked as Exhibit Number 24.
24  Do you recognize Exhibit Number 24 as being an e-mail you
25  sent to Mr  Koopmans in the very early morning hours, 20

Page 76

1   after midnight, on the morning of Tuesday, September 21,
2   that relates to these matters
3         A   Um-hmm.
4         Q   And in this, you had referred to yourself
5   before I think as the guilty party  You said, now, what I
6   wanted to see, but here's -- Not what I wanted to see, but
7   here's your proof, I am the guilty party  And then you
8   have a number of entries
9         A   Um-hmm
10        Q   Unix commands or other entries that appear
11  below  Can you just generally tell me, are those entries
12  that appear below, are those entries that appeared on your
13  keystroke log or shell history that relates to the
14  activities that you took in the early morning hours when
15  you were paged of September 17th, that resulted in the
16  archive log corruption which you've already testified to?
17        A   Yes
18        Q   Okay  These particular entries, do they
19  appear somewhere in Exhibit 49?
20        A   I would hope
21        Q   But you don't -- You haven't been back
22  through to --
23        A   I would have -- Yeah, I -- you would --
24  I'm sure they're in here somewhere, I would guess.
25        Q   Let me ask you this  Who can access your

Page 77

1   shell history?
2         A   Anybody that has -- is logged into Oracle
3         Q   So Mr. Walters, for example, at any point
4   in time -- Not Mr  Walters  Let's change it  Someone
5   over in the operating systems group, if they wanted to at
6   any point in time, could review your shell history; is
7   that correct?
8         A   Yes, if they access to Oracle account.
9   yes, they have read permissions to this file
10            MR  SHANK:  And when you say access,
11        Kevin, are you talking about just reading the
12        shell history?
13  BY MR  LUCAS:
14        Q   Well, let's just take them one at a time
15  If you wanted to read it -- If someone wanted just to look
16  at your keystroke history --
17        A   Um-hmm
18        Q   -- anybody with Oracle -- within Convergys
19  at Oracle could do that; is that correct?
20        A   No, see, when you're on the Unix box, you
21  have a specific account, okay  So I log in as ewalters
22  Then I what they call opt over and become the user Oracle
23  Once I opt over, only certain people have that privilege,
24  and those would be the DBAs  Once they opt into Oracle,
25  then they have access to read/write to this file

ERIC JAY WALTERS                                          February 19, 2004

Page 78

1    Q   Let me just go through --
2    A   Now, it would be specific to, and I don't
3  have here what the permissions are granted on that file
4  But typically -- Well, obviously, the Oracle user would
5  have read/write access  I don't know who all would have
6  read access  And then if you have root, you have access
7  to do read/write to any file  So the OSG group or the
8  Unix administrators would have full access to become any
9  user and -- and read/write to any file.
10   Q   And who did you say that was?  That was
11 the USG group you said would have that?
12   A   OSG
13   Q   OSG, I'm sorry  Okay  Let me see if I
14 understand this generally  That you would log on in your
15 name.
16   A   Um-hmm.
17   Q   How did you do that?  Is there some sort
18 of a password that you do?
19   A   Yeah, we'd have individual passwords.
20   Q   And you can do that from any terminal?
21   A   Yeah.
22   Q   You wouldn't have to be sitting at your
23 terminal?  You could walk over to the next desk and log in
24 as ewalters with your password; is that correct?
25   A   Yes.

Page 79

1    Q   And then you opt and then you become the
2  user  And as I think, at least I heard you, any of the
3  DBAs, the Convergys DBAs then could have become the user
4  for these purposes; is that correct?
5    A   Yes
6    Q   And at a minimum, any of the Convergys
7  DBAs could then have read your shell history, correct?
8    A   Yes
9    Q   Any of the Convergys DBAs, could they have
10 written to or edited your shell history?
11   A   Yes.
12   Q   Okay  And then at least everybody or at
13 least the various people in the OSG group, as well, could
14 have read and/or written to or edited your shell history?
15   A   Anybody with root access on that box.
16   Q   Okay  Now, what does that mean, root
17 access on that box?
18   A   System administrator  Root access is the
19 base account of any Unix box.
20   Q   So let me just --
21   A   And --
22   Q   -- ask you -- I'm sorry.
23   A   And from that you can do pretty much
24 anything  You can bring down the box  You can do -- It's
25 --

Page 80

1    Q   You don't -- Do you know who the system
2  administrators were that had root access over in the OSG
3  group at the time?
4    A   I don't know the complete list.
5    Q   Mr  Williams, I take it, would have been
6  at least one of them?
7    A   Yes.
8    Q   Okay  And I take it there would have been
9  a number of others?
10   A   Yes, a couple others, at least
11   Q   And then at the time in September of 1999,
12 if Mr  Koopmans or Mr  Darin Brown or Mr  Neil Hulin as
13 examples, wanted to, they could access your shell history,
14 they could read it, and they could write to or edit it,
15 correct?
16   A   They could.
17   Q   And they could do the same at the time
18 with respect to Mr  Rao's shell history, correct?
19   A   Yes
20   Q   And so if you wanted to, you could see Mr.
21 Hulin's shell history, he could see yours, you could see
22 Rao's, if you wanted to, and you knew how to do this; is
23 that the basic situation?
24   A   Yeah  I mean, it -- the history file was
25 set up this way specifically for convenience for the

Page 81

1  individual user.
2    Q   So the mere -- Do I correctly understand,
3  however, that the mere fact that something appears on your
4  shell history doesn't mean that you entered it; somebody
5  else with access to your shell history could not only
6  read, but write to it and edit it, if they wanted to?
7        MR  SHANK: Object to foundation;
8    calls for speculation.
9        THE WITNESS: Could they?  In
10   conspiracy sense, yes
11 BY MR  LUCAS:
12   Q   Well, no, I don't mean in a conspiracy
13 sense  I mean in an actuality sense it is -- it was
14 possible at the time within Convergys for that to happen;
15 is that correct?
16       MR  SHANK: Objection
17       THE WITNESS: Yes
18       MR  SHANK: Foundation; calls for
19   speculation
20 BY MR  LUCAS:
21   Q   Well, do you know at the time or are you
22 unaware that people within Convergys' department were, in
23 fact, accessing history files of various production DBAs?
24       MR  SHANK: Object to form
25       THE WITNESS: No, I did not.

21 (Pages 78 to 81)

Page 82

1  BY MR. LUCAS:
2      Q  I mean, I just -- I mean, I don't want you
3  to think I'm trying to get you in a conspiracy mode. Do
4  you know, for example, that Mr. Brown, in fact, Darin
5  Brown, in fact, was accessing history files of other
6  production DBAs at the time?
7          MR. SHANK: Objection to form.
8          THE WITNESS: No, I did not.
9  BY MR. LUCAS:
10     Q  Okay. Did you know that Mr. Hulin, in
11 fact, during this time period, was actually accessing
12 history files, shell history files of other DBAs?
13         MR. SHANK: Objection to form.
14         THE WITNESS: No.
15 BY MR. LUCAS:
16     Q  Do you know that the shell histories of
17 production DBAs that were being accessed by these
18 individuals included Mr. Rao, Mr. Rick Litten, Mr. Ravi
19 Kura and perhaps others?
20         MR. SHANK: Objection to form.
21         THE WITNESS: I don't know what their
22 -- Could they?
23 BY MR. LUCAS:
24     Q  No, that they were. Do you know that they
25 were?

Page 83

1      A  I have -- no.
2      Q  Does that surprise you?
3          MR SHANK: Objection to form;
4  objection to foundation; calls for speculation.
5          THE WITNESS: I mean for what
6  purpose, I don't know. I mean, could it, yeah,
7  it could.
8  BY MR LUCAS:
9      Q  And all I'm asking, if it in fact
10 happened, which I'm representing to you it did, but --
11     A  Okay.
12     Q  -- if you don't believe -- you don't have
13 to believe me --
14     A  Right.
15     Q  But if it in fact happened, that would
16 surprise you, would it not?
17         MR. SHANK: Objection to form
18         THE WITNESS: Not if they were trying
19 to determine something.
20 BY MR. LUCAS:
21     Q  I want to change the focus just a minute
22 because I neglected to ask you a document, and I want to
23 continue on and I'm afraid that I'll just forget. We
24 don't even have to mark it as an exhibit. I'm going to
25 show you a document that's been marked as Convergys'

Page 84

1  CVG2657. It's a memoran -- It's an e-mail -- I'm sorry
2  -- from you, dated September the 9th, 1999. And that has
3  notations on here that are mine. You can just ignore the
4  highlighting
5          But there's a sentence that says, Since
6  the SSUP instance will be located on unit 68, we'll need
7  an archive file system for it also. That's the sentence I
8  want to ask you about. Just take a look at the memorandum
9  to yourself
10     A  Okay
11     Q  Can you tell me what that -- Is that part
12 of the usage split project that you're referring to?
13     A  Yes.
14     Q  And can you just explain to me what that
15 means?
16     A  Unit 68 would be an EMC frame. That point
17 would be -- And an EMC frame is just a disc drive
18     Q  What does that mean? Does this mean
19 another archive log system was being set up for the usage
20 instance as part of the usage split?
21     A  Right, you wouldn't -- you wouldn't mix
22 the two archive log destinations.
23     Q  Can you turn back to Exhibit 49, which is
24 the document which is the shell history relating to you
25 that's been produced by Convergys in this case. Would you

Page 85

1  look first at the top, ewalters_hist_bak.txt.
2      A  Um-hmm.
3      Q  What does that mean?
4      A  Eric Walters history backup dot text.
5      Q  What is the BAK?
6      A  Back up, that would be my guess
7      Q  Well, let me ask you. Do you know what
8  the format or system is for identifying by Convergys in
9  September of 1999, for identifying a file of this sort?
10     A  I don't -- I don't remember offhand how
11 they -- cause they can identify it within the profile; I
12 don't know.
13     Q  Okay. Well, for example, this doesn't
14 have any numbers in it, any, you know, things that would
15 correspond to a date or something like that
16     A  Um-hmm.
17     Q  Was it typical for Convergys at the time
18 back in 1999, if you know, to have some sort of
19 identification in shell histories that had numbers or
20 dates?
21     A  No.
22         MR. SHANK: Objection to form.
23 BY MR. LUCAS:
24     Q  It was not?
25     A  No.

CONVERGYS
IGATE, et al.

D. SPRAGUE, CVR>
513-923-4680>